## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

G.T., by his Parents Michelle and Jamie T.,
*on behalf of himself and all similarly situated individuals*,
and The Arc of West Virginia,

        Plaintiffs,

v.                              Civ. Act. No.  2:20-cv-00057

KANAWHA COUNTY SCHOOLS, and
RON DUERRING, Superintendent,
Kanawha County Schools, in his official capacity,

        Defendants.

_____/

## CLASS ACTION COMPLAINT

### INTRODUCTION

1.   Defendant Kanawha County Schools ("KCS") unlawfully fails to provide effective behavior supports for a class of its students with disabilities, leading to unjustified disciplinary removals from the classroom due to the students' behaviors.  KCS punishes students for their behaviors and removes them from the classroom instead of developing and implementing effective behavior supports—required by law—that would allow these students to succeed in general education settings alongside their peers without disabilities.

2.   Plaintiff G.T. is a third-grade KCS student diagnosed with autism and attention deficit hyperactivity disorder ("ADHD").  G.T. has significant strengths and could be educated successfully in a general education classroom, with effective behavior supports.  However, he has been denied effective behavior supports at his KCS public school and, as a result, has experienced disciplinary removals from school.  Because of KCS's failures to provide G.T. with effective

behavior supports, and subsequent removals of G.T. from the classroom, he is not making appropriate progress.

3.    Plaintiff G.T.'s situation is representative of many students with behavior support needs within KCS.  KCS fails to provide students with disabilities the instruction and services, including behavior supports, they need to succeed in school.  As a result, these students drop out at a high rate and experience repeated yet avoidable disciplinary sanctions, including in-school and out-of-school suspensions, undocumented "send homes," placement in alternative schools, expulsions, and referrals to law enforcement.  Many students with behavior support needs are pushed into segregated classrooms where they interact only with other students with disabilities, and where there is inadequate (and sometimes no) instruction and inappropriate and ineffective efforts at behavior management.

4.    Plaintiffs G.T., on behalf of himself and others similarly situated, and The Arc of West Virginia bring this class action complaint for declaratory, injunctive, and compensatory relief to challenge KCS's systemic policies, practices, and procedures that violate federal and state law.

5.    KCS's actions violate the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794(a), Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, the West Virginia Human Rights Act ("HRA"), W. Va. Code § 5-11-9 *et seq.*, and West Virginia Policy 2419 ("WV Policy 2419").

6.    The IDEA requires public schools to provide all eligible children with disabilities a free appropriate public education ("FAPE").  20 U.S.C. § 1412(a)(1).  To meet their FAPE obligation, schools must provide "special education and related services." 42 U.S.C. § 1401(9).  The standard for providing a FAPE is a "demanding" one: students with disabilities must receive "appropriately

ambitious" special education that gives them "the chance to meet challenging objectives." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017). This standard must be met by public schools in West Virginia, including schools within KCS. *See R.F v. Cecil Cty. Pub. Sch.*, 919 F.3d 237 (4th Cir. 2019). *See also* W. Va. § 18-20-1; WV Policy 2419.

7. Section 504 and Title II of the ADA prohibit public entities, including public schools, from discriminating against students on the basis of their disabilities. 29 U.S.C. § 794; 42 U.S.C. § 12132 *et seq.* They require public schools to modify their policies, practices, and procedures as needed to avoid discrimination, and to provide students with disabilities equal educational opportunities. *Id.*

8. Under federal law, for students whose behavior impedes learning, public education must include effective behavior supports. 20 U.S.C. § 1400(c)(5). These supports may include, but are not limited to, Functional Behavior Assessments ("FBAs") of the student's behaviors, Behavior Intervention Plans ("BIPs") identifying interventions addressing those behaviors, and other positive behavior interventions and supports. With such supports, G.T. and the Plaintiff class can learn, make progress, and realize bright futures in general education classrooms in KCS alongside their peers without disabilities. Without them, they are at high risk of doing poorly in school, becoming involved in the delinquency or criminal systems, and being unable to obtain a job or live independently as they transition to adulthood.

9. KCS has no functioning system for identifying children with disabilities who need behavior supports and providing effective supports to them. Instead, all too often it subjects them to formal (i.e. suspensions or expulsions) or informal (i.e. requests to parents to take or keep students home) removals from school and school activities for behaviors related to their

disabilities.  Had the students been provided the effective behavior supports to which they are entitled, it is likely that many of these disciplinary removals would not have been necessary.

10. Over the past several months, Plaintiff G.T. repeatedly raised concerns with KCS regarding its failure to provide effective behavior supports to students with disabilities who need them to receive a FAPE and avoid discrimination.  These concerns were raised through correspondence with KCS as well as through a formal due process complaint filed with the West Virginia Department of Education.  However, KCS has not acted to remedy the systemic and urgent failures that Plaintiffs have identified, leaving Plaintiffs with no recourse other than this action.

11. Plaintiffs seek injunctive and declaratory relief for ongoing violations of the IDEA, Section 504, the ADA, and West Virginia law, including an order that Defendants provide Plaintiff G.T. and the Plaintiff class with the effective behavior supports they need to receive a FAPE and avoid discrimination, and enable them to be educated in general education classrooms with their peers.

## PARTIES

**A.    Plaintiffs**

12. Plaintiff G.T., a minor, seeks to proceed using a pseudonym.  G.T. brings this action by and through his parents, Michelle and Jamie T., as permitted by Federal Rule of Civil Procedure 17(c).

13. Plaintiff G.T. is a nine-year-old student with autism and ADHD attending third grade at Bridgeview Elementary School in KCS.  He is a student with a disability who is eligible for special education under the IDEA and West Virginia law.  He is also a qualified individual with a disability under Section 504 and the ADA.  As a child with an impairment that substantially limits

his ability to learn, G.T. is also an individual with a disability within the meaning of the West Virginia Human Rights Act, W.Va. Code § 5-11-1 *et seq.*  Further, G.T. has exhausted all administrative remedies available to him.

