**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

G.T., by his Parents Michelle and Jamie T.,
K.M., by his Parents Danielle and Steven M.,
*on behalf of themselves and all similarly*
*situated individuals*, and The Arc of West Virginia,

          Plaintiffs,

v.                                  Civ. Act. No. 2:20-cv-00057
                                  Judge Irene C. Berger

THE BOARD OF EDUCATION OF
THE COUNTY OF KANAWHA, and
RON DUERRING, Superintendent,
The Board of Education of the County
of Kanawha, in his official capacity,

          Defendants.

_____/

## FIRST AMENDED CLASS ACTION COMPLAINT

### INTRODUCTION

1.    Defendant the Board of Education of the County of Kanawha (the "BOE") unlawfully fails to provide effective behavior supports for a class of its students with disabilities, leading to unjustified disciplinary removals from the classroom due to the students' behaviors. The BOE punishes students for their behaviors and removes them from the classroom instead of developing and implementing effective behavior supports—required by law—that would allow these students to succeed in general education settings alongside their peers without disabilities.

2.    Plaintiff G.T. is a third-grade student enrolled in Kanawha County Schools ("KCS") and is diagnosed with autism and attention deficit hyperactivity disorder ("ADHD").

3.   Plaintiff K.M. is a fourth-grade KCS student diagnosed with multiple disabilities including Down syndrome and ADHD.

4.   Both G.T. and K.M. have significant strengths and could be educated successfully in a general education classroom, with effective behavior supports.  However, both G.T. and K.M. have been denied effective behavior supports at their KCS public schools and, as a result, have experienced disciplinary removals from school.  Because of the BOE's failures to provide G.T. and K.M. with effective behavior supports, and subsequent removals of G.T. and K.M. from their respective classrooms, neither student is making appropriate educational progress.

5.   Plaintiffs G.T.'s and K.M.'s situations are representative of many students with behavior support needs within KCS.  The BOE fails to provide students with disabilities the instruction and services, including behavior supports, they need to succeed in school.  Instead, students like K.M. are told by their schools that they "do[] not belong here."  As a result, these students drop out at a high rate and experience repeated yet avoidable disciplinary sanctions, including in-school and out-of-school suspensions, undocumented "send homes," and expulsions. Older children may be placed in alternative schools, or referred to law enforcement.  Many students with behavior support needs are pushed into segregated classrooms where they interact only with other students with disabilities, and where there is inadequate (and sometimes no) instruction and inappropriate and ineffective efforts at behavior management.

6.   Plaintiffs G.T. and K.M., on behalf of themselves and others similarly situated, and The Arc of West Virginia bring this class action complaint for declaratory, injunctive, and compensatory relief to challenge the BOE's systemic policies, practices, and procedures that violate federal and state law.

7.   The BOE's actions violate the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*., Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794(a), Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, the West Virginia Human Rights Act ("HRA"), W. Va. Code § 5-11-9 *et seq.*, and West Virginia Policy 2419 ("WV Policy 2419").

8.   The IDEA requires public schools to provide all eligible children with disabilities a free appropriate public education ("FAPE").  20 U.S.C. § 1412(a)(1).  To meet their FAPE obligation, schools must provide "special education and related services." 42 U.S.C. § 1401(9).  The standard for providing a FAPE is a "demanding" one: students with disabilities must receive "appropriately ambitious" special education that gives them "the chance to meet challenging objectives." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017).  This standard must be met by public schools in West Virginia, including schools within KCS.  *See R.F v. Cecil Cty. Pub. Sch.*, 919 F.3d 237 (4th Cir. 2019).  *See also* W. Va. § 18-20-1; WV Policy 2419.

9.   Section 504 and Title II of the ADA prohibit public entities, including public schools, from discriminating against students on the basis of their disabilities.  29 U.S.C. § 794; 42 U.S.C. § 12132 *et seq.*  They require public schools to modify their policies, practices, and procedures as needed to avoid discrimination, including the stigma that accompanies unnecessary segregation, and to provide students with disabilities equal educational opportunities.  *Id.*

10. Under federal law, for students whose behavior impedes learning, public education must include effective behavior supports.  20 U.S.C. § 1400(c)(5).  These supports may include, but are not limited to, Functional Behavior Assessments ("FBAs") of the student's behaviors, Behavior Intervention Plans ("BIPs") identifying interventions addressing those behaviors, and other positive behavior interventions and supports.  With such supports, G.T., K.M., and the

Plaintiff class can learn, make progress, and realize bright futures in general education classrooms in KCS alongside their peers without disabilities. Without them, they are at high risk of doing poorly in school or dropping out, becoming involved in the delinquency or criminal justice systems, and being unable to obtain a job or live independently as they transition to adulthood.

11. The BOE has no functioning system for identifying children with disabilities who need behavior supports and providing effective supports to them. Instead, all too often it subjects them to formal (i.e., suspensions or expulsions) or informal (i.e., requests to parents to take or keep students home) removals from school and school activities for behaviors related to their disabilities. Had the students been provided the effective behavior supports to which they are entitled, it is likely that many of these disciplinary removals would not have been necessary.

12. Over the past several months, Plaintiffs G.T. and K.M. repeatedly raised concerns with the BOE regarding its failure to provide effective behavior supports to students with disabilities who need them to receive a FAPE and avoid discrimination. These concerns were raised through correspondence with the BOE as well as through formal due process complaints filed with the West Virginia Department of Education. However, the BOE has not acted to remedy the systemic and urgent failures that Plaintiffs have identified, leaving Plaintiffs with no recourse other than this action.

13. Plaintiffs seek injunctive and declaratory relief for ongoing violations of the IDEA, Section 504, the ADA, and West Virginia law, including an order that Defendants provide Plaintiffs G.T., K.M., and the Plaintiff class with the effective behavior supports they need to receive a FAPE and avoid discrimination, and enable them to be educated in general education classrooms with their peers.

## PARTIES

### A.     Plaintiffs

14. Plaintiff G.T., a minor, seeks to proceed using a pseudonym.  G.T. brings this action by and through his parents, Michelle and Jamie T., as permitted by Federal Rule of Civil Procedure 17(c).

15. Plaintiff G.T. is a nine-year-old student with autism and ADHD attending third grade at Bridgeview Elementary School ("Bridgeview") in KCS.  He is a student with a disability who is eligible for special education under the IDEA and West Virginia law.  He is also a qualified individual with a disability under Section 504 and the ADA.  As a child with an impairment that substantially limits his ability to learn, G.T. is also an individual with a disability within the meaning of the West Virginia Human Rights Act, W.Va. Code § 5-11-1 *et seq*.  G.T. has exhausted all administrative remedies available to him.

16. Plaintiff K.M., a minor, seeks to proceed using a pseudonym.  K.M. brings this action by and through his parents, Danielle and Steven M., as permitted by Federal Rule of Civil Procedure 17(c).

17. Plaintiff K.M. is a nine-year-old student with Down syndrome and ADHD attending fourth grade at Alum Creek Elementary School ("Alum Creek") in KCS.  He is a student with a disability who is eligible for special education under the IDEA and West Virginia law.  He is also a qualified individual with a disability under Section 504 and the ADA.  As a child with an impairment that substantially limits his ability to learn, K.M. is also an individual with a disability within the meaning of the West Virginia Human Rights Act, W.Va. Code § 5-11-1 *et seq*.  Further, K.M. has exhausted all administrative remedies available to him.

