# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

G.T., *by his parents Michelle and Jamie T. on*
*behalf of himself and all similarly situated individuals,*
et al.,

                        Plaintiffs,

v.                                                    CIVIL ACTION NO.   2:20-cv-00057

THE BOARD OF EDUCATION OF THE
COUNTY OF KANAWHA,

                        Defendant.

## MEMORANDUM OPINION AND ORDER

The Court has reviewed the *Plaintiffs' Motion for Class Certification* (Document 120), the

*Memorandum in Support of Plaintiffs' Motion for Class Certification* (Document 121), the

*Defendant's Response in Opposition to Plaintiffs' Motion for Class Certification* (Document 128),

and the *Plaintiffs' Reply in Support of Class Certification* (Document 133), as well as all exhibits.

In addition, the Court has reviewed the *Defendant's Motion to Strike* (Document 129), the

*Plaintiffs' Opposition to Defendant's Motion to Strike* (Document 135), and the *Defendant's Reply*

*in Support of Motion to Strike* (Document 136).   The Court has also reviewed the *Defendant's*

*Motion to Strike Dr. Elliot's Supplemental Declaration and Supplemental Report* (Document 134),

the *Plaintiffs' Opposition to Defendant's Motion to Strike* (Document 137), and the *Defendant's*

*Reply in Support of Motion to Strike Dr. Elliott's Supplemental Declaration and Supplemental*

*Report* (Document 138), as well as all exhibits.

1

For the reasons stated herein, the Court finds that the motion for class certification should be granted, and the motions to strike should be granted in part and denied in part.

## MOTIONS TO STRIKE

The Defendant seeks to strike several of the exhibits put forth by the Plaintiffs in support of class certification, including expert reports, testimony, and reports and articles.  It seeks to strike portions of Dr. Judy Elliott's report (Pl.'s Ex. 2) that apply legal standards and draw legal conclusions.   It seeks to strike Dr. Sara Boyd's report, arguing that she is not qualified to testify regarding Individualized Educational Plans (IEPs), Behavior Intervention Plans (BIPs), or Functional Behavioral Assessments (FBAs).   It seeks to strike declarations from parents recounting their children's experiences based on the failure to disclose those witnesses, as well as the majority of a declaration from the former executive director of The Arc of West Virginia, who was disclosed only to offer her experiences with named Plaintiff K.M.   It also seeks to strike reports and articles, arguing that they are hearsay, unreliable, and/or irrelevant.   Finally, it seeks to strike a supplement to Dr. Elliott's report attached to the Plaintiffs' reply brief, arguing that it was not produced or disclosed within the agreed upon timelines for expert disclosures.

The Plaintiffs argue that the evidentiary rules are relaxed for motions for class certification, and their evidence should properly be considered.   They argue that motions to strike pursuant to Rule 12(f) are applicable only to pleadings, not to exhibits to motions for class certification.   With regard to Dr. Elliott's supplemental report, they contend that it is not prejudicial and was necessary to correct misinterpretations of her report and deposition testimony asserted by the Defendant.[1]

---

1 In support of their argument that the supplemental report provides necessary clarification, the Plaintiffs submitted complete versions of the depositions of Dr. Raphael, Dr. Ball, and Dr. Haines.   The Plaintiffs also cited portions of Dr. Elliott's deposition that neither party submitted.   Both parties submitted partial deposition transcripts as exhibits

2

They further argue that the Court's scheduling order establishing deadlines related to expert disclosure is silent as to supplemental or rebuttal testimony.

The Court finds that the expert reports may be considered for purposes of class certification.   To the extent the Defendant objects to the legal standards and conclusions offered by Dr. Elliott, the Court will, of course, determine and apply the appropriate legal standards without regard to Dr. Elliott's opinions.   Because this is a motion for class certification considered by the Court, not evidence being presented to a jury, there is little concern that an expert's misstated or mistaken legal conclusion will cause confusion.   The Court found Dr. Boyd well-qualified to offer opinions regarding the supports that were offered to K.M. and G.T., as well as the interventions and supports likely to help them succeed.   Dr. Boyd has extensive experience evaluating children and youth with disabilities, including intellectual and cognitive disabilities. Direct experience drafting IEPs or BIPs is not necessary for a well-qualified clinical psychologist specializing in work with children with disabilities and behavioral issues to opine regarding the needs and behaviors of children with disabilities.

However, the Court finds that the declarations from parents of students other than the Named Plaintiffs and the declaration of Christina Smith should be disregarded for purposes of this motion.[2]   The Defendant indicates that it requested disclosure of all witnesses supporting class certification, and the Plaintiffs failed to disclose these witnesses.[3]   The Plaintiffs assert that

---

to their briefing on class certification.   The Court's scheduling order directs parties to submit complete versions of all exhibits and cite to those portions relied upon.   Following this directive would, perhaps, have alleviated concerns about testimony being misinterpreted or taken out of context.   In the Court's review of the deposition excerpts submitted by the Defendant, the bits of testimony relied upon were so devoid of context as to be of little assistance to the Court in evaluating their import.   A single page of deposition transcript relied upon for a line of testimony on a subject clearly under discussion before and after that page does not carry significant evidentiary weight.

[2] Should the Plaintiffs wish to use these witnesses for the merits portion of the case with proper disclosure, they would be free to do so.

[3] With respect to Ms. Smith, the Defendant asserts that the Plaintiffs failed to disclose the nature and extent of her

evidence that would not be admissible at trial may nonetheless be considered for class certification, but do not respond to the assertion that they failed to disclose the witnesses in response to discovery requests. The Court ordered a separate, preliminary discovery process relevant to class certification to allow the parties to conduct the discovery exchanges that permit each to explore and rebut the other's evidence, presenting a record of all evidence and argument relevant to class certification to the Court. That process requires disclosure of evidence and witnesses, and the Court finds it appropriate to exclude those declarations (Documents 120-7 through 120-11) from consideration.

Exhibits 18, 19, 24, and 25 are publications cited by the Plaintiffs. Exhibit 18 is a report on racial disparities in how school systems identify, classify, and support students with disabilities published by the Center for Civil Rights Remedies at The Civil Rights Project, and includes analysis of disciplinary data for students with disabilities. Document 19 is a ProPublica report regarding racial disparity in discipline at Capital High School and Exhibits 24 and 25 are both newspaper articles on the same subject. The Plaintiffs cited Exhibit 18 for disciplinary data, including comparisons between suspension rates for students with and without disabilities in Kanawha County, and between suspension rates for students with disabilities in Kanawha County and in other school districts across the state and country. The Court finds that Exhibit 18 provides background and context that may be helpful in analyzing the class certification factors. Further, such information could be introduced through an expert at trial under Rule 803(18). The data itself appears to be drawn from the United States Department of Education, Civil Rights Division, which could be admissible as a public record. Exhibits 19, 24, and 25 focus solely on racial

---

declaration.

disparities in discipline. The Plaintiffs' complaint and proposed class definition address disparities based on disability status, not race. Although race may impact the experiences of students with disabilities, it is not the subject of this lawsuit and the Court finds these exhibits irrelevant.

