IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

G.T., *by his parents Michelle and Jamie T.*
*on behalf of themselves and all similarly situated*
*individuals*, et al.,

       Plaintiffs,

v.

                                CIV. ACT. NO. 2:20-CV-00057
                                JUDGE BERGER

THE BOARD OF EDUCATION OF
THE COUNTY OF KANAWHA,

       Defendant.

_____

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

_____

J. Mark Adkins (WVSB #7414)
Richard S. Boothby (WVSB #9572)
Gabriele Wohl (WVSB #11132)
William M. Lorensen (WVSB #13223)
BOWLES RICE LLP
600 Quarrier Street
Post Office Box 1386
Charleston, West Virginia 25325-1386
(304) 347-1100
Fax: (304) 347-1756
madkins@bowlesrice.com
rboothby@bowlesrice.com
gwohl@bowlesrice.com
wlorensen@bowlesrice.com
*Counsel for the Board of Education of the County of Kanawha*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

    A.    Policy 2419 is the measuring stick for KCS's compliance with the IDEA. ............ 2

    B.    Over the intervening period, KCS implemented an improvement plan with respect to its practices for providing and monitoring behavior supports. ............... 3

    C.    Over the intervening period, KCS's suspension rates for students with disabilities have decreased and become less disparate. ......................................... 5

    D.    Plaintiffs failed to develop any evidence regarding KCS's systemic practices since 2021, and instead downplay KCS's intervening changes. ............................ 7

    E.    Plaintiffs failed to develop evidence on the services provided to build students' social skills and self-regulation skills at KCS. ........................................ 8

    F.    G.T.'s individual circumstances have changed since the 2021-2022 school year and KCS has adapted his services to meet his needs. ................................... 9

    G.    Lacking any evidence of a uniformly applied policy or practice, Plaintiffs reuse their approach from last time: citing unpersuasive expert opinion to imply widespread failure ....................................................................................... 10

ARGUMENT ................................................................................................................... 11

    A.    Plaintiffs fail to adhere to the law-of-the-case on the requisite commonality showing. ................................................................................................................ 11

    B.    The renewed class definition suffers a series of related Rule 23 failures that expose the judicial inefficiencies in certifying this class. .................................... 14

    C.    Plaintiffs fail to establish final and class-wide injunctive relief under Rule 23(b)(2). ............................................................................................................... 16

    D.    The Renewed Motion should be denied for failure to exhaust. ........................... 17

CONCLUSION ................................................................................................................ 20

## TABLE OF AUTHORITIES

**Cases**

*Bd. of Educ. of the Cnty. of Hedrick Hudson v. Rowley*,
458 U.S. 176 (1982) ........................................................................................ 17

*E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*,
773 F.3d 509 (4th Cir. 2014) ..................................................................... 18, 19

*Endrew F. v. Douglas Cnty. Sch. Dist.*,
580 U.S. 386 (2017) ........................................................................................ 14

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ......................................................................... 15

*G.T. v. Bd. of Educ. of Cnty. of Kanawha*,
117 F.4th 193 (4th Cir. 2024) .................................................................... 12, 14

*Jamie S. v. Milwaukee Pub. Sch.*,
668 F.3d 481 (7th Cir. 2012) ......................................................................... 17

*Johnson v. Charlotte-Mecklenburg Sc. Bd. of Educ.*,
20 F.4th 835 (4th Cir. 2021) ........................................................................ 2, 20

*Kirkpatrick v. Lenoir Cnty. Bd. of Educ.*,
216 F.3d 380 (4th Cir. 2000) ......................................................................... 18

*M.E. es rel. C.E. Buncombe Cnty Bd. of Educ.*,
72 F. App'x 940 (4th Cir. Aug. 18, 2003) ................................................... 18

*M.M. ex rel. D.M. v. School Dist. of Greenville Cnty.*,
303 F.3d 523 (4th Cir. 2002) ......................................................................... 18

*Marcus v. BMW of N.A., LLC*,
687 F.3d 583 (3d Cir. 2012) .......................................................................... 15

*Roland M. v. Concord Sch. Comm.*,
910 F.2d 983 (1st Cir. 1990) ......................................................................... 18

*Schaffer ex rel. Schaffer v. Weast*,
546 U.S. 49 (2005) ............................................................................................ 2

*Schaffer ex rel. Schaffer v. Weast*,
554 F.3d 470 (4th Cir. 2009) ..................................................................... 18, 19

*Shook v. Bd. of Cnty. Comm. of El Paso*,
   543 F.3d 597 (10th Cir. 2008) ............................................................................ 16

*Springer v. Fairfax Cnty Sch. Bd.*,
   134 F.3d 659 (4th Cir. 1998) .............................................................................. 18

*Stafford v. Bojangles' Restaurants, Inc.*,
   123 F.4th 671, 680 (4th Cir. 2024) .................................................................... 12

*Student A by and through Parent A v. San Fran. Unified Sch. Dist.*,
   9 F.4th 1079 (9th Cir. 2021) ........................................................................ 19, 20

*T.R. v. Sch. Dist. of Philadelphia*,
   458 F. Supp. 3d 2742 (E.D. Pa. 2020) .............................................................. 19

*White*,
   64 F.4th 302 (D.C. Cir. 2023) ............................................................................ 12

**Statutes**

20 U.S.C. § 1415(i)(2)(A) ........................................................................................ 18

20 U.S.C. § 1416(a)(3) ............................................................................................. 17

**Rules**

Fed. R. Civ. P. 23(b)(2) ......................................................................................... 1, 16

Fed. R. Civ. P. 23(a)(1) ............................................................................................ 15

## INTRODUCTION

Since the last round of class certification briefing, the Defendant Board of Education of the County of Kanawha ("KCS") implemented an improvement plan monitored by the West Virginia Department of Education ("WVDE").  The plan addresses KCS's practices for identifying students with disabilities who need behavior supports, providing supports, monitoring the provision of supports, and monitoring out-of-school suspensions for students with disabilities.  The WVDE has commended KCS for implementing the plan with fidelity, and the suspension rates for students with disabilities have decreased significantly in the interim.