14. Plaintiff The Arc of West Virginia ("The Arc WV") is a not-for-profit membership organization whose primary office is located in Parkersburg, West Virginia.  The Arc WV is dedicated to promoting and protecting the rights of people with intellectual and developmental disabilities ("I/DD"), including autism, throughout the state.  The Arc WV engages in public policy advocacy and develops programs to support people with I/DD to learn, live, and work in their communities.  Supporting the rights of students with disabilities to receive the supports and services they need to make progress in their neighborhood schools alongside their peers without disabilities has been a priority of The Arc WV throughout its history.  As The Arc WV's position statement on education states: "All children and youth with…I/DD must receive a free appropriate public education that includes fair evaluation, ambitious goals, challenging objectives, the right to progress, individualized supports and services, high quality instruction, and access to the general education curriculum in age-appropriate inclusive settings."[1]

15. The Arc WV serves people with I/DD statewide directly and through four affiliated member chapters throughout the state, including The Arc of the Three Rivers based in Kanawha County.  The Arc WV has over 2,400 members throughout the state, including over 200 in Kanawha County.  In 2019, The Arc WV provided assistance to 130 families state-wide who sought advice and advocacy regarding special education services.  Thirteen of these families reside in Kanawha County with children attending KCS schools.  The Arc of the Three Rivers serves 180

---

[1] *Position Statement: Education*, The Arc (2018), https://thearc.org/position-statements/education/.

individuals annually, including more than twenty students who are eligible to attend KCS, seventeen of whom actually attend KCS. Plaintiff G.T. is a constituent and his mother is a member of both The Arc WV and The Arc of the Three Rivers.

**B.    Defendants**

16. Defendant KCS is the Local Education Agency ("LEA") for Plaintiff G.T. and is responsible for providing a FAPE to him and to the Plaintiff class. "The LEA . . . is responsible for the direct provision of services under IDEA, including the development of an individualized education program ("IEP") for each disabled student, the expenditure of IDEA funds to establish programs in compliance with IDEA, and the maintenance of records and the supply of information to the SEA [State Educational Agency] as needed to enable the SEA to function effectively in its supervisory role under IDEA." *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 943 (4th Cir. 1997). KCS receives federal financial assistance and is a public entity as defined by Title II of the ADA.

17. Defendant Ron Duerring is the Superintendent of KCS and is responsible for the daily operations of KCS, including its programs and services for students with disabilities. *See* W.Va. Code § 18-4-10. Defendant Duerring is sued solely in his official capacity for prospective, injunctive relief.

**JURISDICTION AND VENUE**

18. This Court has original jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 because those claims arise under federal law, specifically the IDEA, Section 504, and the ADA. Declaratory and injunctive relief are available pursuant to 28 U.S.C. §§ 2201-02. This Court has supplemental jurisdiction over Plaintiffs' state law claims, because Plaintiffs' claims arise out of the same case or controversy as Plaintiffs' federal claims. *See* 28 U.S.C. § 1367.

19. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district and because all Defendants maintain offices in this district and are responsible for enforcing the laws relevant to this litigation in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

20. Plaintiff G.T. filed a Complaint and Request for Due Process Hearing with the West Virginia Department of Education's Office of Federal Programs ("WV OFP") on behalf of himself and a class of similarly situated students on June 5, 2019 seeking injunctive, declaratory, and compensatory relief.

21. In his due process complaint, G.T. alleged that KCS failed to provide him and class members with a FAPE, by failing to provide necessary behavior supports, as required by federal and state law, 20 U.S.C. § 1412(a), West Virginia Code § 18-20-1, and WV Policy 2419.  The complaint also alleged violations of the ADA, 42 U.S.C. § 12132 and Section 504, 29 U.S.C. § 794.

22. A due process hearing was conducted on August 19, 20, and 21, 2019.

23. The WV OFP Hearing Officer dismissed the class allegations as well as the ADA and Section 504 claims from the complaint, finding that she lacked jurisdiction to consider such allegations.

24. The WV OFP Hearing Officer further denied all individual relief sought by G.T.

25. Through this process, Plaintiff G.T. has exhausted the administrative remedies provided by the IDEA, 20 U.S.C. § 1400 *et seq.*  This Court therefore has express appellate jurisdiction over the administrative ruling issued pursuant to the IDEA.  *Id.* at § 1415(i)(2).

26. G.T., on his own behalf, appeals the decision of the WV OFP Hearing Officer as to the denial of individual injunctive and compensatory relief.

## CLASS ACTION ALLEGATIONS

27. Plaintiff G.T., on behalf of himself and all other similarly situated individuals, brings this action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2) on behalf of the following class: All Kanawha County Schools students with disabilities who need behavior supports and have experienced disciplinary removals from any classroom.

28. The Plaintiff class is so numerous that joinder of all members is impracticable. During the 2015-2016 school year, a total of 4,299 of the 27,044 children in KCS received special education under the IDEA. An additional 1,216 of KCS children with disabilities received services under Section 504 in this same year. Of the students who received special education, 2,086 have disabilities such as emotional disturbance, autism, other forms of I/DD, or other health impairments including ADHD. Of the more than 5,500 students with disabilities in KCS receiving services under the IDEA and Section 504, many require behavior supports to make progress in their education.[2]

29. According to the West Virginia Department of Education, during the 2015-2016 school year, KCS subjected students served under the IDEA to 1,486 out-of-school suspensions. That same year, it subjected students served only under Section 504 to 411 out-of-school suspensions. KCS has continued to suspend students with disabilities at a high rate. The most recent data indicates that KCS's use of disciplinary suspensions to punish students with disabilities has only

---

[2] The 2015-2016 school year is the most recent school year for which the Civil Rights Data Collection has published data; however, Plaintiffs believe that the 2015-2016 school year is likely representative of the most recent school year.

increased: during the 2018-2019 school year, KCS had a total of 4,312 students with an IEP and subjected these students to *at least* 1,611 suspensions.[3]

30. There are questions of law and fact common to the claims of all class members, including (a) whether KCS's failure to provide effective behavior supports and resulting disciplinary removals of students with disabilities violates the IDEA and WV Policy 2419,[4] and (b) whether KCS's failure to provide effective behavior supports and resulting disciplinary removals of students with disabilities violates Section 504, Title II of the ADA, and the HRA.