18. Plaintiff The Arc of West Virginia ("The Arc WV") is a not-for-profit membership organization whose primary office is located in Parkersburg, West Virginia.  The Arc WV is dedicated to promoting and protecting the rights of people with intellectual and developmental disabilities ("I/DD"), including autism, throughout the state.  The Arc WV engages in public policy advocacy and develops programs to support people with I/DD to learn, live, and work in their communities.  Supporting the rights of students with disabilities to receive the supports and services they need to make progress in their neighborhood schools alongside their peers without disabilities has been a priority of The Arc WV throughout its history.  As The Arc WV's position statement on education states: "All children and youth with…I/DD must receive a free appropriate public education that includes fair evaluation, ambitious goals, challenging objectives, the right to progress, individualized supports and services, high quality instruction, and access to the general education curriculum in age-appropriate inclusive settings."[1]

19. The Arc WV serves people with I/DD statewide directly and through four affiliated member chapters throughout the state, including The Arc of the Three Rivers based in Kanawha County.  The Arc WV has over 2,400 members throughout the state, including over 200 in Kanawha County.  In 2019, The Arc WV provided assistance to 130 families state-wide who sought advice and advocacy regarding special education services.  Thirteen of these families reside in Kanawha County with children attending KCS.  The Arc of the Three Rivers serves 180 individuals annually, including more than twenty students who are eligible to attend KCS, seventeen of whom actually attend KCS.  Plaintiff G.T. is a constituent and his mother is a member

---

[1] *Position Statement: Education*, The Arc (2018), https://thearc.org/position-statements/education/.

of both The Arc WV and The Arc of the Three Rivers.  Plaintiff K.M. is a constituent and his parents are members of both The Arc WV and The Arc of the Three Rivers.

**B.    Defendants**

20. Defendant the BOE is the Local Education Agency ("LEA") for Plaintiffs G.T. and K.M. and is responsible for providing a FAPE to both students and to the Plaintiff class.  "The LEA . . . is responsible for the direct provision of services under IDEA, including the development of an individualized education program ("IEP") for each disabled student, the expenditure of IDEA funds to establish programs in compliance with IDEA, and the maintenance of records and the supply of information to the SEA [State Educational Agency] as needed to enable the SEA to function effectively in its supervisory role under IDEA."  *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 943 (4th Cir. 1997).  The BOE receives federal financial assistance and is a public entity as defined by Title II of the ADA.

21. Defendant Ron Duerring is the Superintendent of the BOE and is responsible for the daily operations of KCS, including its programs and services for students with disabilities.  *See* W. Va. Code § 18-4-10.  Defendant Duerring is sued solely in his official capacity for prospective, injunctive relief.

## JURISDICTION AND VENUE

22. This Court has original jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 because those claims arise under federal law, specifically the IDEA, Section 504, and the ADA.  Declaratory and injunctive relief are available pursuant to 28 U.S.C. §§ 2201-02.  This Court has supplemental jurisdiction over Plaintiffs' state law claims, because Plaintiffs' claims arise out of the same case or controversy as Plaintiffs' federal claims.  *See* 28 U.S.C. § 1367.

23. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district and because all Defendants maintain offices in this district and are responsible for enforcing the laws relevant to this litigation in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

### A.   G.T.

24. Plaintiff G.T. filed a Complaint and Request for Due Process Hearing with the West Virginia Department of Education's Office of Federal Programs ("WV OFP") on behalf of himself and a class of similarly situated students on June 5, 2019, seeking injunctive, declaratory, and compensatory relief.

25. In his due process complaint, G.T. alleged the BOE failed to provide him and class members with a FAPE, by failing to provide necessary behavior supports, as required by federal and state law, 20 U.S.C. § 1412(a), West Virginia Code § 18-20-1, and WV Policy 2419.  The complaint also alleged violations of the ADA, 42 U.S.C. § 12132 and Section 504, 29 U.S.C. § 794.

26. A due process hearing was conducted on August 19, 20, and 21, 2019.

27. The WV OFP Hearing Officer (the "Hearing Officer") dismissed the class allegations as well as the ADA and Section 504 claims from the complaint, finding that she lacked jurisdiction to consider such allegations.

28. The Hearing Officer further denied all individual relief sought by G.T.

29. Through this process, Plaintiff G.T. has exhausted the administrative remedies provided by the IDEA, 20 U.S.C. § 1400 *et seq.*  This Court therefore has express appellate jurisdiction over the administrative ruling issued pursuant to the IDEA.  *Id.* at § 1415(i)(2).

30. G.T., on his own behalf, appeals the decision of the Hearing Officer as to the denial of individual injunctive and compensatory relief.

**B.    K.M.**

31. Plaintiff K.M. filed a Complaint and Request for Due Process Hearing with the WV OFP on behalf of himself and a class of similarly situated students on June 27, 2019, seeking injunctive, declaratory, and compensatory relief.

32. In his due process complaint, K.M. alleged the BOE failed to provide him and class members with a FAPE, by failing to provide necessary behavior supports, as required by federal and state law, 20 U.S.C. § 1412(a), West Virginia Code § 18-20-1, and WV Policy 2419.  The complaint also alleged violations of the ADA, 42 U.S.C. § 12132, and Section 504, 29 U.S.C. § 794.

33. A due process hearing was conducted on October 28, 29, and 30, 2019.

34. The Hearing Officer dismissed the class allegations as well as the ADA and Section 504 claims from the complaint, finding that she lacked jurisdiction to consider such allegations.

35. The Hearing Officer found that K.M. and his parents met their burden of proof on certain issues, and granted limited individual relief sought by K.M.  The Hearing Officer also found that K.M. and his parents failed to meet their burden of proof on certain issues, and denied such relief.

36. Through this process, Plaintiff K.M. has exhausted the administrative remedies provided by the IDEA, 20 U.S.C. § 1400 *et seq.*  This Court therefore has express appellate jurisdiction over the administrative ruling issued pursuant to the IDEA.  *Id.* at § 1415(i)(2).

37. K.M., on his own behalf, appeals the decision of the Hearing Officer as to the denial of certain portions of individual injunctive and compensatory relief.

C.    **The Plaintiff Class**

38. The remainder of the class members do not need to exhaust their claims individually because such actions would be futile.  It would be futile for the remainder of the class to exhaust their claims individually, because plaintiffs allege systemic violations and request systemic remedies to address the BOE's failures.  Alternatively, if this Court holds that exhaustion is required, plaintiffs have satisfied the exhaustion requirement.

## CLASS ACTION ALLEGATIONS

39. Plaintiffs G.T. and K.M., on behalf of themselves and all other similarly situated individuals, bring this action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2) on behalf of the following class: All Kanawha County Schools students with disabilities who need behavior supports and have experienced disciplinary removals from any classroom.

40. The Plaintiff class is so numerous that joinder of all members is impracticable.  During the 2015-2016 school year, a total of 4,299 of the 27,044 children in KCS received special education under the IDEA.  An additional 1,216 of KCS children with disabilities received services under Section 504 in this same year.  Of the students who received special education, 2,086 have disabilities such as emotional disturbance, autism, other forms of I/DD, or other health impairments including ADHD.  Of the more than 5,500 students with disabilities in KCS receiving services under the IDEA and Section 504, many require behavior supports to make progress in their education.[2]

41. According to the West Virginia Department of Education, during the 2015-2016 school year, the BOE subjected students served under the IDEA to 1,486 out-of-school suspensions.  That

---

[2] The 2015-2016 school year is the most recent school year for which the Civil Rights Data Collection has published data; however, Plaintiffs believe that the 2015-2016 school year is likely representative of the most recent school year.

same year, it subjected students served only under Section 504 to 411 out-of-school suspensions. The BOE has continued to suspend students with disabilities at a high rate. The most recent data indicates that the BOE's use of disciplinary suspensions to punish students with disabilities has only increased: during the 2018-2019 school year, KCS had a total of 4,312 students with an IEP and subjected these students to *at least* 1,611 suspensions.[3]

42. There are questions of law and fact common to the claims of all class members, including (a) whether the BOE's failure to provide effective behavior supports and resulting disciplinary removals of students with disabilities violates the IDEA and WV Policy 2419,[4] and (b) whether the BOE's failure to provide effective behavior supports and resulting disciplinary removals of students with disabilities violates Section 504, Title II of the ADA, and the HRA.

43. The claims of Plaintiffs G.T. and K.M. are typical of the claims of the class. Due to the BOE's policies, practices, procedures, acts, and omissions in failing to provide effective behavior supports to its students, Plaintiffs G.T. and K.M. and the Plaintiff class are subjected to, or are at substantial risk of being subjected to, formal or informal disciplinary removals from school.