Finally, the Plaintiffs submitted a supplemental expert report, wherein Dr. Elliott responds to the Defendant's experts and to the characterization of her initial report. As the Plaintiffs point out, the Court's scheduling order relevant to class certification did not speak to rebuttal reports. The statements to which Dr. Elliott responds were made in the Defendant's response brief and exhibits thereto. She could not have produced the supplemental report any earlier. It does not contain new or contrary information—it simply engages with the arguments presented by the Defendant, particularly arguments based on the Defendant's interpretation of her words. *See, e.g., Romeo v. Antero Res. Corp.*, No. 1:17CV88, 2020 WL 1430468, at *6 (N.D.W. Va. Mar. 23, 2020) (finding good cause to consider exhibits presented in a reply brief that "do not present new information or raise foundational issues, but rather rebut points in the motion for class certification"). Nothing in the Court's orders or the Rules precludes consideration of Dr. Elliott's supplemental report, and the motion to strike it will be denied.

## FACTS

The Plaintiffs, G.T., K.M., and The Arc of West Virginia, assert that Kanawha County Schools (KCS) does not provide adequate behavioral supports to students with disabilities who require such supports to succeed in the classroom. G.T. and K.M. are elementary school students in Kanawha County with Individualized Education Plans (IEPs). Both sometimes exhibit challenging behaviors related to their disabilities, and both have experienced disciplinary removals

from the classroom.   The Arc of West Virginia is a not-for-profit membership organization focused on disability rights, particularly for those with intellectual and developmental disabilities. Among other services, it provides support for families of children receiving special education services at public schools in West Virginia.   The Plaintiffs allege violations of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, of Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. § 794, of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and of the West Virginia Human Rights Act, W. Va. Code § 5-11-1 *et seq.* They seek declaratory judgment, preliminary and permanent injunctive relief, appointment of an independent monitor or ombudsman, and attorneys' fees and costs.

### A.   Data and Expert Assessments of Kanawha County Schools

Kanawha County Schools has a total student population of approximately 4,200. (West Virginia Education Information System, att'd as Pl.'s Ex. 16) (providing 4,239 students in 2017-2018, 4,312 in 2018-2019, and 4,210 in 2019-2020.)   According to federal data, 17.7% of students in Kanawha County receive services under the IDEA and 4.4% have disabilities covered under Section 504. (Civil Rights Data Collection, "Kanawha County Schools: Instances of Corporal Punishment and Suspensions," and "Kanawha County Schools: LEA Summary of Selected Facts," U.S. Department of Education Office of Civil Rights) (att'd as Pl.s' Ex. 17, Document 120-18.) IDEA students are the subject of 33% of in-school suspensions, 34.9% of out-of-school suspensions, and 25% of expulsions.   (*Id.*)   The OCR data indicates that KCS had 3,016 out-of-school suspensions for students without disabilities, 1,396 out-of-school suspensions for IDEA students, and 481 for Section 504 students.   (*Id.*)

6

The Plaintiffs retained Dr. Steven Raphael, a professor at University of California – Berkeley and an expert in statistics and quantitative data.   The Defendant provided spreadsheets detailing suspension incidents for students with IEPs and with Section 504 plans.[4]   In reviewing those spreadsheets, which correspond to multiple school years, Dr. Raphael found 5,228 unique KCS students with IEPs.   Of those students, 342 had one recorded suspension incident, and 647 had two or more recorded suspension incidents.   He created a random sample of 200 of the students with two or more recorded suspension incidents.   In addition, he created a random sample of 134 KCS students with Section 504 plans who had two or more recorded suspension incidents, out of a total of 268 Section 504 students with two or more suspensions.   Although the data submitted by the Defendant was subsequently amended, leading to minor changes in the makeup of the samples, Dr. Raphael affirmed that the samples remained valid, representative samples.

The Plaintiffs retained Dr. Grace "Judy" Elliott, a consultant to multiple school districts on appropriate programming for students with disabilities, to analyze the data and records and opine regarding KCS's policies and procedures.   The Court found Dr. Elliott's report detailed, credible, and well-grounded by both quantitative data analysis and qualitative review of individual records.

Dr. Elliott calculated rates of suspensions in 2018-2019 for students with and without disabilities and compared the rates for each school within Kanawha County.   She found an overall probability that a general education student at any level would be suspended of 0.33, and a probability that a student with a disability receiving special education would be suspended of 0.55.[5] In all elementary schools, the suspension probability was 0.14 for students without disabilities,

---

4 Section 504 of the Rehabilitation Act establishes Section 504 plans used in school systems to provide supports to students with a broad range of disabilities that may impede learning in the general education classroom.
5 These probabilities were derived by dividing the number of suspensions by the number of students.   Suspensions are not distributed evenly; some students receive multiple suspensions, while many are never suspended.

and 0.23 for students with disabilities.   In all middle schools, it was 0.69 for students without disabilities, and 0.71 for students with disabilities.   In high schools, it was 0.38 for students without disabilities, and 0.93 for students with disabilities.

Dr. Elliott found significant variation between schools.   The highest suspension rates were at the Chandler Academy, an alternative school serving grades 6–12, with a suspension probability of 2.2 for students without disabilities and 5.93 for students with disabilities.   Three middle schools with the highest probability of suspensions for students without disabilities—Sissonville at 0.83, East Bank at 1.73, and West Side at 2.1—also had above average suspension probabilities for special education students, with Sissonville at 1.14, East Bank at 1.43, and West Side at 0.99.[6] Dr. Elliott found the variation in suspension rates suggestive of a lack of districtwide policies, ineffective policies, and or a lack of monitoring of existing policies related to behavior supports for at-risk students.   Among the files she reviewed for students with disabilities with suspensions, the number of suspensions for 2018 to 2019 ranged from 1 to 141, with an average of 22.7.   The average number of office discipline referrals, excluding those leading to suspensions, was 19.2 per student, with a range of 1 to 124.   "[A] significant number of students [had] over 10, 50, or even 100 suspensions during the two-plus years for which [she] received records."   (Elliott Rep. at 43) (Pl.s' Ex. 2, Document 120-3.)

Within the student files, Dr. Elliott found a number of patterns.   She observed a pattern of continuing behavior problems and continuing classroom removals, with repeated suspensions, office referrals, lunch detentions, classroom exclusions, bus suspensions, expulsion petitions, and unofficial parent pick-up requests.   Despite repeated behaviors leading to repeated classroom

---

6 The materials sometimes refer to West Side Middle School by its previous name, Stonewall Jackson Middle School.

removals, the records rarely indicated that staff recognized "that the student's disability-related behavior interfered with the student's learning or the learning of others, which should have prompted a review of the IEP to determine whether the student needed additional or different behavior supports."   (Elliott Rep. at 21.)[7]   The Multidisciplinary Evaluation Team (MDET) often found that disciplinary issues were not a manifestation of the student's disability, a conclusion Dr. Elliott found unsupported where the records reflected a history of suspensions and classroom exclusions paired with a relevant mental health diagnosis.