In the Motion for Class Certification (ECF No. 222, the "Renewed Motion"), Plaintiffs ignore the intervening changes, cite no evidence about current systemic practices, and seek to re-certify the same putative class as before albeit with minor tweaks to their vocabulary.  Plaintiffs' renewed putative class definition is "All [KCS] students identified by [KCS] as having disabilities and needing behavior supports but who are not being provided with appropriate therapies to build social skills and self-regulation."  (ECF No. 224 at 7.)  Plaintiffs claim that KCS has "practice of failing to provide class members with therapies needed to make educational and behavioral progress in school – namely, therapies that improve social skills and self-regulation."  (*Id.*)

The Renewed Motion defies the law-of-the-case: there is no uniformly applied policy or well-defined practice harming students with disabilities at KCS.  Related Rule 23 problems stem from that, all of which show that certifying another class would thwart (rather than serve) judicial economy.  The record is clearer than ever that Plaintiffs fail to establish that their relief requested comports with Federal Rule of Civil Procedure 23(b)(2).  Finally, the Renewed Motion is barred by the law of exhaustion.  Defendant requests that the Renewed Motion be denied.

## BACKGROUND

**A.    Policy 2419 is the measuring stick for KCS's compliance with the IDEA.**

Under the IDEA, "[p]articipating States must certify to the Secretary of Education that they have policies and procedures that will effectively meet the [IDEA's] conditions." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 52-53 (2005). Meanwhile, local education agencies (LEAs) like KCS must "certify to [their respective] state education agency that they are acting in accordance with the State's policies and procedures." *Id.* Put differently, a local school board is "charged with fulfilling the state's obligations under the IDEA for students within [its] jurisdiction." *Johnson v. Charlotte-Mecklenburg Sc. Bd. of Educ.*, 20 F.4th 835, 839 n.2 (4th Cir. 2021). As such, an LEA's "systemic" compliance with the IDEA is measured by its compliance with its State's implementing regulations. *Id.*

The West Virginia Board of Education (WVBE) promulgated Policy 2419 as West Virginia's "approved [IDEA] policies and procedures." (Exhibit 1, Policy 2419 (eff. 2023) at 11.) Policy 2419 "outlines the policies and procedures districts must follow in meeting the requirements of the IDEA." (*Id.*) The WVBE has the "primary responsibility" for establishing IDEA policies and procedures for LEAs. (*Id.* at 89-92.) LEAs (like KCS) are responsible for adopting and complying with Policy 2419 and providing a free appropriate public education (FAPE) in the least restrictive environment (LRE) to students with disabilities enrolled in their schools. (*Id.* at 92-93.) The WVBE prohibits county LEAs from making any changes to Policy 2419 without state approval:

> To receive funds under IDEA, LEAs must adopt and implement appropriate special education policies and procedures. These procedures . . . must be approved by the [WVBE]. This manual [Policy 2419] is provided to each LEA as WVBE- approved policies and procedures to be adopted by the LEA. Any changes to procedures outlined in the manual must have WVBE approval.

(*Id.* at 31.)

2

When the State directs LEAs to enact policies, practices, plans, or procedures in addition to those required by Policy 2419, that direction is ordinarily made in response to relevant statistical indicators.  (Exhibit 2, WVDE Explanation of Indicators.)   Issues meeting a WVDE statistical indicator may subject an LEA to a WVDE-monitored improvement plan regarding their compliance with applicable policies, procedures, and practices.  (Ex. 1 at 123.)

**B.    Over the intervening period, KCS implemented an improvement plan with respect to its practices for providing and monitoring behavior supports.**

In the 2021-2022 school year, KCS had a significant discrepancy[1] in out-of-school suspensions on the basis of disability (Indicator 4A) and race and ethnicity (Indicator 4B).  (Exhibit 3, 2023 ADA Results at 2.)  In response, per Policy 2419, KCS developed and implemented a targeted systemic improvement plan.   (Exhibit 4, 2023 ADA Improvement Plan.)   The improvement plan was developed by KCS's Office of Exceptional Students ("OES") and is monitored by the WVDE, which evaluates statistical and qualitative indicators to assess whether the plan is being implemented by the school district with fidelity.

Per the improvement plan, KCS created and hired two new specialist positions at OES to assist, train, and monitor school-based teams.  (Exhibit 5, Def's 1st Supp. Resp. to Plfs' Ltd. Disc. Req. at 8-9.)  The new Special Education Compliance Specialist (Holly Samples) focuses on individualized education plan (IEP) compliance, provides support and training to school-based IEP teams, and monitors a sampling of 40 randomly-selected IEPs on a monthly basis for compliance with Policy 2419.  (*Id.*; Exhibit 6, 2025/04/02 Dep. Tr. of Holly Samples at 16:3-21:6.)  As a part of her regular monitoring of IEPs, Ms. Samples provides feedback to individual IEP teams regarding strengths and areas for improvement.  (Ex. 6 at 20:18-21:6.)

---

[1]    The State defines "significant discrepancy" as whether an LEA exceeds a standard deviation from state-wide rates regarding the percentage of students receiving more than 10 days of out-of-school suspension.  (*See* Ex. 2.)

KCS also created and hired a Behavior Compliance Specialist (Vicky Brown) specializing in student behavior.  (Ex. 5 at 9.)  The Behavior Compliance Specialist provides support and training to school-based teams and administrators regarding the provision of behavior related services to students with disabilities.  (*Id.*)  Ms. Brown monitors out-of-school suspensions on a daily basis to ensure that students with disabilities receiving multiple suspensions for a pattern of behavior have behavior support plans in place.  (Exhibit 7, 2025/04/11 Dep. Tr. of Vicky Brown at 26:9-27:3, 106:20-108:2.)