31. The claims of Plaintiff G.T. are typical of the claims of the class. Due to KCS's policies, practices, procedures, acts, and omissions in failing to provide effective behavior supports to its students, both Plaintiff G.T. and the Plaintiff class are subjected to, or are at substantial risk of being subjected to, formal or informal disciplinary removals from school.

32. Plaintiff G.T. will fairly and adequately represent the interests of the class. Plaintiff G.T. possesses a strong personal interest in the subject matter of this lawsuit. Plaintiff G.T. is represented by experienced counsel with expertise in federal laws concerning disability rights and special education, as well as expertise in federal class action litigation. Counsel has the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.

---

[3] Plaintiffs requested this information via a Freedom of Information Act request to the West Virginia Department of Education and KCS. Plaintiffs were informed by the West Virginia Department of Education that pursuant to West Virginia data release/reporting procedures, certain data were suppressed to protect student privacy. Plaintiffs did not receive a response from KCS.

[4] WV Policy 2419 follows the requirements of the IDEA and apply to school age students whose educational programs require special education and related services. Districts must adopt and implement appropriate special education policies and procedures to receive federal funds under the IDEA.

33. KCS's policies, practices, procedures, acts, and omissions harm all class members in the same manner. KCS's systematic failure to provide effective behavior supports and its subsequent disciplinary removals of students with disabilities from the classroom has deprived the Plaintiff class of the educational services to which they are entitled by federal law, subjected them to disability-based discrimination, and increased their risk of being subjected to such harms in the future. Final injunctive and declaratory relief is thus appropriate for the Plaintiff class as a whole.

## STATUTORY BACKGROUND

**A.    The Individuals with Disabilities Education Act ("IDEA")**

34. In enacting the IDEA, Congress found that "[d]isability is a natural part of the human experience and in no way diminishes the right of individuals to participate in or contribute to society. Improving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c)(1).

35. Under the IDEA, public schools must provide "special education" and "related services" to all children with disabilities aged three to twenty-one residing in the state. 42 U.S.C. § 1401(9). Special education and related services for each child are designed by a team, including parents, teachers, and the student (if appropriate), and documented in a written IEP. 42 U.S.C. § 1414(d)(1)(A), (B).

36. The IDEA further requires states to ensure that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes . . . cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5).

37. Together, these requirements are commonly referred to as the school's duty to provide students a FAPE in the least restrictive environment ("LRE"). As the local educational agency for Kanawha County, KCS is responsible for ensuring that all eligible children with disabilities within the county receive a FAPE in the LRE. 20 U.S.C. §§ 1412(a)(11)(A), (a)(1), (a)(5). KCS must coordinate with other public agencies as needed to ensure that children with disabilities receive the education to which they are entitled under the IDEA. *See* 20 U.S.C. § 1412(12).

38. More specifically, KCS must provide a FAPE according to the "markedly more demanding" standard clarified by the United States Supreme Court in *Endrew F.*, which explicitly demands that every child with a disability receive an "ambitious" education with the chance to meet "challenging objectives." 137 S. Ct. at 1000. For most children, this standard means receiving instruction and services in the general education classroom with students without disabilities. *Id*. at 995.

39. Schools must provide positive behavior supports and other interventions, including FBAs and BIPs, when needed to provide a FAPE to children with disabilities whose behavior impedes their learning or that of other students. 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. §§ 300.324(a)(2)(i), (b)(2); 300.320(a)(4); WV Policy 2419. An FBA is a systematic assessment of a child's behavior used to identify antecedent conditions to and the purpose of behaviors of concern. *See* WV Policy 2419, Glossary. Put simply, an FBA is a data collection process to analyze why a child behaves in a particular manner so that school staff can develop supports that address the behaviors. An FBA is "a sequential, multi-step team evaluation process that helps to determine the purpose and effect of the problem behavior(s) so that IEP goals and objectives can be identified and interventions and modifications can be developed and implemented, specifically through a student's Behavior Intervention Plan. An FBA requires that *both school personnel and*

*the parents* evaluate the behaviors of concern within the broader perspective of the student's home and school environments." WV Policy 2419, Glossary (emphasis added). A BIP is a data-driven plan that describes the interventions school staff will use to support the student's behavior, which should address the root causes of the concerning behaviors analyzed in the FBA. *See id.* When a series of disciplinary removals from the classroom constitute a change in a child's placement, the school must conduct an FBA and develop or modify a BIP to address the child's behavior. 34 C.F.R. § 300.530(d)(1), (f)(1);[5] *see also* WV Policy 2419, 126 CSR 16.

**B. Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act**

40. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination on the basis of disability by recipients of federal financial assistance.

41. Section 504 also requires covered entities to provide children with disabilities a FAPE. FAPE under Section 504 requires special education and related services designed to meet the needs of children with disabilities as adequately as the needs of children who do not have disabilities. *See* 34 C.F.R. § 104.33(a), (b)(1). This requirement is similar to the IDEA requirement to provide a FAPE, but, "unlike FAPE under the IDEA, FAPE under [Section] 504 is defined to require a comparison between the manner in which the needs of disabled and non-disabled children are met, and focuses on the 'design' of a child's educational program." *Mark H. v. Lemahieu*, 513 F.3d

---

[5] A pattern of repeated incidents of child misbehavior and classroom disruption, as well as violations of a code of student conduct resulting in disciplinary removals from school, may indicate that a child should receive behavior supports. *See* U.S. Dep't of Education, Office of Special Educ. & Rehab. Servs., Dear Colleague Letter on Positive Behavioral Interventions and Supports in Individualized Education Programs (IEPs) 4 (Aug. 1, 2016). If the child already has behavior supports, on repeated incidents of misbehavior the school must consider whether the child's behavior supports should be changed. *Id.*

922, 933 (9th Cir. 2008). Nonetheless, implementation of an IEP developed in accordance with the IDEA is one means of meeting Section 504's requirement. *See* 34 C.F.R. § 104.33(b)(2).