44. Plaintiffs G.T. and K.M. will fairly and adequately represent the interests of the class. Plaintiffs G.T. and K.M. possess strong personal interests in the subject matter of this lawsuit. Plaintiffs G.T. and K.M. are represented by experienced counsel with expertise in federal laws

---

[3] Plaintiffs requested this information on November 4, 2019, via a Freedom of Information Act request to the West Virginia Department of Education and the BOE. Plaintiffs were informed by the West Virginia Department of Education that pursuant to West Virginia data release/reporting procedures, certain data were suppressed to protect student privacy. Plaintiffs did not receive a response from the BOE.

[4] WV Policy 2419 follows the requirements of the IDEA and applies to school age students whose educational programs require special education and related services. Districts must adopt and implement appropriate special education policies and procedures to receive federal funds under the IDEA.

concerning disability rights and special education, as well as expertise in federal class action litigation.  Counsel has the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.

45. The BOE's policies, practices, procedures, acts, and omissions harm all class members in the same manner.  The BOE's systematic failure to provide effective behavior supports and its subsequent disciplinary removals of students with disabilities from the classroom has deprived the Plaintiff class of the educational services to which they are entitled by federal law, subjected them to disability-based discrimination, including unnecessary segregation and resulting stigma, and increased their risk of being subjected to such harms in the future.  Final injunctive and declaratory relief is thus appropriate for the Plaintiff class as a whole.

## STATUTORY BACKGROUND

**A.    The Individuals with Disabilities Education Act ("IDEA")**

46. In enacting the IDEA, Congress found that "[d]isability is a natural part of the human experience and in no way diminishes the right of individuals to participate in or contribute to society.  Improving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities."  20 U.S.C. § 1400(c)(1).

47. Under the IDEA, public schools must provide "special education" and "related services" to all children with disabilities aged three to twenty-one residing in the state.  42 U.S.C. § 1401(9).  Special education and related services for each child are designed by a team, including parents, teachers, and the student (if appropriate), and documented in a written IEP.  42 U.S.C. § 1414(d)(1)(A), (B).

48. The IDEA further requires states to ensure that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes . . . cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5).

49. Together, these requirements are commonly referred to as the school's duty to provide students a FAPE in the least restrictive environment ("LRE"). As the LEA for Kanawha County, the BOE is responsible for ensuring that all eligible children with disabilities within the county receive a FAPE in the LRE. 20 U.S.C. §§ 1412(a)(11)(A), (a)(1), (a)(5). The BOE must coordinate with other public agencies as needed to ensure that children with disabilities receive the education to which they are entitled under the IDEA. *See* 20 U.S.C. § 1412(12).

50. More specifically, the BOE must provide a FAPE according to the "markedly more demanding" standard clarified by the United States Supreme Court in *Endrew F.*, which explicitly demands that every child with a disability receive an "ambitious" education with the chance to meet "challenging objectives." 137 S. Ct. at 1000. For most children, this standard means receiving instruction and services in the general education classroom with students without disabilities. *Id.* at 995.

51. Schools must provide positive behavior supports and other interventions, including FBAs and BIPs, when needed to provide a FAPE to children with disabilities whose behavior impedes their learning or that of other students. 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. §§ 300.324(a)(2)(i), (b)(2); 300.320(a)(4); WV Policy 2419. An FBA is a systematic assessment of a child's behavior used to identify antecedent conditions to and the purpose of behaviors of concern. *See* WV Policy 2419, Glossary. Put simply, an FBA is a data collection process to

analyze why a child behaves in a particular manner so that school staff can develop supports that address the behaviors.  An FBA is "a sequential, multi-step team evaluation process that helps to determine the purpose and effect of the problem behavior(s) so that IEP goals and objectives can be identified and interventions and modifications can be developed and implemented, specifically through a student's Behavior Intervention Plan.  An FBA requires that *both school personnel and the parents* evaluate the behaviors of concern within the broader perspective of the student's home and school environments."  WV Policy 2419, Glossary (emphasis added).  A BIP is a data-driven plan that describes the interventions school staff will use to support the student's behavior, which should address the root causes of the concerning behaviors analyzed in the FBA.  *See id.*  When a series of disciplinary removals from the classroom constitute a change in a child's placement, the school must conduct an FBA and develop or modify a BIP to address the child's behavior.  34 C.F.R. § 300.530(d)(1), (f)(1);[5] *see also* WV Policy 2419, 126 CSR 16.

**B. Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act**

52. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination on the basis of disability by recipients of federal financial assistance.

53. Section 504 also requires covered entities to provide children with disabilities a FAPE.  FAPE under Section 504 requires special education and related services designed to meet the needs of children with disabilities as adequately as the needs of children who do not have disabilities.

---

[5] A pattern of repeated incidents of child misbehavior and classroom disruption, as well as violations of a code of student conduct resulting in disciplinary removals from school, may indicate that a child should receive behavior supports.  *See* U.S. Dep't of Education, Office of Special Educ. & Rehab. Servs., Dear Colleague Letter on Positive Behavioral Interventions and Supports in Individualized Education Programs (IEPs) 4 (Aug. 1, 2016).  If the child already has behavior supports, on repeated incidents of misbehavior the school must consider whether the child's behavior supports should be changed.  *Id.*

*See* 34 C.F.R. § 104.33(a), (b)(1).  This requirement is similar to the IDEA requirement to provide a FAPE, but, "unlike FAPE under the IDEA, FAPE under [Section] 504 is defined to require a comparison between the manner in which the needs of disabled and non-disabled children are met, and focuses on the 'design' of a child's educational program."  *Mark H. v. Lemahieu*, 513 F.3d 922, 933 (9th Cir. 2008).  Nonetheless, implementation of an IEP developed in accordance with the IDEA is one means of meeting Section 504's requirement.  *See* 34 C.F.R. § 104.33(b)(2).

54. Title II of the ADA prohibits discrimination on the basis of disability by state and local government agencies, including LEAs.  42 U.S.C. § 12132; *see* 28 C.F.R. § 35.130.

55. Under Title II of the ADA, LEAs must provide students with disabilities with opportunities to participate in school services, programs, and activities that are equal to those provided to students without disabilities.  28 C.F.R. § 35.130(b)(1)(ii), (iii).

56. Both the ADA and Section 504 prohibit state and local governments, including LEAs, from discriminating when providing educational services, programs, and activities to children with disabilities.  *See* 28 C.F.R. § 35.130(b)(1); 34 C.F.R. § 104.4(b)(1).  Further, LEAs may not provide educational services or administer their educational programs in a way that results in, aids, or perpetuates discrimination against children with disabilities.  *See* 28 C.F.R. § 35.130(b)(1)(v), (b)(3); 34 C.F.R. § 104.4(b)(1)(v), (b)(4).

57. Both Section 504 and Title II of the ADA require LEAs to provide aids, benefits, and services to students with disabilities in the most integrated setting appropriate to the student's needs, which is defined as a setting that enables individuals with disabilities to interact with persons without disabilities to the fullest extent possible.  34 C.F.R. § 104.4(b)(2); 28 C.F.R. § 35.130(d); 28 C.F.R. pt. 35, App. A, p. 450.

58. The Supreme Court has held that Title II of the ADA prohibits the needless isolation or segregation of persons with disabilities. *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999) (holding that "unjustified institutional isolation of persons with disabilities is a form of discrimination"). As the Supreme Court found, separating individuals with disabilities from their peers without disabilities "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life," and "severely diminishes life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600-601. Unjustifiable disciplinary removals of students with disabilities from classrooms where they are educated alongside peers without disabilities violates this prohibition on unnecessary segregation.

## STATEMENT OF FACTS

## A. The BOE Fails to Provide its Students with Disabilities with Effective Behavior Supports, Including FBAs and BIPs

59. The BOE frequently removes students with disabilities who need behavior supports from the classroom for disciplinary reasons based on their behaviors. Such removals manifest in a variety of ways. Informal removals sometimes occur when the BOE sends a student home from school early by calling a student's parents and asking them to pick up the student from school before the end of the school day or to keep the student at home. The BOE does not record these informal removals as disciplinary incidents in the West Virginia Education Information System and therefore they are not included in the data the BOE is required to maintain. The school may also formally suspend or expel the student for disciplinary reasons, or may place the student in an alternative school or refer the student to law enforcement. The BOE also regularly removes students with disabilities who require behavior supports from their mainstream, general education

classrooms and instead places them in behavior disorder classrooms for only students with disabilities, often after imposing informal or formal disciplinary removals from school.