Dr. Elliott also notes that students with mental health conditions were often misclassified as qualifying for special education based on having an "other health impairment" rather than an "emotional/behavioral disorder," which she believed could contribute to the failure to recognize a need for behavior supports.   Dr. Shelby Haines, an expert for the Defendant, contested the idea that a student's eligibility category would impact the manifestation determination.   Dr. Haines stated that in a manifestation meeting, "[t]here would be no difference in reviewing the antecedents of the behavior, the child's disability, and the unique circumstances of the incident if a child was labeled OHI, as opposed to EBD.   The process is the same for all children on IEPs, no matter what the student's eligibility category."   (Haines Rep. at 8) (Def.'s Ex. 8, Document 128-9.)

A common theme in Dr. Elliott's report was that KCS staff went through the motions of completing appropriate paperwork without adequately identifying and addressing issues. Psychological evaluations "do not fully address the needs of students with significant or consistently recurrent behavioral challenges," do not provide sufficient information to develop recommendations for behavioral supports, and do not "address developmental, family, or

---

[7] Page numbers reflect the PDF pagination for the exhibit, rather than the page numbers within the report, for the expert declarations and reports.

sociocultural issues that have clear relationships to patterns of problem behavior."   (Elliott Rep. at 31.)   The records reflect efforts at engagement with caregivers, but no meaningful incorporation of strategies based on parental input.   FBAs were not completed as often as Dr. Elliott believed warranted, and she was quite critical of the quality of those that were completed.   KCS frequently uses an expedited FBA form with limited information.[8]   Even the full FBAs do not contain the depth and understanding of the root causes of behaviors necessary to generate a BIP with an effective set of behavior supports.   In particular, she noted that the FBAs tend not to distinguish between a skill deficit (e.g., not knowing how to resolve conflict) and a performance deficit (e.g., choosing not to appropriately resolve conflict), which may require different supports.   There was not appropriate follow-up to ensure that plans were implemented consistently and to make adjustments if the students continued to exhibit challenging behaviors.

Dr. Elliott indicates that KCS uses appropriate forms to develop IEPs and Section 504 plans, but that the content of the plans is often inadequate to address the type and severity of behavioral issues.   Many lack behavioral goals despite a student's history of documented behavior problems, and those with behavior goals are often unrealistic, such as a goal of 100% compliance with staff directives rather than a more incremental goal.   BIPs generally did not indicate who would provide a service, when and where it would take place, or how long it would last, and did not include specific goals and methods of monitoring performance.   BIPs rarely provided appropriate replacement behaviors.   For instance, a KCS BIP that identified a student's

_____

8 Dr. Katherine Porter, then Assistant Superintendent and Director of Special Education, explained that the expedited FBAs were used when a team was developing a behavior plan during a meeting as an alternative to an in-depth functional behavior assessment, and a more in-depth FBA would follow only if the team believed it to be needed.

challenging behavior as "threat of injury" provided a replacement of "no threat of injury," rather than specifying alternatives like asking for help or applied anger management techniques.   IEPs and behavior supports were not monitored for the key metrics of fidelity to the plan and sufficiency of the plan.   As a result, behavior supports that were ineffective either because they were not appropriate to the needs of the student or because they were not consistently implemented were unsuccessful, students continued to experience disciplinary removals, and the team discontinued behavior supports as ineffective without developing an alternative.

KCS rarely provides behavior supports that are customarily offered in other school districts, including training for students in social skills, anger management, and self-control, de-escalation supports, re-integration following suspensions, processes for regular check-ins with adults, and cognitive behavior supports.   The behavior supports provided at KCS tend to be directed at performance deficits, with an implicit assumption that the student is capable of performing the desired behavior but chooses not to.   These supports include use of rewards and earned privileges, positive teacher feedback, and accommodations like additional time for tests or occasional breaks from the classroom.   In addition to providing more supports to teach skills and expand students' capacity to respond to triggers appropriately for those students with a skill deficit, Dr. Elliott indicates that KCS seems to lack sufficient access to psychological and similar professional services to help address issues such as anxiety, depression, and trauma that may be the root causes of some behaviors.

Dr. Elliott indicates that it is the customary practice for school systems to provide students with IEPs and behavioral or emotional problems with related services, "including counseling, psychological services, or targeted case management, as appropriate to the student, as well as

11

school-community agency collaboration and school-home collaboration."  (Elliott Rep. at 40.)
KCS sometimes provides supportive services like occupational therapy, speech therapy, or a
school bus aide, but none of the student records reviewed by Dr. Elliott incudes behavioral related
services.   KCS relies heavily on classroom teachers to provide behavior supports, with more
specialized services often very limited—for example, a half hour per month with an autism
specialist.

Dr. Elliott included a review of one case file in which a student with an IEP had a total of
39 classroom removals, including office referrals by the end of the 2015-2016 year, and a total of
14 days of suspensions in the 2016-2017 school year.   KCS determined that one behavioral
incident in which he set off a firecracker at school was not a manifestation of his disability,
although he had a history of similar behaviors.   Dr. Elliott opined that he was misclassified as
eligible for special education under the Specific Learning Disability category but should have been
classified as Emotional/Behavioral Disorder.   His IEP goals remained identical from 2015 to
2020.   His IEPs contain no behavior goals and no indication that his behavior interferes with his
learning or that of others, despite repeated disciplinary removals from the classroom and chronic
absenteeism.

In addition to specified shortcomings found in student records, Dr. Elliott found that "KCS
does not appear to have a districtwide approach to developing appropriate IEPs, BIPs, and 'Section
504' plans."  (Elliott Rep. at 43.)  She noted a failure to collect data for districtwide oversight,
without which district leadership could not identify and work to remediate problems, as well as a
lack of training for IEP teams.   If the district collected data, it could implement training and
provide additional resources to the schools with particularly high or disproportionate suspension

rates for students with disabilities.   The KCS Exceptional Students Office does not collect suspension information for students with disabilities, including documenting whether students subject to suspensions receive behavior supports and whether their FBAs and BIPs are being developed or revised.   KCS relies on end-of-year state academic assessments, rather than monitoring academic performance for students with disabilities throughout the year.   The district does not have a cohesive early-warning system to identify students with challenging behaviors and begin providing supports early.   Instead, interventions begin only when there is a significant problem.   As a result, students are already beginning to fall behind before KCS begins providing either academic or behavioral assistance.   Compounding the problem, Dr. Elliott opined that KCS does not provide sufficient training or professional development for staff addressing complex behavioral issues, which are handled primarily within individual schools by IEP teams, with classroom teachers largely responsible for designing and implementing behavior supports.

The Defendant presented evidence from Dr. James Ball, a Board Certified Behavior Analyst-Doctorate (BCBA) specializing in autism, who has worked as a consultant with KCS, as well as other school districts.   He indicated that KCS has a variety of staff members who support students with disabilities, including BCBAs to help staff conduct a more intensive FBA or train staff on specific Behavior Management Plans where needed.   In addition, each school is assigned a Special Education Specialist who reports to Dr. Kate Porter, then Assistant Superintendent and Director of Special Education.   Dr. Porter indicated that these Specialists would notify her of any concerns with a school's handling of special education or disciplinary matters.   Dr. Ball further explained that three autism itinerant specialists travel the county to provide services to students with autism, and two curriculum specialists are available to assist in designing appropriate

13

curriculums for specific students.   School counselors or psychologists may assist with cognitive therapy, de-escalation strategies, or other supports for students.   Furthermore, he indicated that classroom teachers are familiar with Positive Behavior Interventions and Supports and utilize various techniques to address behavior issues with all students, regardless of IEP status.