Notwithstanding the limitations of the State-run WVEIS[2] database, Ms. Brown monitors behavior-related services and evaluations provided to KCS students with disabilities, including behavior support plans (BSPs), behavior intervention plans (BIPs), functional behavior assessments (FBAs), and MDRs.  (Ex. 7 at 10:3-8; 25:13-26:8; 33:9-21.)  KCS is creating new WVEIS tags that, starting in the fall of 2025-2026, will allow school-based teams to flag support services in WVEIS so that OES can monitor them more efficiently.  (*Id.* at 33:9-34:10.)  Also, in the fall of 2025-2026, KCS will roll out its newly purchased behavior dashboard (Aubre).  (Ex. 8 at 149:13-151:21.)  KCS is the first school district in the state to purchase and implement this type of dashboard.  (*Id.*)

In March of 2022, KCS developed a Behavior Support Continuum and a Behavior Supports Quick Guide designed to provide clearer guidance school administrators and educators about the provision of services and multi-tiered levels of supports to students with disabilities.  (Exhibit 9, Behavior Support Continuum.)  The Behavior Support Continuum clarifies the continuum of services and potential next steps depending on existing behavior supports and goals.  (*Id.*; Ex. 7 at

---

[2]    The West Virginia Education Information System (WVEIS) is West Virginia's state-wide student information system.

75:10-76:17.)  The Quick Guide provides examples of common behavior supports based on student grade level and behavior.  (Ex. 9 at 2.)

These are just examples of the increased support, guidance, and training provided by OES to school-based teams to ensure that behavior support services are provided in accordance with individual student needs.  Since the spring of 2021, KCS has conducted more than 60 training sessions on behavior-related issues ranging from de-escalation strategies, crisis prevention, BIPs and data monitoring, and discipline data reviews.  (Exhibit 10, Behavior Trainings Since 2021.) These resources and trainings have been well-received by school-based teams and school administrators.  (Ex. 8 at 36:18-42:6.)

In its 2024 Annual Desk Audit of KCS, the WVDE "commended" KCS "for creating and successfully implementing [its] improvement plan," (Ex. 3 at 2) and found "more evidence of supportive, effective practices in place" indicative of "improvements in supportive behavior approaches and interventions," (Ex. 4 at 2.)  The WVDE found the improvement at KCS to be a "direct result of the continued focus with administration, teachers, parents, and all special education staff."  (*Id.*)

## C.    Over the intervening period, KCS's suspension rates for students with disabilities have decreased and become less disparate.

KCS's population of students with disabilities has increased by approximately 21% since the 2021-2022 school year.  (Exhibit 12, Rodet Report at 3.)  Despite the growing enrollment of students with disabilities, KCS is suspending fewer students and for shorter durations.

Fewer students with disabilities are subject to long-term out-of-school suspensions (i.e., suspensions totaling more than ten school days).  (Ex. 4 at 10-11.)  The number of students with disabilities who received more-than-ten days of suspension over the 2023-2024 school year decreased by almost 27% relative to the 2022-2023 school year.  (*Id.*)  The number of disabled

students suspended for more-than-ten days over the 2023-2024 school year for minimally disruptive behavior plummeted by 59% relative to the year prior. (*Id.*) Despite significant growth in KCS's population of students with disabilities, fewer students are subject to more-than-ten days of suspension over the school year.

Assigning out-of-school suspensions to students with disabilities is increasingly reserved for imminently dangerous, illegal or aggressive behaviors, or behaviors that violate the West Virginia Safe Schools Act. (Ex. 12 at 4-5 (tables 3 and 4).) KCS's suspension rates[3] for students with disabilities are trending towards parity with total suspension rates, particularly suspensions assigned for minimally disruptive behavior (where disparities were most acute in 2021-2022). (*Id.* at table 3.) The trend toward parity at KCS deviates from state-wide trends of increasing disparity. (*Id.* at 6-7 (tables 5-6).) In 2023-2024, the most recent school year for which a cross-comparison is available, KCS has less disparate rates of suspension for students with disabilities than the state-wide rate. (*Id.* at 8 (table 7).) That means KCS has greater parity in out-of-school suspensions compared to the State as a whole.

KCS has lower and more equitable suspension rates for students with disabilities relative to 2021. Consistent with these broader trends at KCS, the WVDE has observed "better alignment with the recommendations from the WVDE to avoid suspensions [for less disruptive behavior] even though this is an allowable consequence per Policy 2419." (Ex. 4 at 2.) KCS has cleared Indicator 4A for the last two consecutive school years where data is available (2022-2023 and 2023-2024).[4] (Ex. 13, KCS ADA Trends at 2.)

---

[3]     Dr. Rodet calculates suspension rates as a percent of behavior incidents that result in out-of-school suspension for students with disabilities as compared to that same percent for all students. (Ex. 12 at 4.)

[4]     Although this Court previously rejected evidence of discrepancies for race and ethnicity, KCS cleared that indicator (Indicator 4B) for black students but narrowly missing the indicator for Hispanic students.

**D.    Plaintiffs failed to develop any evidence regarding KCS's systemic practices since 2021, and instead downplay KCS's intervening changes.**

Plaintiffs have disclosed no expert opinion regarding the quality of KCS's behavior-related practices or aggregate suspension statistics since the spring of 2021. Dr. Sara Boyd did not review any documents regarding KCS's improvement plan. (Exhibit 14, 2025/05/28 Dep. Tr. of Sara Boyd at 10:8-12:1.) She disclaimed being a "policy" or "systems" expert, and limited her opinions to the services provided to G.T. as documented in a cold review of G.T.'s records. (*Id.* at 49:15-22, 134:2-135:6; *infra* at 10-11.) Dr. Judy Elliott last criticized KCS's systemic compliance with the IDEA in 2021, and Plaintiffs have not disclosed any new opinions regarding the current practices or suspension statistics in the four intervening school years. (ECF No. 222-15.)