42. Title II of the ADA prohibits discrimination on the basis of disability by state and local government agencies, including public school districts. 42 U.S.C. § 12132; *see* 28 C.F.R. § 35.130.

43. Under Title II of the ADA, public schools must provide students with disabilities with opportunities to participate in school services, programs, and activities that are equal to those provided to students without disabilities. 28 C.F.R. § 35.130(b)(1)(ii), (iii).

44. Both the ADA and Section 504 prohibit states and local governments, including public school districts, from discriminating when providing educational services, programs, and activities to children with disabilities. *See* 28 C.F.R. § 35.130(b)(1); 34 C.F.R. § 104.4(b)(1). Further, public schools may not provide educational services or administer their educational programs in a way that results in, aids, or perpetuates discrimination against children with disabilities. *See* 28 C.F.R. § 35.130(b)(1)(v), (b)(3); 34 C.F.R. § 104.4(b)(1)(v), (b)(4).

45. Both Section 504 and Title II of the ADA require public school districts to provide aids, benefits, and services to students with disabilities in the most integrated setting appropriate to the student's needs, which is defined as a setting that enables individuals with disabilities to interact with persons without disabilities to the fullest extent possible. 34 C.F.R. § 104.4(b)(2); 28 C.F.R. § 35.130(d); 28 C.F.R. pt. 35, App. A, p. 450.

46. The Supreme Court has held that Title II of the ADA prohibits the needless isolation or segregation of persons with disabilities. *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999) (holding that "unjustified institutional isolation of persons with disabilities is a form of discrimination"). As the Supreme Court found, separating individuals with disabilities from their peers without disabilities "perpetuates unwarranted assumptions that persons so isolated are incapable or

unworthy of participating in community life," and "severely diminishes life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600-601. Unjustifiable disciplinary removals of students with disabilities from classrooms where they are educated alongside peers without disabilities violates this prohibition on unnecessary segregation.

## STATEMENT OF FACTS

**A. KCS Fails to Provide its Students with Disabilities with Effective Behavior Supports, Including FBAs and BIPs**

47. KCS frequently removes students with disabilities who need behavior supports from the classroom for disciplinary reasons based on their behaviors. Such removals manifest in a variety of ways. Informal removals sometimes occur when KCS sends a student home from early school by calling a student's parents and asking them to pick up the student from school before the end of the school day or to keep the student at home. KCS does not record these informal removals as disciplinary incidents in the West Virginia Education Information System ("WVEIS") and therefore they are not included in the data that KCS is required to maintain. The school may also formally suspend or expel the student for disciplinary reasons. KCS also regularly removes students with disabilities who require behavior supports from their mainstream, general education classrooms and instead places them in behavior disorder classrooms for only students with disabilities, often after imposing informal or formal disciplinary removals from school.

48. These disciplinary removals often occur because KCS is failing to provide its students with effective behavior supports and interventions, including FBAs, BIPs, and other positive behavior supports such as behavior coaching, case management and individual care coordination, and self-regulation or social skills training.

14

49.  The widespread nature of this problem is reflected across the KCS school district.  As indicated above, rates of disciplinary removals of students with disabilities is consistently high across schools within KCS.

50. Despite notice that it is unlawfully failing to provide its students with effective behavior supports across the district, KCS has not changed its practices.  Instead, it has continued to remove students for their behaviors rather than developing and implementing effective behavior supports that would allow these students to succeed in general education classrooms.  Because of KCS's actions and inactions, students with disabilities are at substantial and imminent risk of removal from schools throughout KCS.

51. These unnecessary removals cause students with disabilities to fall behind their peers without disabilities behaviorally and academically, and place them at greater risk of dropping out of school, failing to graduate with a diploma, or becoming involved with law enforcement and the courts.  These effects can harm these students for years and derail their future opportunities both at school and in adult life.

52. As a result, KCS has deprived G.T. and the Plaintiff class of the education to which they are entitled.

**B. Plaintiff G.T.**

53. G.T. is a nine-year-old boy in the third grade who receives special education and related services under the IDEA.  He has been diagnosed with autism and ADHD.  KCS has failed to provide him with needed behavior supports.  KCS has also subjected him to multiple out-of-school suspensions and other disciplinary measures as a result of behaviors.

54. G.T. has many strengths that should help him succeed in school.  G.T. has a strong reading ability, a deep appreciation for history, and an expansive vocabulary that is advanced for

a child his age. Additionally, G.T. has a strong aptitude for and interest in mathematics. His math skills are more advanced than the material and instruction he receives in his special education classroom.

55. In addition to academic strengths, G.T. has good social skills. G.T. follows directions well and does what he is asked to do. G.T. also gets along well with his classmates and plays well with his siblings.

56. G.T. is a young child with autism, and he faces challenges as a result of his disability. He becomes anxious when he is overwhelmed or placed in unfamiliar situations. At times, G.T. becomes upset by external factors, which then leads to a physical outburst.

57. G.T. requires specially designed instruction and related services to make progress in the general education curriculum. G.T.'s disabilities cause him to engage in challenging behaviors at times. It is because of G.T.'s challenging behaviors that he needs effective behavior supports to be successful.

58. When G.T. started first grade, G.T.'s parents informed KCS that G.T. had meltdowns, extreme fear, and negative reactions to both flies and bees. G.T. displayed behaviors at school that interfered with his education, but the causes were not always clear.