60. These disciplinary removals often occur because the BOE is failing to provide its students with effective behavior supports and interventions, including FBAs, BIPs, and other positive behavior supports such as behavior coaching, case management and individual care coordination, and self-regulation or social skills training.

61. The widespread nature of this problem is reflected throughout the KCS system. As indicated above, rates of disciplinary removals of students with disabilities is consistently high across schools within KCS.

62. Despite notice that it is unlawfully failing to provide its students with effective behavior supports across the district, the BOE has not changed its practices. Instead, it has continued to remove students for their behaviors rather than developing and implementing effective behavior supports that would allow these students to succeed in general education classrooms. Because of the BOE's actions and inactions, students with disabilities are at substantial and imminent risk of removal from schools throughout the KCS district.

63. These unnecessary removals cause students with disabilities to fall behind their peers without disabilities behaviorally and academically, and place them at greater risk of dropping out of school, failing to graduate with a diploma, and/or involvement with law enforcement and the courts. These effects can harm these students for years and derail their future opportunities both at school and in adult life.

64. As a result, the BOE has deprived G.T., K.M., and the Plaintiff class of the education to which they are entitled.

**B. Plaintiff G.T.**

65. G.T. is a nine-year-old boy in the third grade who receives special education and related services under the IDEA. He has been diagnosed with autism and ADHD. The BOE has failed to provide him with needed behavior supports. The BOE has also subjected him to multiple out-of-school suspensions and other disciplinary measures as a result of behaviors.

66. G.T. has many strengths that should help him succeed in school. G.T. has a strong reading ability, a deep appreciation for history, and an expansive vocabulary that is advanced for a child his age. Additionally, G.T. has a strong aptitude for and interest in mathematics. His math skills are more advanced than the material and instruction he receives in his special education classroom. He also has good social skills: G.T. follows directions from his teachers and gets along well with his classmates and siblings.

67. G.T.'s parents actively advocate for G.T. to receive an appropriate education, and want a strong working relationship with G.T.'s school.

68. G.T. is a young child with autism, and he faces challenges as a result of his disability. He becomes anxious when he is overwhelmed or placed in unfamiliar situations. At times, G.T. becomes upset by external factors, which then leads to a physical outburst.

69. G.T. requires specially-designed instruction and related services to make progress in the general education curriculum. G.T.'s disabilities cause him to engage in challenging behaviors at times. It is because of G.T.'s challenging behaviors that he needs effective behavior supports to be successful.

70. When G.T. started first grade at Bridgeview, G.T.'s parents informed the BOE that G.T. had meltdowns, extreme fear, and negative reactions to both flies and bees. At school, G.T. displayed behaviors that interfered with his education, but the causes were not always clear.

71. Despite this, the BOE did not conduct an FBA or create a BIP, and did not provide other behavior supports. Instead, the BOE placed G.T. in a self-contained intellectual disability classroom for over 90% of his day. His IEP did not set ambitious goals for him, but merely highlighted G.T.'s deficits and inability to complete work at grade level.

72. G.T.'s mother expressed her concerns about G.T. being placed in a self-contained classroom at his IEP meeting. G.T.'s special education teacher shared that, like G.T.'s parents, she also did not believe that the self-contained classroom was the appropriate placement for G.T. Rather, she believed G.T. could excel in general education with supports. Nevertheless, the BOE placed G.T. in the self-contained classroom throughout his first grade year.

73. The BOE did not document G.T.'s progress during first grade, nor did it provide a rationale for maintaining G.T. in a segregated placement in second grade.

74. Nevertheless, at the start of second grade, G.T. remained in a segregated, self-contained classroom for students with an intellectual disability.

75. In September 2018, the BOE moved G.T. into a general education classroom for approximately three-quarters of each day. Although the BOE increased G.T.'s time in the general education setting, it did not provide G.T. with the behavior and academic supports necessary to enable him to succeed in that setting. As a result, the academic material provided to G.T. was not tailored to engage G.T. or address his learning needs, and he continued to have meltdowns in the classroom.

76. That fall, G.T.'s teachers sent him to the principal's office numerous times for being disruptive in the classroom.

77. For example, G.T. received one-day out-of-school suspensions on both October 1 and October 3, 2018. These suspensions resulted from G.T. becoming overwhelmed and having

19

physical outbursts.  On October 1, G.T. was upset about losing a "Dojo point,"[6] and on October 3, he was frustrated because he was not allowed to shop at the book fair with other students.  The BOE had not provided G.T. with any behavior supports or a BIP at the time of these incidents.

78. After these two suspensions, a school psychologist drafted what the BOE referred to as a BIP without first conducting an FBA or obtaining input from G.T.'s parents.

79. Instead, the BOE directed G.T.'s classroom teacher to take notes on G.T.'s behavior and share them with the psychologist, who would then enter the information into her records.  There is no indication that any of this information was used to determine the purpose and effect of G.T.'s behavior or develop any sort of behavior plan to help G.T. learn how to regulate his emotions and behaviors when he becomes overwhelmed.  It is unclear what the information recorded by G.T.'s teacher was used for, if at all.

80. On November 13, 2018, the school again suspended G.T. for one day.  School staff stated that G.T. "refused to do any work" but did not indicate any reason why he was unwilling to work.  Rather, his teacher sent him to the office twice because he was upset and agitated.  Office staff called G.T.'s father and asked him to pick up G.T. early from school.

81. On November 15, 2018, the BOE placed G.T. in an in-school suspension after he became upset and acted out in physical education class.  The incident summary drafted by the BOE notes G.T. "sobbing" or "crying" several times throughout.  There is no indication that the BOE took this opportunity to try to understand what prompted G.T.'s behavior.

82. On November 29, 2018, G.T. was suspended for three days following an incident after he took candy from his teacher's desk.

---

[6] G.T.'s teacher used the Dojo system to track students' behavior in the classroom.  Students earned points for good behavior and lost points for negative behaviors.  Students were told when they lost Dojo points.

83. Finally, after suspending G.T. five times that semester, the BOE held an IEP meeting on December 10, 2018.  The only service added to G.T.'s IEP at that meeting was thirty minutes of "autism services" per month.  G.T.'s parents expressed concerns that setting aside only thirty minutes per month to meet with an "autism teacher" would not meaningfully benefit G.T. However, no additional services or time were provided to support G.T.  No behavior services or supports were provided to G.T., and the BOE did not seek G.T.'s parents' consent to conduct an FBA to determine the causes of G.T.'s challenging behaviors.  In addition, the BOE did not provide any training to G.T.'s general education teacher on how to respond to her students with disabilities whose behavior impede their learning.  Nor was she provided training on implementing a BIP for G.T. with fidelity.

84. On December 11, 2018, G.T. became upset because he did not have money to spend at a holiday event at Bridgeview called "Santa's Workshop."  School staff called G.T.'s father who brought money to the school.  G.T. was in the office when his father arrived.  G.T. was upset and wanted to go home, but his father told him he needed to stay at school.  When G.T.'s father got up to leave, G.T. ran out of the building.  After his father called to him and told him that he could not run away, G.T. stopped, began to cry, and told his father that he was sorry.

85. As a result of this incident, the BOE suspended G.T. for ten days, stating that the suspension was for "aggressive behaviors."  According to the BOE records, Bridgeview staff considered expelling G.T. for this incident.

86. As required by law, the BOE held another IEP meeting with G.T.'s parents on December 17, 2018, and the team found that his behaviors were a manifestation of his disability. As required by the IDEA, the BOE initiated an FBA to determine the causes for G.T.'s behaviors.

87. At that meeting, G.T.'s parents expressed their desire for G.T. to remain in general education, as they believed he could do well in that setting with appropriate support. Instead, the BOE placed G.T. in a self-contained behavior disorder classroom, over his parents' objection. The BOE made this change in placement before it completed the FBA and before it created or implemented a BIP.