Dr. Ball stressed the highly individualized process of developing IEPs and BIPs for students who need behavior supports, as well as the case-by-case nature of any behavior incident resulting in discipline.   He disagreed with many of Dr. Elliott's conclusions and opined that, in his experience, KCS applied a robust process to produce appropriate IEPs and BIPs for students with disabilities.   Much of his report was very generalized and lacked specific data or examples. As a result, although the Court found his descriptions of the specific resources and procedures utilized at KCS credible, the Court found his conclusions less convincing and less reliable than those reached by Dr. Elliott.[9]

Dr. Porter testified that she reviewed the expedited FBAs from every manifestation meeting packet to ensure compliance with policy for students who have more than 10 days of suspensions or an expulsion.   Her office does not collect data on disciplinary incidences in the schools or how often students with or without disabilities are removed from the classroom or suspended, apart from compliance with the 10-day manifestation rule.   She indicated that the District does not monitor each school's behavior policies and administration of discipline.   She relied on school-based teams to take primary responsibility for monitoring behavior issues and ensuring that students receive the services they need.   Her office did not monitor IEPs or data related to student

---

9 In addition, some of Dr. Ball's statements suggested that more robust and detailed discussion, such as greater analysis of the root causes of behaviors, took place during IEP meetings.   If such discussions took place but no information or conclusions were included in student records, the value is limited, as new teachers or staff members reviewing the records would be left without access to important information.

outcomes.   Individual IEP teams would monitor whether students were meeting goals, and her office did not track how many students with disabilities were meeting goals.   The district does not have general guidelines for FBAs or BIPs for the teachers, counselors, or BCBAs on IEP teams to refer to.   The lead psychologist conducts annual trainings with school psychologists for more in-depth FBAs, but the district does not otherwise provide training related to FBAs or implementing behavior supports.

Dr. Porter contended that an IEP team would include the student's teacher, ensuring that the teacher would be familiar with the BIP or other interventions, and the teacher would take responsibility for sharing information with any paraprofessionals or others not on the team.   She stated that the district does not provide formal training for staff responsible for developing BIPs, but "our psychologists and school counselors and specialists are well schooled on writing behavior plans" so "we have not seen that as an area we need to address."   (Porter Depo. at 105::21–25) (Pl.s' Ex. 30, Document 120-31.)

B.   G.T. and K.M.

G.T. is an elementary school student in Kanawha County.   He has been diagnosed with autism and attention deficit hyperactivity disorder (ADHD) and receives special education services.   K.M. is a student at another elementary school in Kanawha County.   He has been diagnosed with Down Syndrome, oppositional defiant disorder, and ADHD and receives special education services.   Both G.T. and K.M. have experienced disciplinary removals from their classrooms, as well as efforts to limit their placement in general education classrooms in part due to their challenging behaviors.   The Plaintiffs submitted a report prepared by Dr. Sara Boyd, a clinical psychologist with experience consulting regarding appropriate services and placements for

children with disabilities and behavior issues, including within the juvenile justice system.   The Defendants submitted a report from Dr. Shelby Haines, Superintendent of Marshall County Schools, with extensive experience as a BCBA, school psychologist, and in special education administration and consulting.   Both parties also relied on evidence from the due process hearings and decisions.

G.T. struggles with disruptions to his routines, unfamiliar or overwhelming situations, and certain sensory triggers.   He is curious and has many interests, and despite some impairments in language and communication, has "relatively strong fluid reasoning skills and reading abilities." (Boyd Rep. at 18–19) (att'd as Pl.s' Ex. 4, Document 120-5.)    He has had repeated incidents in which he acts out aggressively or runs away in response to a change in routine or a situation that overwhelms him, with repeated suspensions and classroom removals as a result.   In one instance, he had a meltdown during a book fair.   His teacher ultimately calmed him, but he was suspended. In another, he had a meltdown during a Santa's workshop event and ran away from the school. The school initially considered expelling him but following a manifestation meeting during which the school determined that his behavior was a manifestation of his disability, he was not expelled.

Despite the pattern of disruptive behavior related to changes in routine, Dr. Boyd indicated that KCS has not developed a plan to support G.T. during such routine changes and to provide him with advance preparation when events are scheduled.   He does have a BIP that includes plans to warn him of changes in the schedule in advance and provide rewards if he has a day without meltdowns.   However, Dr. Boyd contends that the guidance is not sufficiently concrete and that the FBA "does not describe with adequate specificity the antecedents of G.T.'s disruptive behavior, or the consequences of the behavior, both of which are necessary to identify hypotheses

16

about why G.T. behaves the way he does."   (Boyd Rep. at 25.)   The inadequacies of the FBA in turn contribute to a BIP that Dr. Boyd found does not provide teachers with sufficient guidance on how to implement supports, does not identify target behaviors or replacement behaviors, and does not describe how teachers should mitigate or prevent challenging behaviors.   Goals are not sufficiently concrete, measurable, and objective.   Dr. Boyd also recommended that KCS increase coordination with G.T.'s family to incorporate his parents' input into his plan at school and help his parents implement aspects of his behavior plan at home, because children with autism benefit from consistency across environments.   She also recommended increased coordination with G.T.'s doctor and an updated occupational therapy assessment.

G.T.'s parents sought relief through a due process hearing.   The Hearing Officer found their claims unsubstantiated and did not require any changes in his IEP or BIP.   Dr. Haines reviewed G.T.'s records, including those from the due process hearing, and noted usage of tools to improve social skills and testimony from staff and the BCBA indicating appropriate behavioral support techniques.   She also found the discipline for both G.T. and K.M. to be appropriate, with suspensions for relatively high-level offenses, some of which were subject to mandatory suspensions under state disciplinary policies.

K.M. has behavioral and academic difficulties.   He is frequently late or absent from school, he refuses tasks he does not wish to complete, he employs escape tactics, and he acts out aggressively at times.   He has had repeated suspensions as a result of his behavior, including lengthy suspensions for violence toward teachers and staff.   In addition to formal discipline, his parents were often called to pick him up from school because of his behavior.   His parents have advocated for him to spend more time in the general education classroom, while his school has

17

placed him in a resource room for much of the school day and sought to move him to another elementary school with a self-contained special education program more focused on life skills. He missed a portion of second grade as a result of the dispute regarding his placement, and ultimately continued in his neighborhood school.   An aide assists him in the classroom, and BCBAs work with his teachers and the aide on his behavior issues.

His parents sought a due process hearing, and the hearing officer found some of their claims substantiated.   The hearing officer found that KCS failed to timely develop a BIP for about 18 months after an initial FBA and failed to ensure that the BIP was consistently implemented.   The hearing officer also found that KCS failed to offer a social skills curriculum and failed to provide for some academic needs.   The decision granted some relief, including requiring review of a May 2019 BIP and setting a deadline for a new FBA and BIP if needed, a program to ensure consistency in managing K.M.'s behavior, curriculum modifications, evaluation for use of assistive technology, a process for designating where he should attend school, and compensatory education time.   Dr. Boyd indicated that K.M. needs academic tasks tailored to his ability level to ensure that he is not either bored or frustrated by tasks that are too difficult, which can prompt him to act out or attempt to escape.