KCS retained Dr. Shelby Haines, the current Superintendent and former Special Education Director at Marshall County Schools, to evaluate the quality of KCS's current behavior-related practices for students with disabilities. (Exhibit 11, Haines Report.) Dr. Haines found that some elements of KCS's improvement plan go above and beyond WVDE guidelines. (*Id.* at 6.) Dr. Haines found KCS's current practices to be compliant with Policy 2419 and "extremely applicable for systemic improvement within the county." (*Id.*) Dr. Haines concurred with the WVDE's conclusion that KCS "is to be commended for creating and successfully implementing an improvement plan to address policies, procedures, and practices." (*Id.*)

Plaintiffs downplay KCS's improvement plan by quoting excerpts from the deposition transcripts of Ms. Holly Samples and Ms. Vicky Brown. (ECF No. 224 at 10-13.) Plaintiffs' quotations are misleading and omit necessary context,[5] as explained in greater detail in the attached

---

[5]    For the second time, Plaintiffs violate the scheduling order by submitting only excerpts of deposition transcripts in support of certification—notwithstanding this Court's prior warning about that practice. (ECF No. 183 at ¶ 2; ECF No. 139 at n.1.)

declarations. (Ex. 15, Samples Declaration; Ex. 16, Brown Declaration.) As this Court held last time, this sort of selective reliance on an excerpt of a deposition transcript does not "carry significant evidentiary weight," (ECF No. 139 at n.1), particularly given Ms. Samples and Ms. Brown's clarifying declarations and the unrebutted record regarding the improvement plan.

## E.  Plaintiffs failed to develop evidence on the services provided to build students' social skills and self-regulation skills at KCS.

After the close of the Limited Discovery period—and without having conducted any discovery on the topic[6]—Plaintiffs disclosed that their renewed class definition and allegations focus on "therapies to build social skills and self-regulation."

Social and self-regulation skills are separate and important skills for maintaining good behavior in the classroom. Social skills are for relating with other people: like initiating, holding, and contributing to an on-topic conversation. (Ex. 16 at ¶ 9.) Self-regulation skills are for handling unexpected or stressful situations: like internalizing an unexpected situation without eloping. (*Id.*)

The Renewed Motion does not cite any evidence about the services or curricula KCS provides with respect to these skills. KCS provides different types of services to develop a student's social skills and self-regulation skills. Services to build social skills qualify as "direct" IEP services, meaning that KCS provides social skills services as credit-earning, curriculum-based instruction in a classroom setting. (Ex. 16 at ¶ 10.) Improving social skills is identified as an IEP goal and progress toward the goal is measured like any other IEP goal. (*See id.*) Self-regulation services, on the other hand, are not direct services under Policy 2419, but are rather supplemental or related services. (*Id.* at ¶ 11.) They are interventions practiced on "neutral" time (i.e., while

---

[6]    Plaintiffs did not serve any written discovery requests about social skills or self-regulation skills until after they filed the Renewed Motion. Plaintiffs did not ask any of KCS's three Limited Discovery deponents about social skills or self-regulation skills, either. (Ex. 6 at 154-155 (deposition of Holly Samples with zero questions about social or self-regulation skills); Ex. 7 at 155 (deposition of Vicky Brown, same); Ex. 10 at 193-194 (deposition of Megan McCorkle, same).)

the student is calm) and may be provided in an IEP, classroom plan, BSP, or BIP, but generally not as a direct curriculum-based instruction.  (*Id.*)

**F.     G.T.'s individual circumstances have changed since the 2021-2022 school year and KCS has adapted his services to meet his needs.[7]**

During the past school year, G.T. was an 8th grade student at Dunbar Middle School with plans to attend South Charleston High School in the 2025-2026 school year.  (ECF No. 169 at ¶¶ 5, 7.)  During the 2022-2023 and 2023-2024 school years, G.T. achieved good grades, made progress on his IEP goals, and had zero disciplinary incidents.  (*Id.* at ¶¶ 5-6.)  However, in the fall of 2024-2025, G.T. suffered serious behavior regression.  G.T.'s recent behavior has involved suicidal comments and threats of gun violence, resulting in KCS conducting two threat assessments to evaluate the seriousness of his threats to himself and others.  (Exhibit 17, 02/11/25 and 05/11/25 Threat Assessments.)  G.T.'s behavior escalated as recently as the week the Renewed Motion was filed.  (*Id.* at 10-20.)

G.T.'s IEP team held a meeting in November of 2024 to revise his IEP goals.  (Exhibit 18, G.T.'s IEP dated 2024/11/20.)  His IEP includes specific goals for improving his social skills by November of 2025.  (*Id.* at 12 (goals 1 and 3).)  To accomplish this, G.T. receives 225 minutes of social skills instructional curriculum per week.  (*Id.* at 13.)  KCS conducted an FBA in November of 2024, which concluded that G.T. would benefit from a new BIP and hypothesized that the root cause of G.T.'s behavior is to gain attention and escape the demand.  (Exhibit 19, G.T.'s FBA dated 11/20/24 at 20.)  KCS implemented that BIP in January of 2025, then reviewed and updated it on three subsequent occasions throughout the spring semester of 2025 due to G.T.'s continuing and escalating behavior issues.  (Exhibit 20, G.T. BIP dated 1/17/24; Exhibit 21, G.T.'s BIP

---

[7]     Plaintiffs have abandoned K.M. as a representative plaintiff.  They have not disclosed any expert opinion relating to K.M., did not identify him as a member of the putative class in written discovery, and do not mention him in the Renewed Motion.