59. Despite this recognition of his behavior challenges, KCS did not conduct an FBA, did not create a BIP, and did not provide other behavior supports. Instead, KCS placed G.T. in a self-contained intellectual disability classroom for over 90% of his day. KCS provided G.T. with an IEP at the start of his first grade year that did not set ambitious goals for him, but merely highlighted G.T.'s deficits and inability to complete work at grade level.

60. G.T.'s mother expressed her concerns about G.T. being placed in a self-contained classroom at his IEP meeting. G.T.'s special education teacher shared that, like G.T.'s parents,

she also did not believe that the self-contained classroom was the appropriate placement for G.T. Rather, she believed G.T. could excel in general education with supports. Nevertheless, KCS placed G.T. in the self-contained classroom throughout his first grade year.

61. KCS did not document G.T.'s progress during first grade, nor did it provide a rationale for maintaining G.T. in a segregated placement in second grade.

62. Nevertheless, at the start of second grade, G.T. remained in a segregated, self-contained classroom for students with an intellectual disability.

63. In September 2018, KCS moved G.T. into a general education classroom for approximately three-quarters of each day. Although KCS increased G.T.'s time in the general education setting, it did not provide G.T. with the behavior and academic supports necessary to enable him to succeed in that setting. As a result, the academic material provided to G.T. was not tailored to engage G.T. or address his learning needs, and he continued to have meltdowns in the classroom.

64. That fall, G.T.'s teachers sent him to the principal's office numerous times for being disruptive in the classroom.

65. For example, G.T. received one-day out-of-school suspensions on both October 1 and October 3, 2018. These suspensions resulted from G.T. becoming overwhelmed and having physical outbursts. On October 1, G.T. was upset about losing a "Dojo point,"[6] and on October 3, he was frustrated because he was not allowed to shop at the book fair with other students. KCS had not provided G.T. with any behavior supports or a BIP at the time of these incidents.

---

[6] G.T.'s teacher used the Dojo system to track students' behavior in the classroom. Students earned points for good behavior and lost points for negative behaviors. Students were told when they lost Dojo points.

66. After these two suspensions, a school psychologist drafted what KCS referred to as a BIP without first conducting an FBA or obtaining input from G.T.'s parents. As explained above, a BIP should be written based on a student's FBA, and the FBA should include information provided by the student's parents.

67. Instead, KCS directed G.T.'s classroom teacher to take notes on G.T.'s behavior and share them with the psychologist, who would then enter the information into her records. There is no indication that any of this information was used to determine the purpose and effect of G.T.'s behavior or develop any sort of behavior plan to help G.T. learn how to regulate his emotions and behaviors when he becomes overwhelmed. It is unclear what the information recorded by G.T.'s teacher was used for, if at all.

68. On November 13, 2018, the school again suspended G.T. for one day. School staff stated that G.T. "refused to do any work" but did not indicate any reason why he was unwilling to work. Rather, his teacher sent him to the office twice because he was upset and agitated. Office staff called G.T.'s father and asked him to pick up G.T. early from school.

69. On November 15, 2018, KCS placed G.T. in an in-school suspension after he became upset and acted out in physical education class. The incident summary drafted by KCS notes G.T. "sobbing" or "crying" several times throughout. There is no indication that KCS took this opportunity to try to understand what prompted G.T.'s behavior.

70. On November 29, 2018, G.T. was suspended for three days following an incident after he took candy from his teacher's desk.

71. Finally, after suspending G.T. five times that semester, KCS held an IEP meeting on December 10, 2018. The only service added to G.T.'s IEP at that meeting was thirty minutes of "autism services" per month. G.T.'s parents expressed concerns that setting aside only thirty

minutes per month to meet with an "autism teacher" would not meaningfully benefit G.T. However, no additional services or time were provided to support G.T.  No behavior services or supports were provided to G.T., and KCS did not seek G.T.'s parents' consent to conduct an FBA to determine the causes of G.T.'s challenging behaviors.  In addition, KCS did not provide any training to G.T.'s general education teacher on how to respond to her students with disabilities whose behavior impede their learning.  Nor was she provided training on implementing a BIP for G.T. with fidelity.

72. On December 11, 2018, G.T. became upset because he did not have money to spend at a holiday event at Bridgeview called "Santa's Workshop."  School staff called G.T.'s father who brought money to the school.  G.T. was in the office when his father arrived.  G.T. was upset and wanted to go home, but his father told him he needed to stay at school.  When G.T.'s father got up to leave, G.T. ran out of the building.  After his father called to him and told him that he could not run away, G.T. stopped, began to cry, and told his father that he was sorry.

73. As a result of this incident, KCS suspended G.T. for ten days, stating that the suspension was for "aggressive behaviors."  According to KCS records, Bridgeview staff considered expelling G.T. for this incident.

74. As required by law, KCS held another IEP meeting with G.T.'s parents on December 17, 2018, and the team found that his behaviors were a manifestation of his disability.  As required by the IDEA, KCS initiated an FBA to determine the causes for G.T.'s behaviors.

75. At that meeting, G.T.'s parents expressed their desire for G.T. to remain in general education, as they believed he could do well in that setting with appropriate support.  Instead, despite having never attempted to implement appropriate supports in the general education classroom, KCS placed G.T. in a self-contained behavior disorder classroom, over his parents'

objection. KCS made this change in placement before it completed the FBA and before it created a BIP.

76. G.T.'s December 17, 2018 IEP removed him from the general education environment for academics and placed him for the majority of the day in classrooms solely with other students with disabilities. KCS offered no opportunities to integrate G.T. with his peers for certain subject matters, part of the day, or for small lessons. Instead, his academic instruction in the self-contained classroom is wholly segregated from his mainstream peers.

77. Following G.T.'s December 17, 2018 IEP, school staff told G.T.'s parents it would conduct an FBA and revisit his placement, but, to date, KCS has not revisited G.T.'s placement.