88. G.T.'s December 17, 2018 IEP removed him from the general education environment for academics and placed him for the majority of the day in classrooms solely with other students with disabilities. The BOE offered no opportunities to integrate G.T. with his peers for certain subject matters, part of the day, or for small lessons. Instead, his academic instruction in the self-contained classroom was wholly segregated from his mainstream peers.

89. Following G.T.'s December 17, 2018 IEP, school staff told G.T.'s parents it would conduct an FBA and revisit his placement, but, to date, the BOE has not revisited G.T.'s placement.

90. The BOE did not begin collecting data for an FBA until January of 2019.

91. Now in third-grade, G.T. has remained in the behavior disorder classroom for the 2019-2020 school year. During G.T.'s due process hearing, the BOE's autism programming consultant Dr. Jim Ball ("Dr. Ball") testified, "to successfully integrate Student back into a regular education classroom would require determining the exact triggers that caused Student to be unsuccessful behaviorally in his second grade regular education classroom. Once those triggers are determined and accommodated, Student should begin spending increasing amounts of time in the regular education classroom." *J.T. & M.T.*, Due Process Decision ¶ 42. The BOE has not followed its consultant's advice to determine the triggers causing G.T. to be unsuccessful in his second grade classroom. After over 17 months in a self-contained classroom, the BOE has made almost no attempts to reintegrate G.T. into his general education classroom, even on a small scale.

92. G.T. is not receiving effective behavior supports in his self-contained classroom. Instead, he is flatly told to "control" his behaviors. He receives no positive reinforcement when he behaves appropriately, but instead only receives negative feedback when he does something wrong, which includes being yelled at and forced to take personal time-outs in a small corner of the classroom. On a daily basis, he lacks positive role models that could help demonstrate to him how to improve his behavior in the classroom, as everyone in the behavior disorder classroom shares similar challenges.

93. The goals set by the BOE for G.T. are the same year after year. Academic and behavioral goals in G.T.'s current IEPs are identical to those of his past IEPs. For example, one of G.T.'s math goals in his 2018 IEP was copied verbatim from his 2017 IEP. The date was not even updated, so that the September 5, 2018 IEP erroneously contained a math goal G.T. was to achieve by August 2018. Copying goals from one year to the next indicates that G.T.'s IEPs are not designed to produce progress. *See Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017).

94. The BOE conducted an FBA of G.T.'s behaviors in January 2019, but the assessment was wholly inadequate. As defined by WV Policy 2419, 126 C.S.R. 16, an FBA requires that both school personnel and the student's parents evaluate the student's behaviors of concern across environments. The BOE did not collect information from G.T.'s parents about his behavior at home. Additionally, the FBA does not target G.T.'s most significant behaviors interfering with his education, nor does it analyze them to provide hypotheses about why G.T. engages in the target behaviors.

95. The few recommendations contained in the FBA are not adequately specific to G.T. or are not being implemented in his classroom. For example, the FBA recommends that he use a

visual schedule to help him prepare for transitions between activities; however, G.T.'s visual schedule is often nowhere in sight.

96. In addition, staff in the self-contained classroom do not effectively engage G.T. in instruction, which contributes to his negative behavior. Students in G.T.'s classroom spend much of the school day looking at iPads without direct instruction or other support from the teacher or aides. The teacher occasionally calls G.T. and other students to her desk, but only to show them their grades. G.T may review material he already knows, but he is not learning new curriculum and is falling behind his same-grade peers. Additionally, students, including G.T., frequently lie on the floor due to a lack of chairs in the classroom.

97. Even during the few periods each week when G.T. has the opportunity to spend time with his classmates without disabilities, he is often marginalized. During music class with peers without disabilities, G.T. has been told to sit off to the side with a paraprofessional aide. G.T. is not allowed, like the other music students, to participate in dance activities or drum circle, or be with the rest of the class for other class-wide activities.

98. G.T. has significant strengths and is capable of succeeding in general education settings in his school, but the BOE is not providing him with the effective behavior supports he needs to be successful.

99. Because of his strengths in math, history, vocabulary, and reading, as well as his agreeable nature and willingness to interact with others, G.T. can succeed in general education. Effective behavior supports for G.T. should be designed to help him succeed in a general education classroom.

100.    Consistent with their legal obligations, schools across the country regularly support students with much more significant needs than G.T.'s in general education classrooms

every single day.  Rather than using strategies that have been proven effective to help G.T. meet challenging educational goals, the BOE removes G.T. from his classroom and does not provide G.T. with effective behavior supports he needs to help him achieve ambitious goals and challenging objectives.

101.    With effective supports, G.T. is capable of succeeding in a general education setting.

**C. Plaintiff K.M.**

102.    K.M. is a nine-year-old boy in the fourth grade who receives special education and related services under the IDEA.  He has been diagnosed with Down syndrome and ADHD.  He has also been diagnosed with oppositional defiant disorder ("ODD").  The BOE has failed to provide him with needed behavior supports.  The BOE has also subjected him to multiple out-of-school suspensions and other disciplinary measures as a result of his behaviors.

103.    K.M. has many strengths that should help him succeed in school.  When focused on a task, K.M. is able to take in information while engaging with those around him.  When he is interested in the topic, he is motivated and stays engaged in the work.  K.M. is very independent and likes to be given responsibility.  K.M. has a good sense of humor and a good understanding of his own wants and needs.  K.M.'s parents actively advocate for K.M. to receive an appropriate education, and desire to establish a strong working relationship with K.M.'s school.  K.M.'s parents also encourage K.M. to be involved in his community, through church and basketball.

104.    K.M. is a child with Down syndrome and intellectual disability, and he faces challenges as a result of his disability, including difficulty with fine motor skills.  At times, he can be restless and can have difficulty maintaining focus, consistent with his diagnosis of ADHD.

105.    K.M. requires specially-designed instruction and related services to make progress in the general education curriculum. K.M.'s disabilities cause him to engage in challenging behaviors at times. As such, he needs effective behavior supports to be successful in school.

106.    K.M. has attended his home elementary school, Alum Creek, since preschool. The BOE has noted challenges regarding K.M.'s behavior beginning in preschool and continuing to the present time. Prior to K.M. starting kindergarten, the IEP team initiated behavior goals for K.M., but did not add any behavior services or supports. The behavior goals in his IEP have remained nearly identical throughout his elementary school years.

107.    The IEP created at the end of K.M.'s kindergarten year did not contain any new accommodations, did not include the creation of a BIP or other behavior supports, and did not include any instructional time designated for social skills or behavior curriculum.

108.    In November 2016, during K.M.'s first-grade year, the BOE conducted an inadequate FBA (the "2016 FBA"). This FBA primarily relied on anecdotal records. The KCS Board Certified Behavior Analyst ("BCBA") who conducted the 2016 FBA, Ms. Jones, did not contact K.M.'s parents to obtain information from them regarding K.M.'s behaviors. The 2016 FBA did not indicate the antecedents to K.M.'s behaviors or the consequences/contingencies of the behaviors. This limited FBA was K.M.'s operative FBA from November 2016 until May 2019, despite the fact that the school documented new challenging behaviors from K.M. during this period and continued to discipline K.M. for his behaviors.

109.    After the 2016 FBA was completed, Ms. Jones did not review the FBA with K.M.'s parents. The BOE did not use the FBA to create a BIP for K.M.

110.    Instead of implementing behavior supports for K.M., the BOE attempted to move K.M. to a self-contained classroom at a different school more than thirty minutes from his home

at the end of his first-grade year.  The principal at Alum Creek told K.M.'s father that K.M. could not be educated with his same-age, typical peers, because K.M. was like "a blind person with no arms or legs who wanted to drive.  Although [he] had the desire to drive, it was not possible and it would never happen."  The principal also told K.M.'s father that K.M. "doesn't belong here."

111.    K.M.'s parents disagreed that K.M. could not be educated in his home school, believing he could do so if provided with appropriate behavior supports, and thus refused to agree to the BOE's proposed placement.  As a result of this dispute, K.M. missed the first six weeks of school in second grade.  During this time, the BOE did not provide K.M. with any educational or supplementary services.