Dr. Boyd found that both K.M. and G.T. are not provided behavior supports that could help them succeed with more time spent integrated in the general education classrooms.   Both had additional struggles due to the pandemic, and parents reported a lack of support during periods of remote instruction, and both have had difficulty returning to the classroom.   KCS did not conduct an FBA that adequately explains the reasons for behaviors, which is necessary to develop a BIP that addresses those behaviors appropriately, and FBAs are not supported by sufficient data

18

collection.   For example, Dr. Boyd suggested that suspending a student for running away or attempting to escape may be counterproductive and encourage the behavior.

For both students, Dr. Boyd found that the BIPs do not contain appropriate individualized interventions for targeted behaviors, do not provide staff with sufficient specific guidance as to how to respond to behavior, do not identify appropriate replacement behaviors, do not identify or provide skill training to support replacement and adaptive behavior, and do not identify which staff members are to implement interventions or what methods should be applied.   She found that BIPs and FBAs are not reviewed and revised based on updated data to make changes based on the students' response to various interventions.   She also noted the need for more meaningful collaboration with parents for both students.   As Dr. Haines and Dr. Ball emphasized, parents are included in the IEP process, and there were instances in which both G.T. and K.M.'s parents chose not to respond to invitations to provide input or attend meetings.   However, the concerns expressed by both Dr. Boyd and Dr. Elliott focused on the failure to incorporate parents' reports about behavior, strategies for addressing behavior, rewards, triggers, or changes in home life that may contribute to stress into behavior plans.   Dr. Boyd concluded that for both G.T. and K.M., "KCS has responded with discipline to challenges that could be effectively addressed through the provision of behavior supports.   KCS places the onus on the students to improve their behavior rather than taking a step back to evaluate what changes staff can make to support them."   (Boyd Rep. at 56.)

## APPLICABLE LAW

### A.  Substantive Law

Public schools are required to provide children with disabilities with a free and appropriate

public education (FAPE) in the least restrictive environment (LRE) under the Individuals with

Disabilities Education Act (IDEA).   20 U.S.C. § 1412(a)(1), (5).   The Fourth Circuit explained

that the IDEA requires states to provide disabled children with a FAPE in the "least restrictive and

appropriate environment, with the child participating, to the extent possible, in the same activities

as non-disabled children."   *MM ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 526 (4th

Cir. 2002) (citing 20 U.S.C. § 1412(a)(5)(A)).   Schools are not required to provide the best

possible education or all services that might prove helpful for a child but must meet the minimum

standard of providing a FAPE.   *Id.* at 526-27.

"The IEP is 'the centerpiece of the statute's education delivery system for disabled

children,' and "must be drafted in compliance with a detailed set of procedures."   *Endrew F. ex

rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017) (quoting *Honig v. Doe*,

484 U.S. 305, 311 (1988)).   "To meet its substantive obligation under the IDEA, a school must

offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the

child's circumstances."   *Id.* at 999.   "The adequacy of a given IEP turns on the unique

circumstances of the child for whom it was created."   *Id.* at 1001.

In *Endrew F.*, the school offered IEPs that repeated the same goals from year to year and

did not meaningfully address behavioral issues associated with the child's autism.   *Id.*at 996.   His

parents moved him to a private school specializing in educating children with autism, where both

his behavior and his academic progress improved significantly with a robust behavioral

20

intervention plan.  *Id.* at 996-97.  The public school offered an IEP similar to those offered in previous years and declined to adopt a behavioral plan similar to the one that helped Endrew at the private school.  *Id.* at 997.  Lower courts denied relief, and the Supreme Court established standards for schools' obligations under the IDEA and remanded.  *Id.*

The Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (Section 504), generally construed to "impose similar requirements," prohibit public schools from discriminating against children on the basis of disability.  *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012).  Both statutes require public institutions to make reasonable accommodations for people with disabilities.  *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017).

### B.  Class Certification

Rule 23 of the Federal Rules of Civil Procedure governs class action litigation.  It provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  The Plaintiffs seek to certify a class pursuant to Rule 23(b)(2), which further requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

## DISCUSSION

The Plaintiffs seek to certify a class of "All Kanawha County Schools students with disabilities who need behavior supports and have experienced disciplinary removals from any classroom." (Pl.s' Mem. at 1.) They argue that hundreds of students protected under the IDEA, ADA, and Section 504 have been subject to unnecessary discipline due to the lack of adequate behavior supports. The Plaintiffs presented data indicating that KCS students with disabilities are suspended at a disproportionate rate compared to their peers without disabilities, and that the disparity in suspension rates in KCS is the highest in West Virginia and among the highest among large school districts nationally. They further note evidence that those numbers do not include many instances in which the schools call parents informally to pick up students with disabilities due to behavior problems. They argue that these removals harm students by impeding their academic progress, interfering with development of social skills and relationships, and causing disengagement and alienation from school.

The Plaintiffs argue that "KCS currently lacks adequate systems and procedures to ensure that (1) KCS students with disabilities who need behavior supports are properly identified; (2) the cause of the disruptive behaviors is properly identified; (3) appropriate supports are implemented through IEPs, Section 504 service plans, and BIPs; (4) these plans are properly implemented, such that students actually receive prescribed supports; and (5) the implementation of the plans, and whether students actually make appropriate progress, are meaningfully monitored." (Pl.s' Mem. at 13.) They contend that KCS's failure to monitor data related to behavioral supports or discipline contributes to its failure to respond appropriately to the trends revealed by that data,

22

including the disproportionate suspension rates for students with disabilities.   Better use of data could also identify individual students in need of additional or different behavior supports.

In response, KCS argues that it "has in place extensive policies and practices for identifying students with disabilities, evaluating their needs, implementing individualized education plans and related supports, and regularly monitoring student progress."   (Def.'s Resp. at 1.)   It argues that the Plaintiffs do not point to a specific policy or practice that injures the class, but instead demand that KCS improve outcomes based on the subjective analysis of the experts hired by the Plaintiffs. It disputes many of the factual contentions of the Plaintiffs' experts, as well as their assessments of legal standards and requirements.   KCS argues that the standardized systemic changes the Plaintiffs advocate for would be contrary to the individualization necessary in developing IEPs and supports for students with disabilities.   "Plaintiffs' effort to collectivize student behavior, homogenize all behavior intervention, and re-imagine school board policies based on their sense of 'best practice' is misguided."   (Def.'s Resp. at 3.)   KCS's experts challenged the premise that data regarding rates of discipline for students with disabilities has any meaningful use, given that each student and each instance of discipline is unique.