Update dated 2/13/25; Exhibit 22, G.T. BIP Update dated 3/10/25; Exhibit 23, G.T. BIP Update dated 5/13/25.)  The updates to the BIP included and bolstered antecedent strategies to improve G.T.'s self-regulation skills.  (*Compare* Ex. 21 at 2 *and* Ex. 22 at 2 *with* Ex. 23 at 2-3.)

**G.    Lacking any evidence of a uniformly applied policy or practice, Plaintiffs reuse their approach from last time: citing unpersuasive expert opinion to imply widespread failure.**

To suggest a widespread "practice" of failing to provide needed services, Plaintiffs rely on a pair of opinions held by Dr. Sara Boyd.  (ECF No. 222-5.)  Dr. Boyd opines that (1) KCS is failing to provide G.T. with appropriate therapies to build social and self-regulation skills based on his experience in the 2024-2025 school year, and (2) G.T.'s circumstances resemble the trends observed by Dr. Elliott in her 2021 report.  (*Id.*)

Dr. Boyd's opinions about G.T. have limited foundation and carry no indicia of systemic problems.  Dr. Boyd does not contest the quality of services G.T. received and the progress he made during the 2021-2022, 2022-2023, and 2023-2024 school years, but she perceives a decline in 2024-2025.  (Ex. 14 at 26:24-28:17, 29:23-36:11.)  G.T.'s behavior is developing even in the pendency of discovery and briefing in this case.  (*Supra* at 9-10.)  For the most recent school year, Dr. Boyd approves G.T.'s services in concept but criticizes how they are documented and implemented.  (*Id.* at 69:5-72:15.)  Dr. Boyd has not observed G.T. in the classroom since 2021,[8] (*id.* at 20:22-21:7); did not review any information from KCS staff (like G.T.'s behavior specialist or teachers),[9] (*id.* at 14:22-15:16); and based her opinions on a cold review of his file and interviews with his family.

---

[8]    On May 23, 2025—with only days left in the 2024-2025 school year and under threat of motions practice— Plaintiffs demanded an opportunity for a remote observation of G.T.  After KCS staff adjusted their schedules to accommodate the request, G.T. had an unexcused absence from school on the agreed-upon day.  (Ex. 16 at ¶ 12.)

[9]    After her deposition. Dr Boyd reviewed the depositions of two members of G.T.'s IEP team (Holly Samples and Vicky Brown); but Plaintiffs' attorneys did not ask any questions about G.T. in those depositions.  (Ex. 6; Ex. 7.)

Dr. Boyd's attempt to link G.T. to the patterns observed by Dr. Elliott in 2021 is even less credible. (ECF No. 222-5.) When confronted with specifics, Dr. Boyd admits that G.T.'s current situation is not consistent with Dr. Elliott's past critiques. For example, in 2025, G.T. was not subject to an expedited FBA, (Ex. 14 at 127:23-128:7); received an FBA before the 10-day MDR threshold, (*id.* at 127:5-22); has documented behavior related goals in his IEP, (*id.* at 128:8-14); and received social skills instruction, (Ex. 18 at 13)—all despite Dr. Elliott's 2021 opinion that KCS was systemically doing the opposite. (*Compare with* ECF No. 222-15 at 33-35 (expedited FBAs); *id.* at 32 (waiting for MDR to conduct FBA); *id.* at 37 (lack of behavior goals in IEPs); *id.* at 40-41 (lack of social skills services in IEPs).)

Dr. Boyd admits she is not qualified (or attempting) to opine about district-level opinions advanced by Dr. Elliott in 2021, like the quality of training, (Ex. 14 at 132:16-21); implementation of a multi-tiered system of support, (*id.* at 133:11-22); district-wide approaches to developing IEPs, BIPs, or monitoring those services (*id.* at 129:2-130:18); or aggregate disciplinary statistics, (*id.* at 12:2-8; 131:21-132:8.) Dr. Boyd opines that KCS should improve its processes to provide better services but disclaims having an opinion about what KCS should do differently at a systems level. (*Id.* at 134:2-135:6.)

## ARGUMENT

### A. Plaintiffs fail to adhere to the law-of-the-case on the requisite commonality showing.

Plaintiffs fail to "identify a uniformly applied, official policy of the school district, or an unofficial yet well-defined practice, that drives the alleged violation" advanced by the putative class. *G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 205 (4th Cir. 2024). They claim that KCS has a well-defined practice of "failing to provide class members with therapies needed to make educational and behavioral progress in school." (ECF No. 224 at 7.) This is the same

argument as last time: i.e., that class treatment is warranted because an expert witness opines that KCS is failing to provide adequate services to many students.

The Fourth Circuit foreclosed this argument: "there is no such thing as a systemic failure to provide adequate behavioral supports" in the absence of a uniformly applied well-defined practice driving the alleged failure. *G.T.*, 117 F.4th at 207 (internal citations omitted). Plaintiffs' renewed certification argument uses different vocabulary but is based on the same flawed model as their previously proposed class.[10] Allegedly failing to provide allegedly needed services is not a uniformly applied and well-defined practice: it is a subjectively defined outcome that presupposes some students are not receiving adequate services to meet their individual needs. If the Fourth Circuit's mandate means anything, it holds that an alleged pattern of outcomes (like "failing to provide needed therapies") is not a class-wide policy or practice that can satisfy commonality. *Id.* at 207-208.