78. KCS did not begin collecting data for an FBA until January of 2019.

79. Now in third-grade, G.T. has remained in the behavior disorder classroom for the 2019-2020 school year. During the due process hearing, KCS's autism programming consultant Dr. Jim Ball testified, "to successfully integrate Student back into a regular education classroom would require determining the exact triggers that caused Student to be unsuccessful behaviorally in his second grade regular education classroom. Once those triggers are determined and accommodated, Student should begin spending increasing amounts of time in the regular education classroom." *J.T. & M.T.*, Due Process Decision ¶ 42. KCS has not followed its consultant's advice to determine the triggers causing G.T. to be unsuccessful in his second grade classroom. After over a year in a self-contained classroom, KCS has made no attempts to reintegrate G.T. into his general education classroom, even on a small scale.

80. G.T. is not receiving effective behavior supports in his self-contained classroom. In order to receive effective behavior supports, G.T. needs to be taught strategies, including replacement behaviors for behaviors of concern, that would meet his needs and help him behave

appropriately in a general education environment.  Instead, he is flatly told to "control" his behaviors.  He receives no positive reinforcement when he behaves appropriately, but instead only receives negative feedback when he does something wrong, which includes being yelled at and forced to take personal time-outs in a small corner of the classroom.  On a daily basis, he lacks positive role models that could help demonstrate to him how to improve his behavior in the classroom, as everyone in the behavior disorder classroom shares similar challenges.

81. The goals set by KCS for G.T. are the same year after year.  Academic and behavioral goals in G.T.'s current IEPs are identical to those of his past IEPs.  For example, one of G.T.'s math goals in his 2018 IEP was copied verbatim from his 2017 IEP.  The date was not even updated, so that the September 5, 2018 IEP erroneously contained a math goal G.T. was to achieve by August 2018.  Copying goals from one year to the next indicates that G.T.'s IEPs are not designed to produce progress.  *See Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017).

82. KCS conducted an FBA of G.T.'s behaviors in January 2019, but the assessment was wholly inadequate.  An adequate FBA requires that both school personnel and the student's parents evaluate the student's behaviors of concern across environments, as defined in WV Policy 2419, 126 C.S.R. 16.  KCS did not collect information from G.T.'s parents about his behavior at home.  Additionally, the FBA does not target G.T.'s most significant behaviors interfering with his education, nor does it analyze them to provide hypotheses about why G.T. engages in the target behaviors.  As such, it does not provide a basis for developing effective behavior interventions to address the target behaviors.

83. The few recommendations contained in the FBA are not adequately specific to G.T., and / or are not being implemented in his classroom.  For example, the FBA recommends that he

use a visual schedule to help him prepare for transitions between activities; however, G.T.'s visual schedule is often nowhere in sight.

84. In addition, staff in the self-contained classroom do not effectively engage G.T. in instruction, which contributes to his negative behavior. Students in G.T.'s classroom spend much of the school day looking at iPads without direct instruction or other support from the teacher or aides. The teacher occasionally calls G.T. and other students to her desk, but only to show them their grades. G.T may review material he already knows, but he is not learning new curriculum and is falling behind his same-grade peers. Additionally, students, including G.T., frequently lie on the floor due to a lack of chairs in the classroom.

85. Even during the few periods each week when G.T. has the opportunity to spend time with his classmates without disabilities, he is often marginalized. During music class with peers without disabilities, G.T. has been told to sit off to the side with a paraprofessional aide. G.T. is not allowed, like the other music students, to participate in dance activities or drum circle, or be with the rest of the class for other class-wide activities.

86. G.T. has significant strengths and is capable of succeeding in general education settings in his school, but KCS is not providing him with the effective behavior supports he needs to be successful.

87. Because of his strengths in math, history, vocabulary, and reading, as well as his agreeable nature and willingness to interact with others, G.T. can succeed in general education. Effective behavior supports for G.T. should be designed to help him succeed in a general education classroom.

88. Consistent with their legal obligations, schools across the country regularly support students with much more significant needs than G.T.'s in general education classrooms every

single day.  Rather than using strategies that have been proven effective to help G.T. meet challenging educational goals, KCS removes G.T. from his classroom and does not provide G.T. with effective behavior supports he needs to help him achieve ambitious goals and challenging objectives, as required by law.  *See Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017).  With effective supports, G.T. is capable of succeeding in a general education setting.

## C. The Plaintiff Class

89. G.T.'s experience at KCS is shared by other KCS students who need behavior supports and experience disciplinary removals from any classroom.  These students experience the same injuries and require the same relief as G.T.

90. KCS is required to incorporate and implement a preventive discipline program that takes behavior into account for students with disabilities.  W. Va.  Code § 18A-5-1 (2019).  To comply with this directive, IEP teams must consider whether a student's behavior impedes his or her learning and, if it does, must consider the use of behavior supports and interventions to address the behavior.  20 U.S.C. § 1414(d)(3)(B)(i); W. Va.  Code § 18A-5-1.  If a student with an IEP is subject to disciplinary action, the IEP team must evaluate the supports in place for the student and revise the plan as needed, including through the development or revision of FBAs and BIPs.  *See, e.g.*, 20 U.S.C. § 1400 *et seq.*; W. Va.  Code § 18A-5-1.

91. Rather than adhere to its own policies and procedures, as well as federal and state law, KCS does not appropriately address students' behaviors that are caused by their disabilities and instead removes them from the general education classroom.

92. First, KCS fails to adequately analyze the root causes of students' concerning behaviors, and therefore fails to create effective IEPs or BIPs for them.  Staff perform FBAs or develop BIPs without consulting behavior analysts or others with expertise who could help them

23

understand how to analyze student behavior.  As a result, students are provided with ineffective behavior supports that do not address the behaviors associated with the student's disability.