112.    Finally, following a facilitated IEP meeting on September 28, 2017, K.M. returned to Alum Creek to start his second-grade year.

113.    When K.M. began second grade, the BOE had still not developed a BIP for him, despite having conducted an FBA nearly one year earlier.  K.M. continued to demonstrate behavioral challenges.  Although the BOE set behavior goals for K.M., neither K.M. nor his teachers were taught any strategies to help K.M. meet such behavior goals.

114.    During the 2017-2018 school year, staff at Alum Creek called K.M.'s parents to pick him up early from school for alleged misbehavior over 20 times.  These informal "send homes" deprived K.M. of educational time, but were not recorded as official suspensions and were largely not tracked by the school.

115.    In April 2018, a year and a half after completing K.M.'s FBA, the BOE finally created a BIP (the "April 2018 BIP").

116.    The April 2018 BIP was one page in length, contained little detail, and relied on, without updating, the 2016 FBA.  The BIP did not identify appropriate replacement behaviors to

27

meet K.M.'s needs, and instead included the identical compliance goals that had been in K.M.'s IEP for years (*i.e.*, to stay in his assigned area and engage in tasks without challenging behaviors). The BIP contained no plan for training teachers on how to effectively implement the plan.

117.    At the beginning of third grade, K.M. began engaging in different challenging behaviors, and the BOE suspended him on multiple occasions.  In the fall of 2018, K.M. received four separate out-of-school suspensions for "disruptive/disrespectful" conduct, such as running outside behind the playground, refusing to leave the restroom, pretending to urinate on a carpet, and refusing to leave music class.

118.    The BOE developed a revised behavior plan in October 2018 (the "October 2018 BIP"), in the fall of K.M.'s third grade year.  The October 2018 BIP was developed without any input from K.M.'s parents because the BOE scheduled an IEP meeting to discuss the BIP at a time that K.M's parents had informed the school they could not attend.  The BOE also did not conduct a new FBA, or update the 2016 FBA.

119.    Like the April 2018 BIP, the October 2018 BIP provided no detail or instruction on how to respond to K.M.'s challenging behaviors, and simply referred to the supplementary services and behavior goals sections of the IEP.  Neither the BIP nor the IEP contained any information on how teachers would be taught to implement the plan or how any training would occur.  It did not outline how K.M. would be taught his replacement behaviors.  It did not contain a section on how data were to be collected or tracked.

120.    After the October 2018 BIP was created, K.M. continued to receive suspensions and was disciplined numerous times.

121.    At the beginning of the second semester of his third-grade year, K.M. received a lengthy suspension following an incident during which K.M. allegedly pushed a chair into a

teacher's legs while trying to leave the room. After this incident, the BOE conducted a meeting to determine whether K.M.'s behavior was a manifestation of his disability. At the meeting, school staff found that K.M.'s behavior was not a manifestation of his disability. K.M.'s parents disagreed and filed an expedited due process complaint to challenge that decision.

122.    K.M.'s parents resolved their complaint through a settlement with the BOE. The settlement required that a different behavior analyst conduct a new FBA for K.M.

123.    Per the settlement agreement, a new FBA (the "2019 FBA") and BIP (the "2019 BIP") were completed in the spring of 2019, at the end of K.M.'s third grade year.

124.    In both the 2016 and 2019 FBAs, the BCBAs conducting the FBAs determined that staff working with K.M. were actually *encouraging* his challenging behaviors. In the 2016 FBA and October 2018 BIP, Ms. Jones observed that staff inadvertently contributed to K.M.'s behaviors by negotiating with K.M. to comply with directives – the exact opposite of what they were supposed to do. *D.M. & S.M.*, Due Process Decision at 31. Another KCS BCBA, Ms. Carpenter, testified that she observed that staff failed to reward K.M.'s appropriate behaviors (*i.e.*, when K.M. behaved well, staff did not reward him with attention or by speaking to him). *Id*. Despite these observations over the course of two years, no plan was implemented to train K.M.'s teachers and staff on the proper way to provide behavior supports. The school records show no documentation of any follow-ups or fidelity checks conducted by any of the KCS BCBAs. *Id*.

125.    K.M.'s "one-on-one" aide received minimal training on how to implement the 2019 BIP. None of K.M.'s IEPs or BIPs enumerate time to train staff on how to properly implement K.M.'s BIP. K.M.'s parents were never offered and never received such training.

126.    In addition to failing to properly develop and implement a BIP, the BOE has further encouraged K.M.'s negative behaviors by failing to provide K.M. with an engaging academic

curriculum that has been appropriately modified to meet his needs. Although K.M.'s IEPs have contained a long list of supplementary aids, services, and supports, the majority of them have not been implemented or have been implemented inconsistently.

127.    Throughout second and third grade, the BOE did not focus on modifications and accommodations that would engage K.M., and instead provided him with worksheets that were modified solely by reducing the number of problems for him to answer. Because he had not been engaged in learning the material covered in the worksheets, K.M. would fail these "modified" assignments, and his challenging behaviors continued.

128.    At the start of second grade, K.M. was also evaluated for assistive technology ("AT"). The results of the AT evaluation contained multiple recommendations, none of which were implemented by the BOE.

129.    Although K.M. spends a little under half of his day in a general education setting, the BOE has failed to meaningfully include K.M. in these settings. K.M. is seated apart from the other children in his general education classroom. His desk is in the corner of the classroom and he is physically barricaded from the other children by the teacher's and aide's desks, and not given opportunities to interact with his peers.

130.    At the end of K.M.'s third grade year, the BOE again attempted to remove K.M. from his classroom at Alum Creek, and place him in a segregated classroom for children with behavior disorders at a separate school. The recommendation was made less than three weeks after implementing K.M.'s new BIP. At that time, there was data showing that K.M. had made some progress, and no major disciplinary incidents had occurred since implementation of the new BIP.

30

131. After objecting to this change in placement, K.M.'s parents filed another due process complaint, which prevented this change in placement from occurring. K.M. started fourth grade at his home school and continues to be educated there.

132. A due process hearing was conducted on October 28, 29, and 30, 2019.

133. After the hearing, the Hearing Officer found that the BOE failed to provide FAPE to K.M. by failing to timely develop a BIP for the majority of K.M.'s second grade year. *Id*. at 32. The Hearing Officer also found that the BOE failed to provide FAPE throughout K.M.'s second grade until the end of third grade, because the BOE failed to ensure that K.M.'s BIP was consistently implemented by school personnel. *Id*.

134. The Hearing Officer also found that the BOE tried to change K.M.'s placement to a separate classroom too soon after it began implementing the May 2019 BIP. *Id.* at 36.

135. The Hearing Officer also found that the BOE failed to provide FAPE to K.M. by failing to provide him with specially-designed instruction, including appropriate curriculum modifications. *Id*. at 33.

136. The Hearing Officer also found that the BOE failed to provide FAPE to K.M. by failing to provide a social skills curriculum. *Id*. at 36.

137. Despite finding that the BOE failed to provide K.M. a FAPE by (i) failing to provide effective behavior supports for two years, (ii) failing to ensure K.M.'s behavior plans were being followed with consistency, (iii) failing to provide a social skills curriculum to ensure K.M. could be included in general education, and (iv) failing to make appropriate curriculum modifications, the Hearing Officer granted only limited relief, and did not order most of the remedies requested by K.M.

138.    The Hearing Officer denied all of K.M.'s requests to have the BOE engage independent specialists to assist the BOE in conducting a comprehensive FBA and developing a new BIP, modify K.M.'s curriculum, and conduct trainings for staff responsible for teaching K.M and implementing his BIP.

139.    The Hearing Officer found that the BOE did not provide any evidence that K.M. could not be served effectively or efficiently at his current elementary school.  *Id*. at 28.  Despite this, the Hearing Officer gave the BOE unilateral authority, without convening his IEP team or otherwise getting input from his parents, to determine that it could not serve K.M. "effectively or efficiently" at Alum Creek, and subsequently place K.M. in a self-contained classroom in another school within the district.  This was legal error:  under the IDEA, a child with a disability is to be educated "to the maximum extent appropriate" with children who are not disabled.  20 U.S.C. § 1412(5)(a).  A child with a disability is only to be removed from the regular educational environment when "the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(a).