KCS contends that precedent does not support certifying a class for the "amorphous and wide-ranging" allegations presented in this case.   (Def.'s Resp. at 2.)   "[C]lass actions alleging a litany of failures or systemic inadequacies are wholly disfavored."   (*Id.* at 21.)   It argues that it follows state policy guidelines to comply with IDEA and its implementing regulations.   KCS contends that "the IEP team is not required by the IDEA to implement any specific behavioral interventions or supports," but must merely consider the use of such interventions if it determines that a student's behavior impedes his or her learning or that of others.   (*Id.* at 5–6.)   It argues

23

that the IDEA generally does not mandate use of FBAs or BIPs, except when a student has more than ten days of disciplinary removals and the IEP team finds that the behavior is a manifestation of the student's disability. Neither the IDEA nor West Virginia policy specifies the content of FBAs or BIPs, and "behavior intervention plans and methods can vary widely in scope, breadth and complexity. The implementation of behavior modification interventions is no guarantee that those strategies will prevent or reduce unwanted behaviors." (*Id.* at 9.) KCS further argues that sufficient data collection, monitoring, and oversight take place through the West Virginia Department of Education, which collects annual suspension and expulsion data.

The Court will address these merits-based arguments as relevant to the class certification criteria, particularly the application of Rule 23(b)(2). Although the merits may be intertwined to some extent with class certification factors, and an understanding of the parties' factual contentions related to the merits provides useful background, "the merits of a claim may be considered only when 'relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Brown v. Nucor Corp.*, 785 F.3d 895, 903 (4th Cir. 2015) (*Brown II*) (quoting from *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).

## A. Numerosity

The Plaintiffs indicate that the proposed class includes more than 1,000 students, with at least 390 students with disabilities who received behavior supports and were suspended at least once identified for the 2019-2020 school year alone. The Defendant does not contest numerosity.

In general, if a class includes more than forty members, it may be presumed that joinder of all members would be impracticable. *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 20-2184, 2021

WL 3379035, at *3 (4th Cir. Aug. 4, 2021).   The proposed class here is well above that threshold, and the Court finds that the Plaintiffs have satisfied the numerosity requirement.

### B.  Ascertainability

The Plaintiffs further argue that the proposed class is readily identifiable.   They contend that individual class members may be identified based on the information produced by KCS during discovery, although individual identification is unnecessary because they "seek only unitary injunctive and declaratory relief for the benefit of the entire class under Rule 23(b)(2)."   (Pl.s' Mem. at 18).   The Defendant argues in response that the "class definition hinges on whether a student 'needs behavior supports,'" which is not an objective criteria that can be readily ascertained.   (Def.'s Resp. at 23.)   It stresses that producing spreadsheets noting which students received behavior supports required a great deal of effort and individual judgment, and the process by which IEP teams determine that a student needs behavior support is even more intensive and individualized.

The Fourth Circuit has explained that ascertainability is "an implicit threshold requirement" to class certification.   *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014). "A class cannot be certified unless a court can readily identify the class members in reference to objective criteria."   *Id.*   "The plaintiffs need not be able to identify every class member at the time of certification," but it must be possible to identify class members without extensive individualized fact finding.   *Id.*   Where a court is "presented with data" sufficient to identify class members, any concern regarding ascertainability is "obviated."   *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir.), *cert. denied*, 140 S. Ct. 676 (2019).   When identification of class members requires greater effort, the "district court should also determine whether it is

possible to adjust the class definitions to avoid or mitigate the administrative challenges." *EQT Prod.*, 764 F.3d at 360.

Although the Defendant does not routinely produce data identifying all students with disabilities who receive behavior supports, it was able to assemble such information during class discovery.   Furthermore, more thorough collection of data is part of the remedy sought in this litigation.   *See, e.g.*, *Gaston v. LexisNexis Risk Sols., Inc.*, 483 F. Supp. 3d 318, 334 (W.D.N.C. 2020) (noting that the defendants designed the system that made identification of class members more difficult).   Based on the data presented and analyzed by the parties and their experts, class members appear to be readily identifiable.   To the extent any difficulties arise, tweaking the class definition to reference specific criteria found in student records would be possible.[10]

### C. Commonality

The Plaintiffs cite precedent finding that commonality is more readily established in cases seeking injunctive relief, as the systemic policies for which relief is sought are common to all class members.   They further rely on Dr. Elliott's report identifying consistent problems with the response to challenging behaviors repeated throughout the students records she reviewed.   The Plaintiffs summarize the common questions as follows: "whether the BOE properly (1) identifies students with disabilities who need behavior supports; (2) develops and implements those supports, including in BIPs; (3) monitors whether the students then make academic progress; (4) avoids unjustified disciplinary removals from the classroom; (5) trains its staff to undertake these essential

---

10 As the Plaintiffs point out, disputes about whether individual students should be included in the class are unlikely, given that they seek only class-wide injunctive and declaratory relief.   In a well-reasoned opinion, the Third Circuit held that ascertainability or identification of individual class members is not required for classes certified under Rule 23(b)(2) that seek only injunctive relief.   *Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015).   The Fourth Circuit has not yet ruled on that question, and because the Court finds that the class is ascertainable, it is unnecessary to determine whether ascertainability is required.

functions of educating children with disabilities; and (6) ensures students receive needed behavior supports to avoid discrimination."   (Pl.s' Rep. at 6.)

KCS argues that plaintiffs in IDEA class actions "must establish 'a common driver,' indicating that the school district utilized 'a common mode of exercising discretion' amongst the class plaintiff students."   (Def.'s Resp. at 26, citing *Parent/Pro. Advoc. League v. City of Springfield, Massachusetts*, 934 F.3d 13, 30 (1st Cir. 2019.))   It urges the Court to "reject Plaintiffs' effort to frame the class's injuries in terms of a broken whole-school system—rather than focusing on the application of that system to each student as required under the IDEA."   (*Id.*) It argues that, as in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011), higher-level administrators entrust the decisions that the Plaintiffs critique "to those educational professionals closest to the student."   (*Id.* at 27.)   KCS further contends that the causes of the students' behavior that results in discipline cannot be linked generally to its policies, but instead results from unique circumstances in each instance.   It argues that class treatment would deny it the ability to proffer defenses as to the claimed denial of a FAPE as to each individual student.

To establish commonality, "claims must depend upon a common contention…[which] must be of such a nature that it is capable of class wide resolution."   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).   In *Wal-Mart*, the Supreme Court found that a suit "about literally millions of employment decisions" lacked "some glue holding the alleged *reasons* for all those decisions together."   *Id.* at 352 (emphasis in original).   The Court found that there was "no convincing proof of a companywide discriminatory pay and promotion policy" and thus that the proposed class had "not established the existence of any common question."   *Id.* at 359 (emphasizing that class members had different jobs, at different levels, for different periods, with

different managers, subject to different regional policies, in thousands of stores across the country). In a case considering the impact of the Supreme Court's holding in *Wal-Mart*, the Fourth Circuit explained that "[t]he scale and scope of the putative class, combined with the nature of the evidence offered, was thus essential to *Wal–Mart's* holding." *Brown v. Nucor Corp.*, 785 F.3d 895, 910 (4th Cir. 2015).   In *Brown II*, the Fourth Circuit found that class certification was proper for a class alleging racial discrimination in a single plant, finding that the district court erred in interpreting *Wal-Mart* to support treating "departments as autonomous operations…instead of part of a single facility."  *Id.* at 911.