Providing (or failing to provide) needed services to build social skills and self-regulation is not "uniformly applied" across the putative class. Social skills instruction or self-regulation services that are needed for one student are not needed for others. Some services encompassed by the class definition (like social skill instruction) are "direct services" under Policy 2419 that are provided in curriculum-based instructional settings. (*Supra* at 8-9.) Others (like self-regulation) are related or supplemental services provided in a range of other contexts (like an IEP, BSP, and/or BIP) but typically not curriculum-based instruction. *Id.*

---

[10]    "It is circular logic for plaintiffs to create a laundry list of factually diverse claims and then assert that these claims, in turn, prove the existence of a uniform . . . policy." *Stafford v. Bojangles' Restaurants, Inc.*, 123 F.4th 671, 680 (4th Cir. 2024). Putative class plaintiffs often rely on "overly general policies" when they are "'at a loss for a more specific thread to tie claims together.'" *Id.* (quoting *In re White*, 64 F.4th 302, 314 (D.C. Cir. 2023)). As such, "[a]llegations of generalized policies are not usually sufficient for purposes of class certification." *Id.*

Not providing a particular service which students may need to make behavioral or educational progress might stem from any number of fact patterns and/or reasons, conceivably. Maybe a student needs self-regulation interventions and social skills instruction but is not receiving one, the other, or either. Maybe a student is receiving social skills instruction but not enough of it, or not in the right setting. Maybe the teacher is not collecting sufficient data to help the IEP team analyze the root cause of behavior. Maybe the data is good, but the analysis or conclusions are not. Maybe a student is not responding well to a curriculum that is not tailored to his or her interests. Maybe a student is receiving self-regulation interventions but only (unhelpfully) when disruptive behavior is taking place. Maybe there is a breakdown in communication in the IEP team. Maybe the parents are insisting on interventions that reinforce the student's behavior over the objections of school personnel. Plaintiffs dismiss these as surface-level differences amongst putative class members, but they miss the point. What uniformly applied practice is causing an alleged failure to provide needed therapies such that an injunction could provide final relief to the class as a whole? There is none.

Lacking evidence of a policy or practice that complies with the law-of-the-case, Plaintiffs try the same maneuver as last time: they rely on expert opinion criticizing the quality of services among a sampling of students and use that to infer a class-wide practice. (ECF No. 224 at 18-20.) Unapologetically, they even use the same evidence: Dr. Elliott's 2021 review of a sampling of student files. But the Fourth Circuit rejected Dr. Elliott's report as proof of commonality:

> [T]he district court abused its discretion [by] rely[ing] on a 'pattern' of problems that [Dr. Elliott] identified in her review of a sample of student records . . . . Our sister courts have consistently rejected similar reliance on an asserted pattern of individualized deficiencies to prove the existence of a common question for class certification. As in those cases, none of the shortcomings or patterns identified by [Dr. Elliott] demonstrate the existence of a common contention whose truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

13

*G.T*, 117 F.4th at 207.

Moreover, Dr. Elliott's 2021 report is stale. Her review of student files pre-dates KCS's improvement plan and is irrelevant to evaluating KCS's current practices. Plaintiffs try to dismiss the improvement plan and revive Dr. Elliott's 2021 report by leaning too much on out-of-context deposition testimony (*supra* at 7-8) and Dr. Boyd's opinions about G.T (*supra* at 10-11). But they fall woefully short of their burden of persuasion given the ample and objective evidence of the improvement plan's efficacy. (*Supra* at 3-7.) Plaintiffs' continued reliance on Dr. Elliott's 2021 report is an affront to both the law-of-the-case and undisputed intervening factual developments. This Court should give no evidentiary weight to Dr. Elliott's 2021 report.

Plaintiffs' list of putative "common questions" also betrays them. (ECF No. 224 at 17-18.) Four of the six proposed questions (1, 4, 5, 6) are foreclosed by the law-of-the-case because they question whether KCS is systemically failing to provide appropriate services (but, "there is no such thing"). *G.T.*, 117 F.4th at 207. The others (2, 3) are inherently individual because they ask whether appropriate therapies are required under the IDEA (but, what services are needed depends on the student). *Id.*; *Endrew F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386, 404 (2017). None of these questions can be answered across a putative class. That is precisely because Plaintiffs have failed to identify any uniformly applied policy or well-defined practice driving their putative class allegations. The Renewed Motion should be denied for failure to establish commonality.

**B.    The renewed class definition suffers a series of related Rule 23 failures that expose the judicial inefficiencies in certifying this class.**

The membership of a class of students who are not receiving "appropriate therapies" is not ascertainable. *See EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (quoting *Marcus v. BMW of N.A., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)). Whether a student receives "appropriate therapies" hinges on a host of individual factors that defy ready or objective determination. KCS

disputes that even G.T. is a member of this putative class: G.T. receives ample social skills instruction and self-regulation interventions (updated as recently as 3 days before the filing of the Renewed Motion). (*Supra* at 9-10.) Dr. Boyd's opinion that these services are not adequate for G.T.'s needs is lacking in foundation and not enough to conclude that G.T. typifies, is a member of, or is representative of a class of students who are not receiving needed therapies. (*Supra* at 10-11.) Determining whether there is *even one* member of this putative class warps certification into a minitrial on the merits of G.T.'s individual contentions.

Setting aside G.T., there is no evidence this putative class is sufficiently numerous. *See* Fed. R. Civ. P. 23(a)(1). The class could theoretically consist of many students, some students, or no students at all—but Plaintiffs have come forward with no evidence of anyone other than G.T. To drum up others, Plaintiffs rely on a spreadsheet that identifies 324 KCS students with disabilities receiving BIPs and BSPs. (ECF No. 222-8 (under seal).) But the spreadsheet does not evidence what therapies or services these students are receiving, let alone whether those services are appropriate for their needs.[11] Plaintiffs speculate that "some" of the students on the spreadsheet are not receiving appropriate social skills and self-regulation services. (ECF No. 224 at 15.) That guess is entitled no evidentiary weight and amounts to no more than an allegation that the district is harming many students. Plaintiffs' inability to establish even *one* other class member exposes the judicial inefficiencies in certifying the putative class: why certify a class with, at best, contested evidence of only one class member?