93. Even when students have BIPs that on paper contain appropriate behavior interventions, KCS fails to ensure that such plans are effectively implemented.  KCS fails to train general education teachers to adequately respond to children with disabilities whose behaviors impede their learning by implementing their BIPs with fidelity.  KCS also fails to provide adequate opportunities for its teachers to consult with behavior specialists or others with expertise about how to implement BIPs, including when BIPs do not adequately prevent or ameliorate concerning student behavior and must be revised.

94. KCS routinely removes students with disabilities from the classroom for their behaviors due to its failure to adequately evaluate students with disabilities, or effectively implement behavior plans and other interventions.  Such removal takes place in a variety of ways: this includes undocumented "send homes" or "keep homes," suspensions, and even expulsions. As stated above, during the 2018-2019 school year, the West Virginia Department of Education reported that KCS had a total of 4,312 students with an IEP.  KCS removed these students with IEPs from the classroom *at least* 1,611 times: including at least 193 one-day out-of-school suspensions, 412 one-day in-school suspensions, 595 out-of-school suspensions lasting between one and ten days, 248 in-school suspensions lasting between one and ten days, 93 out-of-school suspensions lasting ten days, and 70 out-of-school suspensions lasting longer than ten days.  The total number of removals increased by at least 234 incidents from the number reported for the 2017-2018 school year.

95. The IDEA requires states to collect and annually report data on its progress toward meeting targets with regard to the provision of special education.  20 U.S.C.A. § 1453(d).  KCS

24

submits data to the West Virginia Department of Education annually and therefore knew or should have known the rates at which it suspends and expels students with IEPs.

96. Because KCS disciplines its students with disabilities instead of providing effective behavior supports, these students are stigmatized and isolated, thereby leaving them vulnerable to bullying or rejection by their peers. The emotional trauma associated with being unwelcome and excluded from school compounds the difficulty children already face upon return or reintegration into the general education classroom—if they are actually reintegrated. Further, they are more likely to be placed in residential facilities or other forms of institutionalization, including the delinquency system. Discipline for KCS students with disabilities is more likely to take the form of a referral to law enforcement than for other students, and juvenile courts may use documented suspensions against the student in truancy proceedings, which makes it more likely that they will be taken out of their homes. *See In re Brandi B.*, 231 W.Va. 71, 743 S.E.2d 882 (W. Va. 2013) (holding that "adjudicating a juvenile a status offender on the basis of absences occasioned by disciplinary suspension is rationally related to the Legislative purpose").

97. Defendants have had ample notice of their systemic failure to provide effective behavior supports to students with disabilities who then experience disciplinary removals from the classroom. Local advocacy groups, including Plaintiffs' counsel, have received numerous complaints about KCS's failures to provide behavior supports to its students with disabilities, and have advocated on behalf of individual KCS students for years. Plaintiffs' counsel also contacted KCS officials directly in advance of filing this Complaint to raise again their systemic concerns. Despite this notice, however, KCS has not changed its policies, practices, and procedures for educating students with disabilities so that they comply with federal and state law.

**CAUSES OF ACTION**

**Count I**

**Violations of Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.***

98. Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

99. G.T. and each member of the Plaintiff class is a child with a disability who is eligible for special education and related services under the IDEA.  *See* 20 U.S.C. §§ 1401, 1412.  Plaintiff The Arc WV's members include the mother of, and other advocates for, G.T. and other members of the Plaintiff class.

100.    Defendant KCS, as the LEA, is responsible for the provision of FAPE in the LRE to all eligible students.  *See* 20 U.S.C. §§ 1401(32), 1412(a)(1), 1412(a)(5).

101.    By the acts and omissions alleged herein, KCS has violated the rights of G.T. and the Plaintiff class under the IDEA, 20 U.S.C. § 1400 *et seq.*, and its implementing regulations by:

    a.  failing to have in effect policies and procedures to ensure KCS provides a FAPE to all eligible children in the district, 20 U.S.C. § 1412(a)(1); 34 C.F.R. § 300.101, including those students with disabilities who need behavior supports to receive a FAPE;

    b.  failing to effectively monitor implementation of and to enforce the IDEA's requirements regarding the provision of FAPE in the LRE, 20 U.S.C. § 1416(a)(1)(C), (a)(3); 34 C.F.R.§ 300.600.

**Count II**

**Violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**

102.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

103.    G.T. and each member of the Plaintiff class is an "otherwise qualified individual with a disability" within the meaning of Section 504.  29 U.S.C. §§ 794, 705(20).  Their disabilities substantially limit one or more major life activities, including but not limited to learning, reading, concentrating, thinking, and communicating.  42 U.S.C. § 12102(2)(A).  As school-age children who live in Kanawha County, G.T. and each member of the Plaintiff class is qualified to participate in KCS's educational programs and services.  34 C.F.R. § 104.3(l)(2).

104.    Defendant KCS is a recipient of federal financial assistance subject to Section 504. 29 U.S.C. § 794(b)(2)(B).

105.    By the acts and omissions alleged herein, KCS has discriminated against G.T. and the Plaintiff class in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. §794, and its implementing regulations by, solely on the basis of disability:

a.    excluding G.T. and the Plaintiff class from participation in, and denying them the benefits of, placement in the LRE, and otherwise discriminating against them, 34 C.F.R. § 104.4(a);

b.    failing to provide them with a FAPE, including special education and related aids and services that are designed to meet their needs as adequately as the needs of children without disabilities are met and that adhere to the procedural safeguards set forth in Section 504, § 104.33;

c.    denying them an educational opportunity that is equal to the opportunity afforded other children, § 104.4(b)(1)(ii);

d.    denying them educational services that are as effective as the services provided to other children, § 104.4(b)(1)(iii);

e.   unnecessarily providing them different or separate educational services, § 104.4 (b)(1)(iv);

f.   aiding or perpetuating discrimination against them by providing significant assistance to schools that discriminate against these children on the basis of disability, § 104.4(b)(1)(v);

g.   utilizing methods of administration that have the effect of subjecting them to discrimination on the basis of disability, have the effect of substantially impairing accomplishment of its objectives for students with disabilities, and perpetuate the discrimination of local schools against these children, § 104.4(b)(4);

h.   failing to serve them alongside their peers without disabilities in academic and nonacademic settings to the maximum extent appropriate, § 104.34; and

i.   denying them an equal opportunity to participate in non-academic and extracurricular services and activities, § 104.37.