140.    The Hearing Officer also misstated the testimony of one of K.M's expert witnesses, Dr. Sara Boyd.  In her decision, the Hearing Officer states that "[K.M.'s] expert . . . recommended a small classroom with intensive behavioral supports."  *Id*. at 45. Dr. Boyd, however, never testified that K.M. should be placed in such classroom.  Although she testified that K.M. may initially need more behavior supports to help learn prosocial behaviors, she recommended such supports in the context of fully transitioning K.M. to a general education setting, and never recommended placing K.M. in a self-contained classroom.  *See* Hr'g Tr. at 150:1-16 (Oct. 29,

2019).  Dr. Boyd emphasized in both her testimony and report that all of her recommendations could be implemented in a general education setting.

141.    The Hearing Officer directed the BOE to consult with its expert, Dr. Ball, to review the May 2019 BIP and determine if the plan is sufficiently assisting K.M. in meeting his goals. *D.M. & S.M.*, Due Process Decision at 44.  The Hearing Officer further directed that, if the May 2019 BIP was not sufficiently assisting K.M., then the BOE was to complete a new FBA and BIP. *Id*. at 44-45.

142.    The BOE was also ordered to have its curriculum specialists review K.M.'s academic curriculum and modify as needed.  *Id*. at 45.  Instead of providing individualized modifications, the BOE has recommended that K.M. should be placed in a segregated classroom and receive the curriculum that is taught in that classroom.

143.    At an IEP meeting held in February 2020, the BOE determined that it could not "effectively or efficiently" serve K.M. at his neighborhood school (a legal standard contrary to the requirements of the IDEA) and would instead be moving him to a segregated classroom at another school, over K.M.'s parents' objections.  The BOE made this determination without first implementing its expert's revisions to K.M.'s BIP, without implementing any training for staff or checking to see whether the BIP was being implemented with fidelity, without appropriately modifying K.M.'s curriculum at his home school, without implementing a social skills program, and without implementing the assistive technology recommendations presented at the February 2020 meeting.

144.    K.M. has significant strengths and is capable of succeeding in general education settings in his school, but the BOE has not, and continues to refuse to even attempt to, provide him

with the effective behavior supports he needs to be successful. Effective behavior supports for K.M. should be designed to help him succeed in the general education classroom.

145.    Consistent with their legal obligations, schools across the country regularly support students with much more significant behavioral needs than K.M.'s in general education classrooms every single day. Rather than using strategies that have proven effective in helping students like K.M. meet challenging educational goals, the BOE is focused solely on removing K.M. from his classroom and home school. The BOE has not provided K.M. with the effective behavior supports he needs to help him achieve ambitious goals and challenging objectives.

146.    With effective supports, K.M. is capable of succeeding in a general education setting.

**D. The Plaintiff Class**

147.    G.T.'s and K.M.'s experiences at KCS are shared by other KCS students who need behavior supports and experience disciplinary removals from any classroom. These students experience the same injuries and require the same relief as G.T. and K.M.

148.    The BOE is required to incorporate and implement a preventive discipline program that takes behavior into account for students with disabilities. W. Va. Code § 18A-5-1 (2019). To comply with this directive, IEP teams must consider whether a student's behavior impedes his or her learning and, if it does, must consider the use of behavior supports and interventions to address the behavior. 20 U.S.C. § 1414(d)(3)(B)(i); W. Va. Code § 18A-5-1. If a student with an IEP is subject to disciplinary action, the IEP team must evaluate the supports in place for the student and revise the plan as needed, including through the development or revision of FBAs and BIPs. *See, e.g.*, 20 U.S.C. § 1400 *et seq.*; W. Va. Code § 18A-5-1.

149.    Rather than adhere to its own policies and procedures, as well as federal and state law, the BOE does not appropriately address students' behaviors that are caused by their disabilities and instead removes them from the general education classroom.

150.    First, the BOE fails to adequately analyze the root causes of students' concerning behaviors, and therefore fails to create effective IEPs or BIPs for them.  Staff perform FBAs or develop BIPs without consulting behavior analysts or others with expertise who could help them understand how to analyze student behavior.  As a result, students are provided with ineffective behavior supports that do not address the behaviors associated with the student's disability.

151.    Even when students have BIPs that on paper contain appropriate behavior interventions, the BOE fails to ensure that such plans are effectively implemented.  The BOE fails to train general education teachers to adequately respond to children with disabilities whose behaviors impede their learning by implementing their BIPs with fidelity.  The BOE also fails to provide adequate opportunities for its teachers to consult with behavior specialists or others with expertise about how to implement BIPs, including when BIPs do not adequately prevent or ameliorate concerning student behavior and must be revised.

152.    The BOE routinely removes students with disabilities from the classroom for their behaviors due to its failure to adequately evaluate students with disabilities, or effectively implement behavior plans and other interventions.  Such removal takes place in a variety of ways: this includes undocumented "send homes" or "keep homes," suspensions, and even expulsions. As stated above, during the 2018-2019 school year, the West Virginia Department of Education reported that KCS had a total of 4,312 students with an IEP.  The BOE removed these students with IEPs from the classroom *at least* 1,611 times: including at least 193 one-day out-of-school suspensions, 412 one-day in-school suspensions, 595 out-of-school suspensions lasting between

one and ten days, 248 in-school suspensions lasting between one and ten days, 93 out-of-school suspensions lasting ten days, and 70 out-of-school suspensions lasting longer than ten days. The total number of removals increased by at least 234 incidents from the number reported for the 2017-2018 school year.

153.    The IDEA requires states to collect and annually report data on its progress toward meeting targets with regard to the provision of special education. 20 U.S.C.A. § 1453(d). The BOE submits data to the West Virginia Department of Education annually and therefore knew or should have known the rates at which it suspends and expels students with IEPs.

154.    Because the BOE disciplines its students with disabilities instead of providing effective behavior supports, these students are stigmatized and isolated, thereby leaving them vulnerable to bullying or rejection by their peers. The emotional trauma associated with being unwelcome and excluded from school compounds the difficulty children already face upon return or reintegration into the general education classroom—if they are actually reintegrated. Further, they are more likely to be placed in residential facilities or other forms of institutionalization, including the delinquency system. Discipline for KCS students with disabilities is more likely to take the form of a referral to law enforcement than for other students, and juvenile courts may use documented suspensions against the student in truancy proceedings, which makes it more likely that they will be taken out of their homes. *See In re Brandi B.*, 231 W.Va. 71, 743 S.E.2d 882 (W. Va. 2013) (holding that "adjudicating a juvenile a status offender on the basis of absences occasioned by disciplinary suspension is rationally related to the Legislative purpose").

155.    Defendants have had ample notice of their systemic failure to provide effective behavior supports to students with disabilities who then experience disciplinary removals from the classroom. Local advocacy groups, including Plaintiffs' counsel, have received numerous

36

complaints about the BOE's failures to provide behavior supports to its students with disabilities, and have advocated on behalf of individual KCS students for years. Plaintiffs' counsel also contacted KCS officials directly in advance of filing this Complaint to raise again their systemic concerns. Despite this notice, however, the BOE has not changed its policies, practices, and procedures for educating students with disabilities so that they comply with federal and state law.

## CAUSES OF ACTION

### Count I

### Violations of Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*

156.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

157.    G.T., K.M., and each member of the Plaintiff class is a child with a disability who is eligible for special education and related services under the IDEA. *See* 20 U.S.C. §§ 1401, 1412. Plaintiff The Arc WV's members include the parents of, and other advocates for, G.T., K.M., and other members of the Plaintiff class.

158.    Defendant the BOE, as the LEA, is responsible for the provision of FAPE in the LRE to all eligible students. *See* 20 U.S.C. §§ 1401(32), 1412(a)(1), 1412(a)(5).