The Fourth Circuit further found that the evidence presented was simply more probative than that rejected in *Wal-Mart*, noting the relatively high proportion of putative class members who submitted evidence regarding their experiences.  *Id.*at 912.  The students with disabilities who make up the proposed class in this case did not submit declarations directly recounting their experiences, but Dr. Elliott's exhaustive review of student records for a significant, representative portion of the class provides similarly strong evidence of the consistent problems with the services provided—or not provided—to students with disabilities with behavioral challenges in Kanawha County Schools.   In addition, the "scale and scope" of the proposed class herein stands in stark contrast to that in *Wal-Mart*: the Plaintiffs propose a class consisting of students with disabilities who need behavior support and have been subject to disciplinary removals within a single school district, whereas the proposed class in *Wal-Mart* consisted of 1.5 million women who worked in 3,500 Wal-Mart stores nationwide.   *Wal-Mart Stores, Inc.*, 564 U.S. at 359–60.

A review of out-of-circuit cases involving class certification for IDEA claims confirms that the commonality analysis rests largely on the quality of the evidence supporting allegations of common policies or common patterns and practices. The Seventh Circuit found certification of a class of students eligible for special education services who had been denied or delayed services improper where an expert reviewed approximately 200 files (in a district where approximately 16,000 students were eligible for special education) but "engaged in no statistical analysis or other accepted analytical method to determine whether any particular violation of the IDEA could properly be characterized as 'systemic.'" *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 488 (7th Cir. 2012). The First Circuit found that an expert report relied upon by the plaintiffs "claims to find a pattern of legal harm common to the class without identifying a particular driver – a uniform policy or practice that affects all class members – of that alleged harm." *Parent/Pro. Advoc. League v. City of Springfield, Massachusetts*, 934 F.3d 13, 30 (1st Cir. 2019) (internal quotation marks omitted).

The First Circuit further explained that "in class actions relating to special education…plaintiffs can satisfy Rule 23(a)'s commonality requirement by identifying a uniformly applied, official policy of the school district, or an unofficial yet well-defined practice, that drives the alleged violation." *Id.* at 29. In another case, the D.C. Circuit remanded for consideration of whether sub-classes might be appropriate where there was not adequate evidence connecting alleged deficiencies within different aspects of the district's processes for identifying eligible children and providing services in the early-education years. *DL v. D.C.*, 713 F.3d 120, 128–29 (D.C. Cir. 2013).

Here, the Plaintiffs presented expert evidence that combined statistical analysis of the disproportionate rates of suspension for students with disabilities with detailed qualitative analysis of student records isolating the deficiencies in behavioral supports that led to those suspensions. Students with disabilities in Kanawha County are subject to disciplinary removals at a rate disproportionate to their non-disabled peers, and at a higher and more-disproportionate rate than students with disabilities in most other school districts in the state and most other large school districts nationally.   Dr. Elliott described several patterns common among a statistically valid sample of student records.   Her findings in those records coincided with the findings of Dr. Boyd with respect to the two Named Plaintiffs.   Dr. Elliott's report reveals a lack of oversight and training at the district level, which deprives school-level IEP teams with the direction and resources necessary to support students.   As a result, classroom teachers without adequate training bear the burden of identifying students who require behavior supports and designing such supports for the complex, individual needs of students with a variety of disabilities.   Although some schools performed better than others, suggesting that personnel in those schools could assist those in schools with particularly high rates of discipline for students with disabilities, Dr. Elliott identified similar procedures and deficiencies throughout the district, including inadequate attention to root causes of behavior, mis-classification of disability eligibility categories, failure to collaborate with parents to design effective and consistent BIPs, a failure to consistently implement BIPs or less formal behavior support plans, and a lack of evaluation and adjustment to plans over time to reflect the responses and changing needs of students.

In addition to the common patterns among school-level decisions, the evidence suggests district-wide deficiencies.   The use of expedited FBAs with limited information is district-wide,

30

and specialized staff like BCBAs and autism itinerant specialists are shared throughout the district. The lack of adequate access to supportive services like psychological and psychiatric care and cognitive behavioral therapy is likewise a district-wide issue.

While the Plaintiffs cannot point to a single policy, they have identified, and provided significant evidence of, a cohesive pattern that reveals the absence of a required element of providing a FAPE in the LRE: KCS does not have an effective system for developing and implementing behavioral supports for students with disabilities whose behavior interferes with their learning or that of others.   Each student will need a different set of supports, but this case is not about the behavioral supports that should be provided to the individual students within the proposed class.[11]   It is about the procedures that KCS uses, or does not use, to develop and implement those supports.   Injunctive relief related to district-wide policies, procedures, and resources would resolve the claims for the class as a whole.   Therefore, the Court finds that the Plaintiffs have adequately demonstrated commonality.

### D.  Typicality

The Plaintiffs next contend that the Named Plaintiffs' claims are typical of those of the class.   They argue that "[t]ypicality is satisfied here because the individual Named Plaintiffs are both KCS students with disabilities who need behavior supports and have experienced disciplinary removals from any classroom, and they share the same interests as the absent class members." (Pl.s' Mem. at 27.)   "The claims raised by the Named Plaintiffs arise out of KCS's systemic failures and are essentially identical to the claims of the absent class."   (*Id.*)   They note that Dr.

---

11  Because the Plaintiffs do not assert individual claims or seek individual relief, there is no need for the Defendant to formulate defenses as to the denial of a FAPE for individual class members that would defeat a finding of commonality.

Boyd "found significant similarities in the educational programs of the two Named Plaintiffs." (*Id.*)  Both had FBAs and BIPs without adequate analysis of the root causes of behaviors and without sufficiently individualized interventions, both lacked adequate parental involvement, both lacked clear and objective goals, and both students experienced disciplinary removals, as well as more restrictive placements, because of behaviors related to their disabilities.

KCS argues that G.T. and K.M. are not typical of the class, citing some of Dr. Elliott's findings that do not apply to them, including her findings that KCS often incorrectly does not find that a student's behavior impedes her learning or is a manifestation of her disability.   For both G.T. and K.M., KCS found that their behaviors impede their learning and that their behaviors are a manifestation of their disabilities, and it conducted FBAs and developed BIPs for both.   KCS further argues that the fact that the results of the two due process proceedings for G.T. and K.M. reached different results demonstrates that their claims are distinct from each other and from any potential class.

Typicality requires that the class representative's claims be typical of those of class members to ensure that the named plaintiffs share the interests of the class.  *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'"  *Id.* (quoting *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 340 (4th Cir.1998)). Therefore, while typicality does not "require[] that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned," the "plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim."  *Id.* at 466–67.   "The typicality requirement goes to the heart of a

32

representative parties' ability to represent a class, particularly as it tends to merge with the commonality and adequacy-of-representation requirements." *Id.* at 466.