Defining class membership in liability-assuming terms—like "not being provided with appropriate therapies"—renders the class invincible from a defense verdict. Imagine KCS proves that G.T. is provided appropriate services to build social skills and self-regulation. G.T. is no

---

[11]    Remarkably, Plaintiffs did not even ask KCS to identify the number of students who are receiving social skills or self-regulation services in written discovery until May 20, after they filed the Renewed Motion.

longer a member of the class he purports to represent, but the class (albeit, now seemingly memberless) escapes judgment. Rule 23 is invoked here not to promote judicial efficiency but to impede it by aggregating and defining away inconvenient defenses like whether KCS is providing services sufficiently tailored to an individual student's needs. The law-of-the-case forecloses that, and the history of this case proves that judicial efficiency does not favor class treatment.

**C.    Plaintiffs fail to establish final and class-wide injunctive relief under Rule 23(b)(2).**

Federal Rule of Civil Procedure 23(b)(2) permits the certification of a class where "final injunctive relief . . . is appropriate respecting the class as a whole." To satisfy the Rule, a putative class must "describe[]" the relief requested in "reasonably particular detail" to allow the court to evaluate its compliance with Rule 23(b)(2). *Shook v. Bd. of Cnty. Comm. of El Paso*, 543 F.3d 597, 605 (10th Cir. 2008). This should not be difficult for a class complying with the law-of-the-case: i.e., one that seeks to enjoin an official policy or well-defined practice of a school district.

But here, Plaintiffs offer no evidence or description of the injunction they seek. The only evidence on this record about Plaintiffs' relief requested is Dr. Elliott's report and testimony in 2021. (*Compare* ECF No. 121 at 40 *with* ECF No. 222-15.) Dr. Elliott conceded that the systemic reforms that she envisioned are not "final": she sought an "ongoing" and "continual improvement process" in collaboration with KCS's leadership. (Ex. 24, 2021/04/28 Dep. Tr. of Judy Elliott at 86:5-91:16.) Ongoing continual improvement is not "final" relief to putative class members. "Ongoing" and "final" are mutually exclusive terms. *See Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 499 (7th Cir. 2012) (concluding that relief that "merely initiate[s] a process" for individualized remedies is "class-wide in name only," and "certainly . . . not final").

If an ongoing process is "final" relief to the putative class, Plaintiffs still fail to describe it with particularity. In 2021, Dr. Elliott was "uncomfortable naming" the change she sought, (Ex. 24 at 91:9-92:15), but hoped for "a collaborative process" in which she and KCS would jointly

16

"identify areas of high priority," (*id.* at 91:6-8). Since then, KCS developed its own improvement plan and Plaintiffs have failed to develop evidence regarding the plan's quality or what other reforms they request. Vague content aside, Dr. Elliott's testimony about the "process" of continual improvement is indistinguishable from what KCS has done in the interim. Dr. Elliott testified that school districts that are "most successful in achieving continuous improvement engage in regular problem-solving process wherein they look at indices, indicators, data to see whether [the plan] is actually happening." (Ex. 24 at 86:14-87:8.) On that, the parties agree. That is exactly what is happening at KCS under WVDE monitoring, as Policy 2419 contemplates. (*Supra* at 2-5.)

Providing quality services to students with disabilities is indeed an ongoing and continual improvement process—one that Congress entrusts to State education agencies, not yet-to-be-explained injunctions in federal court. *See* 20 U.S.C. § 1416(a)(3) (requiring "each State to monitor the [LEAs] located in the State . . . using quantifiable indicators"); *Bd. of Educ. of the Cnty. of Hedrick Hudson v. Rowley*, 458 U.S. 176, 206-07 (1982) (IDEA litigation is "by no means an invitation to the courts to substitute their notions of sound education policy for those of the school authorities which they review"). This Court should deny the Renewed Motion for failure to satisfy Rule 23(b)(2).

**D.    The Renewed Motion should be denied for failure to exhaust.**

The IDEA affords a student or parent an opportunity "to bring a civil action with respect to the complaint presented" at an administrative hearing. 20 U.S.C. § 1415(i)(2)(A). Due process hearings are the "primary forum" to resolve disputes regarding the provision of appropriate therapies to students with disabilities. *Schaffer ex rel. Schaffer v. Weast*, 554 F.3d 470, 476 (4th Cir. 2009). The IDEA's administrative hearing provisions "contemplate that a state educational agency [will] conduct [an] administrative review [before] any civil action." *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 515 (4th Cir. 2014). That serves "the

17

important purpose of allowing states to use their special expertise to resolve educational disputes." *Id.* at 514-515. An IDEA civil action is properly understood as "an external check on the state administrative action." *Kirkpatrick v. Lenoir Cnty. Bd. of Educ.*, 216 F.3d 380, 387 (4th Cir. 2000).

Due process hearings are not a check-the-box exercise. Litigants may not treat the administrative forum as a springboard "to an unrestricted trial *de novo*" in federal court, thereby reducing administrative hearings "to a mere dress rehearsal." *Springer v. Fairfax Cnty Sch. Bd.*, 134 F.3d 659, 667 (4th Cir. 1998) (quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 997 (1st Cir. 1990)). For example, the Fourth Circuit has held that students or parents may not litigate IEPs from school years that were not at-issue at the underlying due process hearing. *See M.M. ex rel. D.M. v. School Dist. of Greenville Cnty.*, 303 F.3d 523 (4th Cir. 2002); *M.E. es rel. C.E. Buncombe Cnty Bd. of Educ.*, 72 F. App'x 940, 942 (4th Cir. Aug. 18, 2003) (unpublished).

Were litigants freely permitted to raise issues that were not raised (or did not exist) at the time of the hearing, the IDEA "would become fodder for endless litigation," "disservic[ing] the IDEA's purpose[s]" and "forc[ing] school districts to divert scarce resources to the already substantial costs of IDEA litigation." *Schaffer*, 554 F.3d at 476. For that reason, the record in a civil action is "generally cabined by the record of the administrative proceedings." *E.L.*, 773 F.3d at 517. The bottom line rule here is clear: to raise it in court, it must be first raised at an administrative hearing.[12]

This Court previously denied KCS's motion to dismiss on the grounds that G.T. and K.M. vicariously exhausted their allegations of inadequate behavior supports and unjust disciplinary removals on behalf of a putative class of similarly situated students. (ECF No. 46 at 12-13.) This

---

[12]     Putative IDEA class plaintiffs often attempt to evade exhaustion by advocating for a "systemic" exception to the rule, an exception that is extremely limited and not applicable here *See, e.g., T.R. v. Sch. Dist. of Phila.*, 4 F.4th 179 (3d Cir. 2021); *Student A by and through Parent A v. San Fran. Unified Sch. Dist.*, 9 F.4th 1079 (9th Cir. 2021).

dismissal reasoning does not warrant continuing to excuse Plaintiffs' failure to exhaust at the present posture. *See T.R. v. Sch. Dist. of Philadelphia*, 458 F. Supp. 3d 274, 291-292 (E.D. Pa. 2020) (in a failed putative IDEA class action, granting summary judgment to school district on exhaustion grounds after previously denying its motion to dismiss for failure to exhaust).

First, the Fourth Circuit's mandate erodes the reasoning. The law-of-the-case holds that G.T. and K.M. *cannot* litigate their allegations of inadequate services on behalf of a putative class of other students under Rule 23—rather, putative class must be glued together by a uniformly applied policy or well-defined practice. G.T. and K.M. did not identify or challenge uniformly applied policies or well-defined practices in their underlying administrative hearings. Instead, they challenged the quality of services they received in the 2017-2018 and 2018-2019 school years. (*See* ECF Nos. 128-10 to 128-12.) These administrative records are not helpful in assessing whether any uniformly applied policy or well defined practice at KCS violates Policy 2419.

Second, even if G.T.'s and K.M.'s due process hearings are generously construed to encompass a challenge to behavior-related policies and procedures, KCS's practices have changed significantly in the intervening school years. (*Supra* at 3-7.) While Dr. Boyd (dubiously) claims to see similar outcomes before and after the improvement plan, (*see supra* at 10-11), those are "not policies or practices that a court could grasp, much less change, without the benefit of any factually developed administrative record." *Student A*, 9 F.4th at 1085. As the Ninth Circuit explained:

> [Plaintiffs'] complaint neither identifies the policies or practices that need addressed nor explains why the pursuit of administrative remedies could not correct their deficiencies . . . . [M]erely characterizing a school district's problems as 'systemic' and the relief sought as 'structural' does not provide the facts necessary to show that the allegedly needed reform is . . . anything other than increased funding and greater adherence to existing policies. An administrative record could shed needed light on what is going right, what is going wrong, and remedies for the latter . . . .

*Id.* There is nothing futile about requiring a student to challenge a policy or practice in an administrative hearing before seeking to enjoin it in federal court. Nothing is stopping that student from seeking injunctive relief compelling the district to start a helpful practice (or stop a harmful one) with spillover benefits to other students. That administrative hearing is not futile, and in fact, serves all the purposes of the IDEA's exhaustion rules by affording (i) the state an opportunity to consider corrective action and (ii) the court a helpful record about the policy or practice's legality or quality. Here, G.T.'s and K.M.'s administrative records are totally irrelevant to KCS's current behavior-related practices. Proceeding to a trial questioning KCS's current practices on the back of these old, unhelpful hearings would be an affront to the primacy of the administrative forum.

## CONCLUSION

For the reasons stated above, KCS requests that the Renewed Motion (ECF No. 222) be denied.

BOARD OF EDUCATION OF THE COUNTY OF KANAWHA,

By Counsel,

*/s/ William M. Lorensen*
J. Mark Adkins (WVSB #7414)
Richard S. Boothby (WVSB #9572)
Gabriele Wohl (WVSB #11132)
William M. Lorensen (WVSB #13223)
BOWLES RICE LLP
600 Quarrier Street
Post Office Box 1386
Charleston, West Virginia 25325-1386
(304) 347-1100
Fax: (304) 347-1756
madkins@bowlesrice.com
rboothby@bowlesrice.com
gwohl@bowlesrice.com
wlorensen@bowlesrice.com

20

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

G.T., *by his parents Michelle and Jamie T.*
*on behalf of themselves and all similarly situated*
*individuals*, et al.,

      Plaintiffs,

v.

                                   CIV. ACT. NO. 2:20-CV-00057
                                   JUDGE BERGER

THE BOARD OF EDUCATION OF
THE COUNTY OF KANAWHA,

      Defendant.

I, William M. Lorensen, hereby certify that on June 13, 2025, the foregoing ***Defendant's Response in Opposition to Plaintiffs' Motion for Class Certification*** was filed via this Court's CM/ECF system, providing electronic notification to the following counsel of record.

Lydia C. Milnes, Esq
Blaire L. Malkin, Esq
Mountain State Justice, Inc.
lydia@msjlaw.org
blaire@msjlaw.org

Robin Hulshizer, Esq.
Kirstin Scheffler Do, Esq.
Karen Frankenthal, Esq.
Jaime Zucker, Esq
Latham & Watkins LLP
robin.hulshizer@lw.com
kirstin.shchefflerdo@lw.com
karen.frankenthal@lw.com
jaime.zucker@lw.com

Megan E. Schuller, Esq.
Ira A. Burnim, Esq
Rebecca Raftery, Esq.
Judge David L. Bazelon Center for Mental Health Law
megans@bazelon.com
irab@bazelon.com

rebeccar@bazelon.com

Shira Wakschlag, Esq
Evan Monod, Esq
The Arc of the United States
shira@thearc.org
monod@thearc.org

Nicholas Ward, Esq.
Disability Rights of West Virginia
nward@drofwv.org
*Attorneys for Plaintiffs*

*/s/ William M. Lorensen*
William M. Lorensen (WVSB #13223)