106.   The relief sought by Plaintiffs and the Plaintiff class would not require a fundamental alteration to KCS's programs, services, or activities.

## Count III

## Violations of the Americans with Disabilities Act, 42 U.S.C § 12131 *et seq*.

107.   Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

108.   G.T. and each member of the Plaintiff class is an "individual with a disability" within the meaning of the ADA.  Their disabilities substantially limit one or more major life activities, including but not limited to, learning, reading, concentrating, thinking, and communicating.  42 U.S.C. § 12102.

28

109.    As school-age children who live in Kanawha County, G.T. and each member of the Plaintiff class is qualified to participate in KCS's educational programs and services. *See* 42 U.S.C. § 12131(2).

110.    Defendant KCS is a public entity subject to Title II of the ADA.

111.    By the acts and omissions alleged herein, KCS has discriminated against G.T. and the Plaintiff class in violation of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and its implementing regulations by, on the basis of disability:

  a.  excluding G.T. and the Plaintiff class from participation in, and denying them the benefits of, a full school day, and otherwise discriminating against them, 28 C.F.R. § 35.130(a);

  b.  denying them an educational opportunity that is equal to the opportunity afforded other children, § 35.130(b)(1)(ii);

  c.  denying them educational services that are as effective as the services provided to other children, § 35.130(b)(1)(iii);

  d.  unnecessarily providing them different or separate educational services, § 35.130(b)(1)(iv);

  e.  aiding or perpetuating discrimination against them by providing significant assistance to local school districts that discriminate against these children on the basis of disability, § 35.130(b)(1)(v);

  f.  utilizing methods of administration that have the effect of subjecting them to discrimination on the basis of disability, have the effect of substantially impairing accomplishment of its objectives for students with disabilities, and perpetuate the discrimination of local school districts against these children, § 35.130(b)(3);

g.  failing to reasonably modify their policies, practices, or procedures as needed to avoid discrimination on the basis of disability, § 35.130(b)(7); and

h.  failing to provide them educational services, programs, and activities in the most integrated setting appropriate to their needs, § 35.130(d).

i.  failing to ensure that its schools do not unnecessarily segregate children with disabilities from their typical peers.  *See Olmstead v. L.C.*, 527 U.S. 581 (1999).

112.    The relief sought by Plaintiffs and the Plaintiff class would not require a fundamental alteration to KCS's programs, services, or activities.

## Count IV

### Violations of the West Virginia Human Rights Act, W. Va. § 5-11-1 *et seq.*

113.    The West Virginia Human Rights Act, W.Va. Code § 5-11-1 *et seq.* prohibits discrimination in public accommodations against individuals with disabilities.

114.    KCS is a public accommodation under the HRA.

115.    G.T. is an individual with a disability within the meaning of the HRA, because his learning is substantially impacted by his mental impairment.

116.    KCS has discriminated against G.T. by denying him an appropriate education, by segregating him from other children of his age, and denying him the accommodations necessary for him to remain in a general education classroom.

## REQUEST FOR RELIEF

Plaintiff G.T., on behalf of himself and all other persons similarly situated, and The Arc WV request this Court grant the following relief:

A.  Certification of this action, as a class action, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, consisting of:

All Kanawha County Schools students with disabilities who (1) need but are not receiving behavior supports from KCS, and (2) have experienced disciplinary removals from any classroom.

B.  A declaratory judgment that KCS has violated the IDEA, Section 504, the ADA, and West Virginia law by failing to provide effective behavior supports to eligible Kanawha County school children and instead subjecting them to unjustified disciplinary removals from school.

C.  A preliminary and permanent injunction ordering KCS to revise its policies, practices, and procedures as necessary to provide effective behavior supports to its students with disabilities, and take other appropriate affirmative actions to ensure that violations of law complained of above do not continue to be engaged in by KCS, their agents, successors, employees, attorneys, and those acting at their direction.

D.  An order appointing an independent monitor or ombudsman whose duties shall include, but not be limited to:

    1.  Periodic, in-person monitoring of KCS's implementation of and compliance with the Court's Order;

    2.  Proposing remedies necessary to bring about full compliance with the Court's order; and

    3.  Regular reports to the Court and Plaintiff's counsel regarding the same.

E.  An award of reasonable attorney's fees and costs; and

F.  Such other relief as may be deemed proper by the Court.

Respectfully submitted,


/s/Lydia C. Milnes
Lydia C. Milnes (WV Bar ID No. 10598)
Blaire L. Malkin (WV Bar ID No. 10671)
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301


Erin Snyder (WV Bar ID No. 12596)
Lori Waller (WV Bar ID No. 11303)
Disability Rights West Virginia
1207 Quarrier Street, Ste 400
Charleston, WV 25301-1845


Michael Faris (IL Bar ID No. 6204179)*
Karen Klass (IL Bar ID No. 6327168)*
Latham & Watkins LLP
330 N. Wabash Ave., Suite 2800
Chicago, IL 60611


Ira A. Burnim (DC Bar No. 406154)*
Lewis Bossing (DC Bar No. 984609)*
Judge David L. Bazelon Center for Mental Health
Law
1101 15th Street NW, Suite 1212
Washington, DC 20005


Shira Wakschlag (DC Bar No. 1025737)*
The Arc of the United States
1825 K Street NW, Suite 1200
Washington, DC 20006

*Attorneys for Petitioner*

*Statement of Visiting Attorney Forthcoming*