159.    By the acts and omissions alleged herein, the BOE has violated the rights of G.T., K.M., and the Plaintiff class under the IDEA, 20 U.S.C. § 1400 *et seq.*, and its implementing regulations by:

        a.    failing to have in effect policies and procedures to ensure the BOE provides a FAPE to all eligible children in the district, 20 U.S.C. § 1412(a)(1); 34 C.F.R. § 300.101, including those students with disabilities who need behavior supports to receive a FAPE;

b.  failing to effectively monitor implementation of and to enforce the IDEA's requirements regarding the provision of FAPE in the LRE, 20 U.S.C. § 1416(a)(1)(C), (a)(3); 34 C.F.R. § 300.600.

## Count II

### Violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794

160.  Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

161.  G.T., K.M., and each member of the Plaintiff class is an "otherwise qualified individual with a disability" within the meaning of Section 504. 29 U.S.C. §§ 794, 705(20). Their disabilities substantially limit one or more major life activities, including but not limited to learning, reading, concentrating, thinking, and communicating. 42 U.S.C. § 12102(2)(A). As school-age children who live in Kanawha County, G.T., K.M., and each member of the Plaintiff class is qualified to participate in KCS's educational programs and services. 34 C.F.R. § 104.3(l)(2).

162.  Defendant the BOE is a recipient of federal financial assistance subject to Section 504. 29 U.S.C. § 794(b)(2)(B).

163.  By the acts and omissions alleged herein, the BOE has discriminated against G.T., K.M., and the Plaintiff class in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations by, solely on the basis of disability:

a.  excluding G.T., K.M., and the Plaintiff class from participation in, and denying them the benefits of, placement in the LRE, and otherwise discriminating against them, 34 C.F.R. § 104.4(a);

b.  failing to provide them with a FAPE, including special education and related aids and services that are designed to meet their needs as adequately as the needs of children without disabilities are met and that adhere to the procedural safeguards set forth in Section 504, § 104.33;

c.  denying them an educational opportunity that is equal to the opportunity afforded other children, § 104.4(b)(1)(ii);

d.  denying them educational services that are as effective as the services provided to other children, § 104.4(b)(1)(iii);

e.  unnecessarily providing them different or separate educational services, § 104.4 (b)(1)(iv);

f.  aiding or perpetuating discrimination against them by providing significant assistance to schools that discriminate against these children on the basis of disability, § 104.4(b)(1)(v);

g.  utilizing methods of administration that have the effect of subjecting them to discrimination on the basis of disability, have the effect of substantially impairing accomplishment of its objectives for students with disabilities, and perpetuate the discrimination of local schools against these children, § 104.4(b)(4);

h.  failing to serve them alongside their peers without disabilities in academic and nonacademic settings to the maximum extent appropriate, § 104.34; and

i.  denying them an equal opportunity to participate in non-academic and extracurricular services and activities, § 104.37.

164.  The relief sought by Plaintiffs and the Plaintiff class would not require a fundamental alteration to KCS's programs, services, or activities.

## Count III

## Violations of the Americans with Disabilities Act, 42 U.S.C § 12131 *et seq*.

165.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

166.    G.T., K.M., and each member of the Plaintiff class is an "individual with a disability" within the meaning of the ADA.  Their disabilities substantially limit one or more major life activities, including but not limited to, learning, reading, concentrating, thinking, and communicating.  42 U.S.C. § 12102.

167.    As school-age children who live in Kanawha County, G.T., K.M., and each member of the Plaintiff class is qualified to participate in KCS's educational programs and services.  *See* 42 U.S.C. § 12131(2).

168.    Defendant the BOE is a public entity subject to Title II of the ADA.

169.    By the acts and omissions alleged herein, the BOE has discriminated against G.T., K.M., and the Plaintiff class in violation of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and its implementing regulations by, on the basis of disability:

   a.    excluding G.T., K.M., and the Plaintiff class from participation in, and denying them the benefits of, a full school day, and otherwise discriminating against them, 28 C.F.R. § 35.130(a);

   b.    denying them an educational opportunity that is equal to the opportunity afforded other children, § 35.130(b)(1)(ii);

   c.    denying them educational services that are as effective as the services provided to other children, § 35.130(b)(1)(iii);

d.  unnecessarily providing them different or separate educational services, §
    35.130(b)(1)(iv);

e.  aiding or perpetuating discrimination against them by providing significant
    assistance to local school districts that discriminate against these children on the
    basis of disability, § 35.130(b)(1)(v);

f.  utilizing methods of administration that have the effect of subjecting them to
    discrimination on the basis of disability, have the effect of substantially impairing
    accomplishment of its objectives for students with disabilities, and perpetuate the
    discrimination of local school districts against these children, § 35.130(b)(3);

g.  failing to reasonably modify their policies, practices, or procedures as needed to
    avoid discrimination on the basis of disability, § 35.130(b)(7); and

h.  failing to provide them educational services, programs, and activities in the most
    integrated setting appropriate to their needs, § 35.130(d).

i.  failing to ensure that its schools do not unnecessarily segregate children with
    disabilities from their typical peers. *See Olmstead v. L.C.*, 527 U.S. 581 (1999).

170.    The relief sought by Plaintiffs and the Plaintiff class would not require a
fundamental alteration to KCS's programs, services, or activities.

### Count IV

### Violations of the West Virginia Human Rights Act, W. Va. § 5-11-1 *et seq.*

171.    The West Virginia Human Rights Act, W.Va. Code § 5-11-1 *et seq.* prohibits
discrimination in public accommodations against individuals with disabilities.

172.    The BOE is a public accommodation under the HRA.

173.    G.T. and K.M. are individuals with disabilities within the meaning of the HRA, because their learning is substantially impacted by their mental impairments.

174.    The BOE has discriminated against G.T. and K.M. by denying them an appropriate education, by segregating them from other children of their age, and denying them the accommodations necessary for them to remain in a general education classroom.

## REQUEST FOR RELIEF

Plaintiffs G.T. and K.M., on behalf of themselves and all other persons similarly situated, and The Arc WV request this Court grant the following relief:

A.  Certification of this action, as a class action, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, consisting of:

All Kanawha County Schools students with disabilities who (1) need but are not receiving behavior supports from the BOE, and (2) have experienced disciplinary removals from any classroom.

B.  A declaratory judgment that the BOE has violated the IDEA, Section 504, the ADA, and West Virginia law by failing to provide effective behavior supports to eligible Kanawha County school children and instead subjecting them to unjustified disciplinary removals from school.

C.  A preliminary and permanent injunction ordering the BOE to revise its policies, practices, and procedures as necessary to provide effective behavior supports to its students with disabilities, and take other appropriate affirmative actions to ensure that violations of law complained of above do not continue to be engaged in by the BOE, their agents, successors, employees, attorneys, and those acting at their direction.

D.  An order appointing an independent monitor or ombudsman whose duties shall include, but not be limited to:

1.  Periodic, in-person monitoring of the BOE's implementation of and compliance with the Court's Order;

2.  Proposing remedies necessary to bring about full compliance with the Court's order; and

3.  Regular reports to the Court and Plaintiffs' counsel regarding the same.

E.  An award of reasonable attorney's fees and costs; and

F.  Such other relief as may be deemed proper by the Court.

Respectfully submitted,


/s/ Lydia C. Milnes_____
Lydia C. Milnes (WV Bar ID No. 10598)
Blaire L. Malkin (WV Bar ID No. 10671)
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301


Lori Waller (WV Bar ID No. 11303)
Disability Rights West Virginia
1207 Quarrier Street, Ste 400
Charleston, WV 25301-1845


Michael Faris (IL Bar ID No. 6204179)
Karen Klass (IL Bar ID No. 6327168)
Latham & Watkins LLP
330 N. Wabash Ave., Suite 2800
Chicago, IL 60611


Ira A. Burnim (DC Bar No. 406154)
Lewis Bossing (DC Bar No. 984609)
Judge David L. Bazelon Center for Mental Health
Law
1090 Vermont Avenue, Suite 220
Washington, DC 20005


Shira Wakschlag (DC Bar No. 1025737)
The Arc of the United States
1825 K Street NW, Suite 1200
Washington, DC 20006

*Attorneys for Petitioner*