G.T. and K.M. both fit squarely into the proposed class definition as students with disabilities who need behavioral support and have experienced disciplinary removals from their classrooms.   As both parties recognize, IEPs and behavioral supports for students with disabilities must be individualized to fit the needs of each unique student.   Typicality does not require that the Named Plaintiffs have experiences identical to those of the class.   Instead, it requires that they have *claims* sufficiently typical to adequately represent the interests of the class.   The Named Plaintiffs, like the proposed class, claim to have been denied a FAPE in the LRE due to inadequate support for challenging behaviors related to their disabilities.   While both have FBAs and BIPs, due in part to the extensive advocacy of their parents and others involved in this litigation, both have continued to struggle to access services they need, to have behavioral supports tailored to their needs, to be integrated into general education classrooms, and to receive even the allegedly inadequate behavioral supports outlined in their BIPs on a consistent basis.   In addition, they remain exposed to the inadequate procedures in KCS.   As they develop different challenging behaviors requiring a different set of responses and supports from KCS, they, like other students with disabilities, will not be able to count on well-trained professionals carefully assessing their needs, designing a BIP responsive to those needs, ensuring that it is consistently implemented, and adjusting it as needed.   Therefore, the Court finds that the Named Plaintiffs' claims are typical of those of the class.

E.  *Representation*

Next, the Plaintiffs contend that the Named Plaintiffs and the proposed class counsel will fairly and adequately represent the interests of the class.   They indicate that the Named Plaintiffs and their parents are committed to this litigation, particularly as they both remain at risk of the harms alleged by the class.   They further contend that the attorneys representing the class have worked and will continue to work extensively to identify and litigate the claims.   They argue that the proposed class counsel are well-qualified, experienced, and possess adequate resources to pursue this litigation.   The Defendant does not contest adequate representation.

The Named Plaintiffs and their families have demonstrated their commitment to this litigation, pursuant to Rule 23(a)(4).   Rule 23(g) requires that the Court consider the work performed by counsel in "identifying or investigating potential claims in the action," counsel's relevant experience and knowledge, and "the resources that counsel will commit to representing the class."   Fed. R. Civ. P. Rule 23(g)(1)(A).   The group of attorneys seeking to represent the class are collectively exceptionally well-qualified, including local attorneys experienced in civil rights litigation in this district, attorneys with both state and national experience in disability rights litigation, and attorneys with extensive experience in class litigation.   The range and depth of expertise will ensure that the Plaintiff class receives knowledgeable and competent representation. The attorneys have also represented that their respective organizations and firms are committed and able to expend the resources necessary to represent the class.   They have ably identified and investigated potential claims, including assisting the Named Plaintiffs during the due process hearings prior to initiating this suit.   Accordingly, the Court finds that the Named Plaintiffs are appropriate class representatives, and that they and their attorney will fairly and adequately protect

the interests of the class.   The Court will also grant the Plaintiffs' motion to appoint their attorneys as class counsel.

### F.  Rule 23(b)(2)

Finally, the Plaintiffs argue that class certification under Rule 23(b)(2) is appropriate because they allege that KCS has acted or refused to act on grounds generally applicable to the class, and injunctive and declaratory relief are suitable remedies.   They argue that the systemic civil rights violations alleged in this suit are precisely the type of claims typically certified under Rule 23(b)(2).

KCS argues that the Plaintiffs do not seek a single, class-wide injunction, but instead seek a variety of system changes and improvements that, as applied to each student, amount to a series of individual injunctions.   The Plaintiffs also seek appointment of an independent monitor, relief that KCS argues is unavailable under the Federal Rules and would simply prompt ongoing litigation, while the IDEA establishes the due process hearing system to serve the similar purpose of addressing disputes with regard to implementation policies and services as to individual students.

"Rule 23(b)(2) permits the court to certify a case for class-action treatment if 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'"   *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 498–99 (7th Cir. 2012) (quoting Fed. R. Civ. P. 23(b)(2)).   "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.   It does not authorize class certification when each individual class member would be entitled to a *different* injunction or

declaratory judgment against the defendant."   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360,

(2011).   "Rule 23(b)(2) sets forth two basic requirements: (1) the party opposing the class must

have acted, refused to act, or failed to perform a legal duty on grounds generally applicable to all

class members, and (2) final relief of an injunctive nature or a corresponding declaratory nature,

settling the legality of the behavior with respect to the class as a whole, must be appropriate."

*Gaston v. LexisNexis Risk Sols., Inc.*, 483 F. Supp. 3d 318, 341 (W.D.N.C. 2020).

As the Court found *infra* with respect to commonality, the Plaintiffs have presented

significant evidence that KCS does not provide the oversight, support, and resources necessary to

support students with disabilities whose behavior impedes their learning or that of their classmates.

It is clear from the Plaintiffs' data that for many students with emotional and intellectual

disabilities, behavior issues are interfering with the ability to receive a FAPE.   The behaviors

themselves interrupt class, the student's removal interrupts his or her own learning, and continued

behavior issues may unnecessarily prompt placement outside the general education environment.

It is equally clear that KCS's approach is not working.

One single policy change would not be sufficient to resolve the Plaintiffs' claims, but they

seek a single injunction addressing multiple inadequacies in KCS's special education program that

would serve to remedy the claims of all class members.   Class members are generally impacted

by most or all of the inadequate systems and processes cited by the Plaintiffs, in contrast to cases

in which a class could be subdivided based on the different harms posed by each alleged flaw in a

special education system.   The changes sought might ultimately impact individual students' IEPs,

but the Plaintiffs do not seek, and the Court would not award, an injunction that requires or

provides ongoing oversight of individual IEPs or Section 504 Plans.   This case is about fixing

36

systemic problems with the way KCS addresses disability-related behavioral problems to ensure that students receive a free and appropriate public education, not about the content of each student's IEP or the disciplinary decisions made following each behavioral infraction.

Whether the Plaintiffs ultimately prove that KCS is not providing a free and appropriate public education in the least restrictive appropriate environment to the class members, that its failure is derived from the deficiencies alleged herein, and that those failures can be corrected with a legally supported class-wide injunction remains to be seen.   At this stage, the Court finds that the Plaintiffs have presented sufficient evidence to support certification of the proposed class pursuant to Rule 23(a) and Rule 23(b)(2).

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the *Defendant's Motion to Strike* (Document 129) be **GRANTED in part and DENIED in part**, as set forth in detail herein, and that the *Defendant's Motion to Strike Dr. Elliot's Supplemental Declaration and Supplemental Report* (Document 134) be **DENIED**.   The Court further **ORDERS** that the *Plaintiffs' Motion for Class Certification* (Document 120) be **GRANTED**. The Court **ORDERS** that the following class be **CERTIFIED**: All Kanawha County Schools students with disabilities who need behavior supports and have experienced disciplinary removals from any classroom.   The Court **ORDERS** that counsel of record for the Plaintiffs, including Lydia C. Milnes, Blaire L. Malkin, Lori Waller, Robin Hulshizer, Kirstin Scheffler, Karen Klass, Jaime Zucker, Ira A. Burnim, Lewis Bossing, and Shira Wakschlag, together with their respective firms and organizations, be **APPOINTED** as class counsel.   Lastly, the Court, finding that this matter is suitable for mediation, does hereby **ORDER** that the parties appear and participate in

good faith in mediation with Robert B. Allen, Attorney at Law, with the firm of Kay Casto & Chaney, within thirty (30) days of the entry of this order.  Counsel for the parties shall jointly contact Mr. Allen to schedule said mediation and shall provide him with all requested documents and information necessary to conduct the same.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:    August 24, 2021

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA